DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice application pending)
ALEXANDRA J. MONSON
(Cal. Bar No. 324794, pro hac vice application pending)
GREENFIRE LAW, PC
P.O. Box 8055
Berkeley, CA 94707
(510) 900-9502
jblome@greenfirelaw.com
amonson@greenfirelaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>        Defendants. | CASE NO.<br><br>**PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

2022-01-21 Complaint Pancake Gather FINAL

1.    This case challenges the decision by the United States Department of Interior, Bureau of Land Management (BLM) to gather wild, free-roaming horses in Nevada that are required to be protected by the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331, et seq. (hereinafter "Wild Horse Act"). The BLM began rounding up thousands of horses in the Pancake Complex of Herd Managements Area, located in Eastern Central Nevada, by helicopter on January 10, with the stated goals of permanently removing 85% of existing "excess horses," or 2,342 animals, from the land, sterilizing stallions before releasing them back into the wild, and forcibly implanting or injecting mares with various forms of birth control. At the time of the filing of this lawsuit, removed horses are being transported to BLM off-range corrals where they are being prepared for adoption or sale or for off-range pastures. The BLM developed its gather plan in violation of the Wild Horse Act, which requires that such plans be carried out pursuant to a Herd Management Area Plan that simply does not exist for the Pancake Complex. Because the BLM has failed to follow proper procedure in developing the gather plan, it is conducting its roundup in violent and inhumane ways.

2.    The roundup of these horses began on January 10, 2022 and continues today. Accordingly, Plaintiffs are filing a Verified Complaint and request for temporary restraining order pursuant to Fed. R. Civ. P. 65(b) to end the Pancake Complex gather before the BLM completes its goal of removing more than 2,300 wild, free-roaming horses from their homeland in violation of the Wild Horse Act, NEPA, and APA.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action pursuant to 5. U.S.C. § 706(2) and 28 U.S.C § 1331.

4.    Venue is proper in this district court pursuant to 28. U.S.C. § 1391. The BLM has sufficient contacts to subject it to personal jurisdiction in this district.

## THE PARTIES

5.    Plaintiff ANIMAL WELLNESS ACTION is a national non-profit corporation that works to promote animal welfare by advocating for the passage and enforcement of laws that shield animals from various forms of intentional and institutional cruelty. Animal Wellness

Action's principal place of business is at 611 Pennsylvania Avenue, SE, #136, Washington D.C., 20003. It maintains 135,000 supporters nationwide, with several thousand in Nevada. The further gathering and removal of wild horses in the Pancake Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of Animal Wellness Action and its staff, volunteers, members, and supporters.

6.    Plaintiff CANA FOUNDATION is a non-profit corporation that works with science-backed information to create rewilding initiatives for wild horses and environments. CANA Foundation's principal place of business is at 6150 Northern Boulevard, East Norwich, NY 11732. CANA Foundation's re-wilding initiatives foster community empowerment, land conservation, and the sustainable management and preservation of America's wild horse populations. CANA Foundation rescues, re-wilds, and re-homes wild horses in order to improve their quality of life and ensure that they can live with dignity in a protected habitat. CANA Foundation actively monitors for any Herd Management Area Plans that are available for public comment in the United States and routinely submits comments throughout the public commenting process. The Pancake Herd Management Area is one of the wild horse herds that CANA Foundation monitors and advocates for. The further gathering and removal of wild horses in the Pancake Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of CANA Foundation and its staff, volunteers, members, and supporters.

7.    Plaintiff WILD HORSE EDUCATION is a national non-profit corporation dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free roaming horse and wild burro populations. Wild Horse Education Wild Horse Education's principal place of business is 216 Lemmon Drive, # 316, Reno, NV 89506. Wild Horse Education has more than 150,000 members and educates and informs the public about wild horses and burros through articles, photographs, videos, and sharing data and other information. Wild Horse Education also frequently submits comments on Herd Management Area Plans, Environmental Assessments, and other wild horse management documents and hearings made available for public comment. Wild Horse Education has

Page 3 of 15

previously held Board meetings and outreach sessions in the Pancake Complex and advocating for the wild horses in the Pancake Complex is a past, present, and future important issue for Wild Horse Education. Wild Horse Education actively participated in the public commenting process of the Environmental Assessment for the Pancake Complex Gather Plan, which was finalized on May 4, 2021. Wild Horse Education has actively participated in the review of wild horse and burro management and gather plans, and their members and supporters regularly attend and observe wild horse and burro roundups, removals, and holding pens. The further gathering and removal of wild horses in the Pancake Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of Wild Horse Education and its staff, volunteers, members, and supporters.

8.      Plaintiff LAURA LEIGH is the founder and President of Plaintiff WILD HORSE EDUCATION. In addition, Plaintiff works with multiple non-profit organizations engaged in public land issues and provides in-field documentation and commentary on public land issues such as wild horse gathers and removals. Ms. Leigh is also a free-lance and photojournalist, whose work has appeared internationally in media broadcast outlets, such as CNN, BBC/ITV, ABC, Common Dreams, and CounterPunch. Ms. Leigh has visited, observed, and photographed the wild horses at the Pancake Complex so many times, that she has formed unique and special relationships with individual horses that she has named and monitored throughout the years. Ms. Leigh experiences great enjoyment from watching young foals born in the Pancake Complex become curious and strong adult horses who then create their own families. Ms. Leigh has also attended several wild horse roundups throughout the United States, and frequently reviews photographs and videos from any roundups she is not able to attend in person. When Ms. Leigh recognizes individual horses that she has previously observed as wild, free-roaming horses, she experiences great sadness, but feels it is her responsibility to the horses to observe their treatment and capture and share it with others to educate them on the plight of wild horses.

9.      Animal Wellness Action, CANA Foundation, and Wild Horse Education (collectively, the Nonprofit Plaintiffs) and their members, supporters, and staff have a long-standing interest in wild, free-roaming horses and routinely advocate for wild horses in Nevada.

1   If they had been given the opportunity, Nonprofit Plaintiffs would have submitted comments to

2   the Bureau of Land Management regarding a Herd Management Area Plan for the Pancake

3   Complex.

4       10.     Wild Horse Education's members, supporters, and staff visit the Pancake

5   Complex Herd Management Area for photography, observing wildlife, and other recreational

6   and professional pursuits. Plaintiffs' members, supporters, and staff gain aesthetic enjoyment

7   from observing, attempting to observe, hearing, seeing evidence of, and studying wild horses.

8   The opportunity to possibly view wild horses, or signs of horses, in these areas is of significant

9   interest and value to Nonprofit Plaintiffs' members, supporters, and staff, and increases their use

10  and enjoyment of Nevada's public lands. Nonprofit Plaintiffs' members, supporters, and staff

11  have engaged in these activities in the past and have specific plans to continue to do so in the

12  future.

13      11.     Nonprofit Plaintiffs' members and supporters are adversely impacted by the

14  gathering and removal of wild horses from the Pancake Complex Herd Management Area.

15  Nonprofit Plaintiffs' members also have an interest in the health and humane treatment of

16  animals, and work to rehabilitate sick and injured wildlife, including horses. Nonprofit Plaintiffs'

17  members, staff, volunteers, and supporters have engaged in these activities in the past and intend

18  to do so again soon.

19      12.     Nonprofit Plaintiffs, as well as their members, supporters, and staff, are dedicated

20  to ensuring the long-term survival of the wild, free-roaming horses throughout the contiguous

21  United States, and specifically in Nevada, and to ensuring that Defendants comply with all

22  applicable state and federal laws related to the survival and humane treatment of wild horses in

23  Nevada. In furtherance of these interests, Nonprofit Plaintiffs' members, supporters, and staff

24  have worked, and continue to work, to protect and advocate for wild horses in Nevada and

25  throughout the contiguous United States.

26      13.     The interests of Nonprofit Plaintiffs' members, supporters, and staff have been,

27  and will continue to be, injured by Defendants' improper and inhumane gather and removal of

28  wild horses in the Pancake Complex. The interests of Nonprofit Plaintiffs' members, supporters,

and staff have been, and will continue to be, injured by Defendants' failure to comply with their

obligations under the Administrative Procedures Act ("APA"), the First Amendment, and the

Wild Horse Act in rounding up and removing wild, free-roaming horses in gruesome and

inhumane ways in the Pancake Complex without a Herd Management Area Plan.

14.    Injunctive Relief alone will redress the injuries of Nonprofit Plaintiffs' members,

supporters, volunteers, and staff. The relief requested by Plaintiffs, if granted, would require

Defendants to comply with the requirements of the APA, the First Amendment, and the Wild

Horse Act before further gathering and removing over 2,000 wild, free-roaming horses from the

Pancake Complex. The relief requested by Plaintiffs, if granted, would reduce the number of

wild, free-roaming horses needlessly injured, killed, or removed by Defendants.

15.    Defendant JON RABY is Nevada State Director of the BLM, and is charged by

Federal statute with managing, administering, and protecting the wild horses and burros in the

State of Nevada, including the Pancake Complex of Herd Management Areas, pursuant to the

Wild Horse Act.

16.    Defendant DEPARTMENT OF INTERIOR, BUREAU OF LAND

MANAGEMENT is charged by federal statute to manage administer and protect the wild horses

and burros in the State of Nevada, including the Pancake Complex of Herd Management Areas,

pursuant to the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340.

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

**Statutory and Regulatory Framework**

17.    Finding that "wild free-roaming horses and burros are living symbols of the

historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms

within the Nation and enrich the lives of the American people," Congress enacted the Wild

Horse Act to ensure that "wild-free roaming horses and burros shall be protected from capture,

branding, harassment, [and] death," and will "be considered in the area where presently found, as

an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

18.    "Wild free-roaming horses" are defined under the Act as "all unbranded and

unclaimed horses ... on public lands of the United States," which include lands "administered by

1    the Secretary of the Interior through the Bureau of Land Management or by the Secretary of

2    Agriculture through the Forest Service." *Id*. §§ 1332(b), (d); *see also* 36 C.F.R. § 222.60(b)(13).

3        19.    The Wild Horse Act provides the statutory authority for the removal of "excess"

4    wild free-roaming horses and burros from the public range. "[E]xcess animals" are defined in the

5    statute as wild free-roaming horses and burros "which must be removed from an area in order to

6    preserve and maintain *a thriving natural ecological balance* and multiple-use relationship in that

7    area."  16 U.S.C. § 1332(f) (1982) (emphasis added).

8        20.    The Wild Horse Act provides that the Secretary of the Interior "shall manage wild

9    free-roaming horses and burros as components of the public lands ... in a manner that is designed

10   to achieve and maintain a thriving natural ecological balance on the public lands." § 1331. To

11   further ensure this objective, the statute provides that "[a]ll management activities shall be at the

12   minimal feasible level." *Id*. § 1333(a). The Secretary's duties have been delegated to the BLM

13   with respect to horses on BLM lands. 43 C.F.R. § 4700.0-3.

14       21.    The BLM's regulations require that the Secretary establish Herd Management

15   Areas for the maintenance of wild horse and burro herds. *See* 40 CFR § 4710.3-1. In delineating

16   each herd management area, the BLM must consider the appropriate management level for the

17   herd, the habitat requirements of the animals, the relationships with other uses of the public and

18   adjacent private lands, and the constraints contained in § 4710.4, which limits management of

19   wild horses and burro "the minimum level necessary to attain the objective identified in

20   approved land use plans and herd management area plans." 40 CFR § 4710.4.

21       22.    Consistently, the BLM's regulations state that the BLM "**shall** prepare a herd

22   management area plan, which may cover one or more herd management areas." 40 CFR § 4710.4

23   (emphasis added).

24       23.    The BLM implements its regulations through a policy document referred to as the

25   Wild Horses and Burros Management Handbook, or the ("BLM Handbook"). According to

26   Chapter 6 of the Handbook, "Herd Management Area Plans (HMAPs) identify and set objectives

27   for [wild horse and burro] herds and their habitat. BLM Handbook, Chap. 6, p. 36. HMAPs are

28   prepared with public involvement through a site-specific environmental analysis and decision

process [as required by the National Environmental Policy Act, or NEPA]. During the NEPA process, the environmental impacts associated with a range of alternative management strategies for the herd and its habitat are analyzed.

24.     Also, according to the BLM Handbook, the approved HMAP outlines the selected management actions, together with the management and monitoring objectives which, when implemented, would make progress toward achieving land health standards, including Land Use Plan goals/objectives, and other relevant objectives. *Id.* at p. 37.

25.     "Activities are carried out with the objective of maintaining free-roaming behavior and at the minimum feasible level of management necessary" to attain the objectives identified in approved land use plans and HMAPs. BLM Handbook, Chap. 1, p. 6. To achieve these goals, HMAPs include a plan for monitoring and evaluating management actions and decisions and require the collection of data/information necessary to evaluate the effectiveness of those decisions. *Id.* at § 6.2, p. 43.

26.     The HMAP affirms that the BLM uses the HMAP to attain the mandate in the Wild Horse & Burros Act to establish a "thriving ecological balance" between and among wild horses, burros, and their habitat. The BLM has identified no other mechanism to attain this goal, so it cannot remove excess horses from rangelands unless the HMAP is in place.

27.     The HMAP is also meant to ensure that the Wild Horse Act's mandates regarding humane handling are followed. The Wild Horse Act instructs that excess horses must be "humanely captured and removed." 16 U.S.C § 1333(b)(2)(B). "[H]umane treatment" is defined as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). Inhumane treatment is defined as "any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community." *Id.* § 4700.0-5(f).

28.     According to the Pancake Complex Gather Plan Environmental Assessment, the Comprehensive Animal Welfare Policy (CAWP) developed by BLM would be implemented to "ensure a safe and humane gather occurs" and to "minimize potential stress and injury to wild

horses." Pancake Complex Gather Plan Environmental Assessment (DOI-BLM-NV-L060-2021-0005-EA), May 4, 2021, at p. 33.

29.    The CAWP provides standards for facility design, capture technique, wild horse and burro care, handling, transportation, and euthanasia or death. Bureau of Land Management (BLM), 2015, Instruction Memorandum 2015-151.

30.    The CAWP Gather Standards state that "[t]he rate of movement and distance the animals travel must not exceed limitations set by the Lead COR/COR/PI who will consider terrain, physical barriers, access limitations, weather, condition of the animals, urgency of the operation (animals facing drought, starvation, fire, etc.) and other factors." *Id.* at p. 1-7.

**The Pancake Complex Gather**

31.    The Pancake Complex consists of 1,228,739 acres of land, 849,613 acres of which is public land managed by the BLM. The Pancake Complex is located approximately 30 miles west of Ely, Nevada. Within the Pancake Complex, there is the Sandy Springs West and Pancake Herd Management Areas, the Jakes Wash Herd Area, and the Monte Cristo Wild Horse Territory.

32.    The BLM has not prepared a Herd Management Area Plan for the Pancake Complex, or for any of the Herd Managements Areas, Herd Areas, or Wild Horse Territories within the Complex.

33.    BLM issued a final decision approving the Pancake Complex Gather Plan Environmental Assessment (DOI-BLM-NV-L060-2021-0005-EA) on May 4, 2021. This assessment will be referred to as the EA throughout this Complaint.

34.    According to the EA, the BLM plans to conduct a series of "phased gathers to remove excess animals" over a 10-year period. The BLM will also apply fertility control methods, such as vaccines and/or IUDs to released mares, and attempt to maintain a sex ratio adjustment of 60% male and 40% female among the released animals. In addition, the BLM would release up to 138 geldings, or non-reproducing males.

35.    In total, the EA analyzed the removal of 2,342 excess wild horses within the

Pancake Complex over the ten-year period contemplated by the EA. Accordingly, the EA analyzed the environmental impacts of removing more than 2,000 wild horses and burros from the Pancake Complex over ten years.

36.     On June 2, 2021, Plaintiffs Wild Horse Education and Ms. Leigh timely appealed defendants' May 4, 2021 approval of the EA to the United States Interior Board of Land Appeals and petitioned for an order staying the decision.

37.     On July 7, 2021, the petition for stay was denied by the United States Interior Board of Land Appeals.

38.     On January 6, 2022, Plaintiffs Wild Horse Education and Ms. Leigh filed a Motion to Reconsider the Stay of the EA.

39.     On January 6, 2022, and without any prior notice to Plaintiffs, BLM issued a press release announcing its plan to begin the FY2022 Pancake Complex Wild Horse Gather on or around January 10, 2022. The press release further stated that "BLM plans to gather up 2,060 horses and remove up to 2,030 excess wild horses" and that BLM would be using helicopters during the gather. The press release stated that the gather is being conducted under the DOI-BLM-NV-L060-2021-0005-EA Pancake Complex Wild Horse Gather Plan Environmental Assessment decision signed on May 4, 2021.

40.     Plaintiffs filed an Amended Motion to Reconsider the Stay Due to New Circumstances on January 10, 2022, given the BLM's plan to implement the EA before the IBLA had rendered its decision over Plaintiffs' appeal.

41.     The IBLA denied Plaintiffs' Amended Motion to Reconsider the Stay on January 14, 2022, after the Gather had already begun.

42.     Several of Nonprofit Plaintiffs' members, supporters, and staff made arrangements to attend, observe, photograph, and film the gather that began on January 11, 2022, at the Pancake Complex.

43.     On January 11, 2022, the Pancake Complex Wild Horse Gather began. As of the filing of this complaint, the Gather has taken place on eight consecutive days: January 11-18, 2022.

44.     On January 11, 2022, a group of three young wild horses fell behind a band, or family, of horses that BLM was pursuing by a low-flying helicopter. One of the young horses, a colt, was observed limping and in obvious distress from several hundred feet away.

45.     The helicopter continued to drive the three young horses toward the holding area even though the colt's leg was clearly broken and the colt was struggling to walk and run.

46.     The helicopter pursued the rest of the band toward the holding area, while the colt was left behind.

47.     For 29 minutes, the colt was clearly suffering with a broken leg. The colt would stand without weight on his front left leg, try to take a few steps, and then stand still with the front leg held up and dangling at an unnatural angle. This continued until personnel reached the colt and euthanized him.

48.     On January 17, 2022, a single wild horse was pursued for over an hour. At the time of capture, the BLM Incident Commander did not know why this particular horse was pursued for so long.

49.     During the course of the gather, most days begin at temperatures below freezing, warm up slightly during the afternoon which melts away the ice and snow, and then returns to freezing by the end of the day.

50.     When the temperature rises during the afternoon, the ground that the horses are being pursued on becomes muddy and slick, and the horses struggle to run without slipping and injuring themselves and others when the helicopters are pursuing them.

51.     The gather has not been paused or stopped due to unsafe ground conditions at any time.

52.     According to BLM's website, as of January 18, 2022, 786 wild horses have already been gathered from the Pancake Complex, and 673 of those wild horses have already been "shipped." There have been 10 wild horse deaths, and only four wild mares have been released back onto the Complex.

53.     Once gathered from the land, the wild horses are placed in a temporary holding facility. At the Pancake Complex, the public has been denied access to view the temporary

holding facilities immediately once the horses are gathered. The public is denied any meaningful access to document and observe the conditions and activities taking place in the temporary holding facilities.

## FIRST CAUSE OF ACTION

54.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

55.    The BLM's decision to authorize the gather of horses in the Pancake Complex without first developing a Herd Management Area Plan violated the agency's duties to protect such horses under the Wild Horse Act. 16 U.S.C. §§ 1334, 1338; 36 C.F.R. §§ 222.60, 222.61, 222.65. That decision was therefore, arbitrary and capricious, and not in accordance with law in violation of NEPA, 42 U.S.C. § 4331 et seq. and the APA, 5 U.S.C. § 706(2).

56.    Defendants' failure to adopt a Herd Management Area Plan for the Pancake Complex and the herd management areas that make up the complex has contributed and will continue to cause defendants to inhumanely capture wild horses and burros in violation of the CAWP as they conduct the Gather, in violation of the Wild Horse Act. 16 U.S.C § 1333(b)(2)(B). That decision was therefore, arbitrary and capricious, and not in accordance with law in violation of NEPA, 42 U.S.C. § 4331 et seq. and the APA, 5 U.S.C. § 706(2).

57.    Defendants' actions have injured plaintiffs in the manner described in this Complaint.

## SECOND CAUSE OF ACTION

58.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth hererin.

59.    The BLM failed to analyze the significant environmental impacts of removing all 2,030 allegedly excess animals from the Pancake Complex at once, rather than over the analyzed ten-year, phased period. The BLM's decision to adopt the EA and not follow it was therefore, arbitrary and capricious, and not in accordance with law in violation of NEPA, 42 U.S.C. § 4331 et seq. and the APA, 5 U.S.C. § 706(2).

60.    The BLM's EA does not identify or analyze the significant impacts to the

environment caused by removing nearly 85% of the horses and burros that make up the Pancake

Complex during a three-week period. The BLM's decision to adopt the EA was therefore,

arbitrary and capricious, and not in accordance with law in violation of NEPA, 42 U.S.C. § 4331

et seq. and the APA, 5 U.S.C. § 706(2).

61.    Defendants' actions have injured plaintiffs in the manner described in this

Complaint.

**THIRD CAUSE OF ACTION**

62.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint

as though fully set forth hererin.

63.    Plaintiffs have a right, under the First Amendment to the U.S. Constitution, to

observe and document the BLM's gather of the wild horses and burros at the Pancake Complex.

64.    Defendants have interfered with plaintiffs' protected right under the First

Amendment by refusing them access to certain aspects of the gather and only providing them

access from vantage points with known obstructed views.

65.    This Court is authorized to enjoin defendants from further violations of plaintiffs'

First Amendment rights, including by compelling defendants to provide plaintiffs meaningful

access to the gather in order to accurately and timely document the BLM's activities.

66.    Defendants' actions have injured plaintiffs in the manner described in this

Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.    Issue a temporary restraining order, preliminary, and permanent injunction

compelling defendants to immediately stop implementation of the Pancake

Complex Herd Management Environmental Assessment until defendants have

fully complied with the Wild Horses & Burros Act, National Environmental

Policy Act, and Administrative Procedures Act;

2022-01-21 Complaint Pancake Gather FINAL

B.      Maintain jurisdiction over this action until defendants are in compliance with the

Wild Horses & Burros Act, the Administrative Procedure Act, the National

Environmental Policy Act, and every order of this Court;

C.      Award plaintiffs attorney fees and costs pursuant to and 28 USC § 2412; and

D.      Grant such additional and further relief to which plaintiffs may be entitled.

DATED: January 21, 2022                    Respectfully Submitted,


                                           *s/ Danielle M. Holt*

                                           Danielle M. Holt
                                           (Nevada Bar No. 13152)
                                           DE CASTROVERDE LAW GROUP
                                           1149 S Maryland Pkwy
                                           Las Vegas, NV 89104
                                           Ph (702) 222-9999
                                           Fax (702) 383-8741
                                           danielle@decastroverdelaw.com

                                           Jessica L. Blome
                                           (Cal. Bar No. 314898, pro hac vice pending)
                                           Alexandra Monson
                                           (Cal. Bar No. 324794, pro hac vice pending)
                                           GREENFIRE LAW, PC
                                           P.O. Box 8055
                                           Berkeley, CA 94707
                                           (510) 900-9502
                                           jblome@greenfirelaw.com
                                           amonson@greenfirelaw.com

                                           *Attorneys for Plaintiffs*

2022-01-21 Complaint Pancake Gather FINAL

**VERIFICATION**

I, Laura Leigh, am a plaintiff in this action. I have read the foregoing Plaintiffs' Verified Complaint for Injunctive and Declaratory Relief.  The facts alleged in the above Complaint are within my own knowledge and I know these facts to be true, except as to matters alleged therein on information and belief.

I declare under penalty of perjury under the laws of the State of Nevada that the above is true and correct and that this declaration is executed on January 21, 2022, at Reno, Nevada.

_____
Laura Leigh, Plaintiff