UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

LAURA LEIGH, *et al.*,

                              Plaintiffs,

          v.

JON RABY, *et al.*,

                              Defendants.

Case No. 3:22-cv-00034-MMD-CLB

ORDER

## I.   SUMMARY

This action arises from a U.S. Bureau of Land Management gather of wild horses in eastern Nevada. Plaintiffs Laura Leigh, Wild Horse Education, Animal Wellness Action, and CANA Foundation have filed a motion for temporary restraining order and preliminary injunction to stop the gather (ECF Nos. 4, 6 ("Motion")),[1] arguing that the government's actions violated the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), 16 U.S.C. § 1331, *et seq.*, and the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 432, *et seq.*, and must be enjoined pending compliance. Plaintiffs further argue that the government has infringed their First Amendment right to observe the gather by unlawfully obstructing their access.[2] Because the Court finds Plaintiffs are unlikely to

---

[1]In accordance with the Court's Local Rules requiring requests for separate relief be separately filed, Plaintiffs filed their motion for temporary injunction (ECF No. 4) and motion for preliminary injunction (ECF No. 6) as separate entries on the docket. *See* LR IC 2-2(b) ("For each type of relief requested or purpose of the document, a separate document must be filed and a separate event must be selected for that document."). The documents are identical, and the Court considers Defendants' response brief (ECF No. 18) as applicable to both motions.

[2]Plaintiffs requested emergency *ex parte* relief. The Court found that Plaintiffs had not shown *ex parte* relief was required, but set an expedited briefing schedule and ordered Plaintiffs to serve Defendants, which they did, and set a hearing for two days later. (ECF No. 8.) Defendants filed their response brief (ECF No. 18), and Plaintiffs made their arguments in reply orally.

succeed on the merits of their claims and that the balance of equities and the public interest weigh against enjoining the Gather, the Court will deny the Motion.

**II.      BACKGROUND**

On January 11, 2022, the U.S. Bureau of Land Management initiated a gather of wild horses on the Pancake Complex in eastern Nevada (the "Gather" or "2022 Gather"). (ECF No. 4 at 10.) Plaintiffs are three non-profits and one individual who work to protect wild horses and Defendants are the U.S. Department of Interior, the Bureau of Land Management ("BLM"), and Nevada BLM Director Jon Raby.

**A.      The Pancake Complex Herds**

The Pancake Complex is an area west-southwest of Ely, Nevada. (Exh. B, ECF No. 4-2 at 16.) It consists of two Herd Management Areas ("HMAs"), one Herd Area ("HA"), and one Wild Horse Territory. (ECF No. 18 at 5.) Before the beginning of the 2022 Gather, the population estimate for the entire Pancake Complex was 3,244 wild horses. (ECF No. 18-1 at 3.) This number is far in excess of the established cumulative appropriate management level ("AML") range for the Pancake Complex, which is only 361-638 wild horses. (Exh. B, ECF No. 4-2 at 17; ECF No. 18-1 at 3.) The Pancake Complex AML range was established in 2008 through the decision-making process of the Ely District Resource Management Plan ("RMP"). (Exh. B, ECF No. 4-2 at 17.)

The BLM reports that conditions on the Pancake Complex are dire. The birth rate of foals is substantially down, which the BLM attributes to lack of resources mares need to feed. (ECF No. 18-1 at 3.) Horses observed in the area in the past two weeks have shown extremely low "body condition scores," indicating poor health. (*Id.*) Severe drought from the past two years has deprived the area of needed water and forage, for horses and other animals on the range alike. (*Id.* at 2; Exh. 3, ECF No. 18-2 at 11-12; Exh. 5, ECF No. 18-2 at 2.) As a result of these conditions, the BLM conducted an emergency horse gather in 2020. (ECF No. 18-1 at 2.) The BLM predicts that without another gather, "[w]ild horse populations would remain over appropriate management levels[,] [t]he impacts to vegetation by grazing or trampling would increase more exponentially[,] . . .

2

1    [o]ver time forage resources would become less available, impacting wild horse herd

2    health, and wild horses would be more susceptible to disease and drought." (Exh. B, ECF

3    No. 4-2 at 65.) Due to ongoing drought conditions and animals leaving the Pancake

4    Complex in search of better conditions, a wild horse gather has become "an Ely District

5    priority." (ECF No. 18-1 at 2.)

6        **B.    The Environmental Assessment**

7        The BLM published its final Environmental Assessment ("EA") of the planned

8    Pancake Complex Wild Horse Gather on May 5, 2021. (Exh. B, ECF No. 4-2 at 13-208.)

9    The EA included a description of the BLM's intended action, or "Proposed Action,"

10   justifications for the Proposed Action, and considered alternatives. (*Id.*) Per the EA, the

11   BLM's Proposed Action is:

12       Over a 10 year period, use phased gathers to removed excess animals in
         order to achieve and maintain the population within AML range, apply

13       fertility control methods (vaccines and/or IUDs) to released mares, maintain
         a sex ratio adjustment of 60% male and 40% female, and release a small

14       non-reproducing component of males (up to 138 geldings) that brings the
         population to mid-AML.

15

16   (*Id.* at 22.) The stated purpose of the Proposed Action "is to gather and remove excess

17   wild horses from within and outside the Pancake Complex and reduce the wild horse

18   growth rates to achieve and maintain established AML ranges." (*Id.* at 19.) More

19   specifically, the Proposed Action "would be to gather and remove approximately 2,342

20   excess wild horses within the Complex to achieve and maintain AML and administer or

21   booster population control measures to gathered and released horses over a period of

22   ten years from the initial gather." (*Id.* at 22.) Such action would ostensibly meet the BLM's

23   goal of "attaining a herd size that is at the low range of AML, reducing population growth

24   rates, and achieving a thriving natural ecological balance on the range." (*Id.*) Because "[i]t

25   is expected that gather efficiencies and holding space during the initial gather would not

26   allow for the removal of sufficient excess animals during the initial gather to reach or

27   maintain low AML," the BLM anticipated needing to conduct "follow-up gathers" "on a

28   periodic basis." (*Id.* at 22-23.)

### C.    Plaintiffs' Challenge and Agency Review

Plaintiff Leigh (as an individual and as president of Wild Horse Education) submitted comments on the preliminary EA draft on November 23, 2020. (Exh. A, ECF No. 4-2 at 6-10.) Specifically, Leigh objected to the BLM's combination of proposed gather plans and broader BLM goals of herd population management. (*Id.* at 7.) Leigh argued that if the BLM sought to enact broader goals, they should develop a Herd Management Area Plan ("HMAP"). (*Id.*) Leigh also argued that the preliminary EA relied on data from the 2008 Ely District RMP, which she claimed is now outdated and lacks in-depth area analysis. (*Id.*)

The BLM noted that it received and considered over 3,600 public comments before issuing the final EA.[3] (Exh. B, ECF No. 4-2 at 73.) These comments and the BLM's responses were summarized in Appendix XIII of the final EA. (*Id.* at 169-207.) Twelve of the comments were expressly attributed to Leigh, including comments arguing that the EA was an improper form to proceed with a gather plan absent an HMAP and that the data relied on in the EA was out of date. (*Id.* at 173-176, 182-184, 202.) The Bristlecone and Tonopah BLM Field Office Managers reviewed the final EA and issued a Finding Of No Significant Impact ("FONSI") on May 4, 2021. (Exh. D, ECF No. 4-2 at 216-218.)

After the final EA was issued, Plaintiffs appealed its adoption with the United States Interior Board of Land Appeals ("IBLA") and petitioned for a stay of the EA's implementation pending review. (Exh. E, ECF No. 4-2 at 220-231.) The IBLA denied Plaintiffs' petition for stay on July 7, 2021. (ECF No. 4 at 10.)

The Gather was publicly announced on January 6, 2022. (ECF No. 4 at 10.) Plaintiffs filed a motion to reconsider the denial of the stay with the IBLA on January 10, 2022, citing changed circumstances. (*Id.*) The IBLA denied Plaintiffs' reconsideration motion on January 14, 2022, after the Gather had begun. (*Id.*)

---

[3]The BLM summarized these comments and their responses in Appendix XIII in the final EA. (Exh. B, ECF No. 4-2 at 169-207). BLM responded to twelve of Leigh's comments, including stating that the "EA is in conformance with section 1333(a) of the [Wild Horse Act] as well as with the approved [land use plans] which provide management goals and objectives for management of wild horses within the Complex." (*Id.* at 174-175.)

4

### D.    The Gather

The 2022 Gather that began on January 11, 2022, is ongoing today. As of January 24, the BLM had gathered 987 and shipped 917 wild horses. (ECF No. 18-1.) The target number of removed horses for the 2022 Gather is 2,030, or 63% of the estimated current population. (*Id.* at 3.) If the BLM succeeds at removing their 2022 Gather target, there would still be approximately 1,214 wild horses in the Pancake Complex. (*Id.*) In other words, even assuming an effective 2022 Gather, the number of horses in the Pancake Complex would be almost double the high-end of the established AML, and more than triple its low-end.

There have already been incidents of injury and death during the Gather. Collette Kaluza, a volunteer for Plaintiff Wild Horse Education, observed the first day of the Gather. (ECF No. 4-1 at 2.) While the BLM pursued a band of horses with a low-flying helicopter, Kaluza observed that three horses had fallen behind the group. (*Id.*) One of the horses, a colt, was limping, and Kaluza reports that it appeared the colt had broken its leg. (*Id.* at 3.) The colt continued to struggle while the helicopter drove the band of horses into the holding pens. (*Id.*) Kaluza timed the duration of the process and reports that it took 29 minutes for BLM personnel to arrive at the range and another 30 minutes to rope the colt and put it in the trailer. (*Id.*) BLM Wild Horse and Burro Specialist Benjamin Noyes submitted a declaration in which he states that as of January 24, a total of 11 horses had died during the Gather. (ECF No. 18-1 at 3.) Of those 11 deaths, three were "acute," or directly attributable to the Gather, and 8 were euthanized due to preexisting conditions. (*Id.*) Noyes reports that the death rate for this Gather (1% overall and 0.3% acute) is within the expected mortality rate for BLM horse gathers (1.1%). (*Id.* at 3-4; Exh. 7, ECF No. 18-3 at 12-13.)

Kaluza observed that the ground was very muddy and slippery during the Gather. (ECF No. 4-1 at 3.) She attributes these conditions to the changing daily temperatures, in which the ground freezes overnight and thaws during the day. (*Id.*) The ground was difficult for Kaluza to walk, drive, or move on as she observed the Gather, and she reports

1   witnessing several horses struggling to run. (*Id.*) Despite these conditions, the BLM has

2   not stopped operations. (*Id.*) Noyes confirms that the conditions in this area are variable,

3   but states that the horses are used to them and regularly run across the valleys up to 10-

4   15 miles per day in search of food and water. (ECF No. 18-1 at 4.)

5        Kaluza also sought to observe the temporary holding corrals, but was informed

6   she would not be permitted to view the corrals every day. (ECF No. 4-1 at 3.) Noyes

7   reports that of the fourteen days of gather operations up until January 24, BLM personnel

8   offered five public viewing days. (*Id.* at 4.) Noyes states that he personally offered Kaluza

9   two additional viewing opportunities, which she declined. (*Id.*) In his declaration, Noyes

10  also stated that BLM policy requires certain restrictions on public viewing for the safety of

11  the horses, personnel, and the public, and to ensure an effective gathering process. (*Id.*

12  at 4-5.) Specifically, Noyes explains that wild horses unaccustomed to humans may be

13  "very flighty" and it is essential to minimize unnecessary movements. (*Id.*) Because of the

14  necessities of hiding the trap from the view of the horses, such as hiding corrals behind

15  a geographic feature so the horses do not change direction, Noyes explains that it is

16  sometimes not possible for the public to always have an optimal viewing point. (*Id.* at 5.)

17  However, he further asserts that he and other personnel take the time to speak with

18  observers and address any expressed concerns. (*Id.*)

19          **E.    This Action and Relief Requested**

20        Plaintiffs initiated this lawsuit on Friday, January 21, 2022 (ECF No. 1) and filed its

21  Motion the following Monday, seeking declaratory and injunctive relief. (ECF Nos. 1, 4 at

22  9.) First, Plaintiffs request the Court temporarily enjoin Defendants from further gathering

23  activities at the Pancake Complex pending the resolution of their motion for preliminary

24  injunction. (ECF No. 4 at 19.) Second, Plaintiffs request the Court to direct Defendants

25  "to give at least one member of each plaintiff organization unobstructed access to the

26  BLM's corrals and holding facilities so they may observe and document the BLM's

27  activities to ensure compliance with applicable federal law." (*Id.*) Finally, Plaintiffs request

28

1   the Court enjoin Defendants from resuming the Gather until the Court can rule on
2   Plaintiffs' requested declaratory relief. (*Id.*)

3        Defendants oppose the Motion. (ECF No. 18.) Noyes estimates that each day the
4   Gather is delayed, the BLM will incur a cost of approximately $20,000 in labor, travel, and
5   operations costs. (ECF No. 18-1 at 5.) Moreover, the BLM is under time-pressure to
6   complete the 2022 Gather before the recorded foaling season begins. (*Id.*) Per BLM
7   policy, no helicopter gathers may take place between March 1 and June 30 of any given
8   year to protect pregnant and nursing mares. (*Id.*)

9        On January 26, 2022, the Court heard oral argument on Plaintiffs' Motion.

10  **III.    LEGAL STANDARD**

11       Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary
12  restraining orders ("TROs"), and requires that a motion for a TRO include "specific facts
13  in an affidavit or a verified complaint [that] clearly show that immediate and irreparable
14  injury, loss, or damage will result to the movant before the adverse party can be heard in
15  opposition," as well as written certification from the movant's attorney stating, "any efforts
16  made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).
17  TROs are governed by the same standard applicable to preliminary injunctions. *See Cal.*
18  *Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d 1111, 1126
19  (E.D. Cal. 2001) (citation omitted). "A preliminary injunction is an extraordinary remedy
20  never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)
21  (citation omitted). "'An injunction is a matter of equitable discretion' and is 'an
22  extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is
23  entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010)
24  (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 32 (2008)).

25       To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood
26  of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of
27  hardships favors the plaintiff; and (4) that the injunction is in the public interest. *See*
28  *Winter*, 555 U.S. at 20. A plaintiff may also satisfy the first and third prongs under a "sliding

scale" approach by showing serious questions going to the merits of the case and that a balancing of hardships tips sharply in plaintiff's favor. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (holding that the Ninth Circuit's "sliding scale" approach remains valid following the *Winter* decision). The plaintiff, however, must still show a likelihood of irreparable harm and that an injunction is in the public interest. *See id.* at 1135.

## IV.   DISCUSSION

As explained below, the Court finds that Plaintiffs have not shown they are likely to succeed on the merits of their claims and that the balance of equities in this instance weighs against enjoining the 2022 Gather. Because the Court further reasons its findings are unlikely to change within the next one to two weeks, and the 2022 Gather must conclude before March 1, the Court will consider both Plaintiffs' motions for temporary restraining order and preliminary injunction now, and will deny both motions.

### A.   Likelihood of Success on the Merits

Plaintiffs allege that the BLM violated the Wild Horse Act, NEPA, and their First Amendment rights. "Because neither NEPA nor the [Wild Horse] Act contain an internal standard of judicial review, the Administrative Procedure Act ["APA"] governs this court's review of the BLM's actions." *In Defense of Animals, Dreamcatcher Wild Horse and Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014). The Court will therefore consider whether Plaintiffs are likely to succeed on their claims by applying the APA standard of review.

If the BLM's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the APA requires courts to set them aside. 5 U.S.C. § 706(2)(A). "An agency's decision is arbitrary and capricious if it fails to consider important aspects of the issue before it, if it supports its decisions with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law." *In Defense of Animals*, 751 F.3d at 1061. Review under the APA's arbitrary and capricious standard is "narrow" and "necessarily deferential." *Friends of*

1  *Animals v. Silvey*, 353 F. Supp. 3d 991, 1003 (D. Nev. 2018) (citing *Motor Vehicle Mfrs.*

2  *Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[T]he reviewing court

3  may not substitute its judgment for that of the agency." *Env't Def. Ctr., Inc. v. U.S. Envt'l*

4  *Prot. Agency*, 344 F.3d 832, 858 n.36 (9th Cir. 2003). Rather, the function of the district

5  court is only to determine whether as a matter of law the evidence in the administrative

6  record permitted the agency to make the decision that it did. *See Occidental Eng'g Co. v.*

7  *I.N.S.*, 753 F.2d 766, 769-70 (9th Cir. 1985).

8    The Court addresses first Plaintiffs claims that the BLM's actions violated the Wild

9  Horse Act or NEPA. Then the Court will address Plaintiffs' First Amendment claim. As

10  explained further below, the Court finds that Plaintiffs have not demonstrated they are

11  likely to succeed on the merits of their claims based on the record presently before the

12  Court.

13              **1.    Wild Horse Act**

14    Plaintiffs argue that the BLM violated the Wild Horse Act in two ways. First,

15  Plaintiffs argue that by initiating the Gather without first developing a Herd Management

16  Area Plan, or "HMAP," BLM's action was arbitrary and capricious or otherwise contrary

17  to the mandate of the Wild Horse Act. (ECF No. 1 at 12.) Because Plaintiffs allege the

18  BLM's own regulation required it to implement an HMAP prior to the Gather, they argue

19  that the Proposed Action violated the APA. (*Id.*) Second, Plaintiffs argue that the Gather

20  was inhumane and the BLM's decision not to adopt an HMAP establishing humane

21  gathering procedures was arbitrary and capricious, also resulting in a violation of the Wild

22  Horse Act. (*Id.* at 11-12.) For the reasons explained below, the Court finds Plaintiffs have

23  failed to demonstrate they are likely to succeed on the merits of their Wild Horse Act

24  claim.

25              **a.    The Act and Regulations**

26    The Wild Horse Act was enacted in 1971 with the stated purpose that, as "living

27  symbols of the historic and pioneer spirit of the West . . . wild free-roaming horses and

28  burros shall be protected from capture, branding, harassment, or death." 16 U.S.C. §

1331. To effect this policy, all wild horses were placed under the jurisdiction of the Secretary of the Interior, who was directed to "protect and manage" the wild horses, "designate and maintain" specific ranges for their preservation, and use his authority "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* at § 1333(a).

In pursuit of this goal, the Secretary is tasked with determining "whether appropriate management levels should be achieved by the removal or destruction of excess animals." *Id.* at § 1333(b)(1). If the Secretary determines that "overpopulation exists on an given area of the public lands . . . he shall immediately remove excess animals from the range so as to achieve appropriate management levels." *Id.* at § 1333(b)(2). If removal is necessary, the wild horses in excess of the appropriate management levels must be "humanely captured." *Id.* at § 1333(b)(2)(B). The BLM defines "humane treatment" as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). Conversely, "inhumane treatment" is defined as "any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community." *Id.* at § 4700.0-5(f).

The BLM has enacted regulations governing its management of wild horse herds on BLM land:

> Herd management areas shall be established for the maintenance of wild horse and burro herds. In delineating each herd management area, the authorized officer shall consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in § 4710.4. The authorized officer shall prepare a herd management area plan which may cover one or more herd management areas.

///
///
///
///

10

1    43 C.F.R. § 4710.3-1.[4] The "constraints contained in § 4710.4" are that "[m]anagement

2    shall be taken at the minimum level necessary to attain the objectives identified in

3    approved land use plans and herd management area plans." 43 C.F.R. § 4710.4.

4                          **b.    HMAP as Prerequisite**

5         Plaintiffs argue that 43 C.F.R. § 4710.3-1 unambiguously requires the BLM to

6    establish an HMAP prior to initiating a gather. (ECF No. 4 at 9.) Although the

7    government's response is somewhat variable, ultimately the Court is not persuaded that

8    Plaintiffs are likely to succeed on the merits.

9         The regulation does include mandatory, repeated language, including that the BLM

10   "shall prepare a herd management area plan." *See* 43 C.F.R. § 4710.3-1. But what

11   constitutes an HMAP remains somewhat unclear. The government argues alternatively

12   that the EA satisfies the requirements of an HMAP and that there is no temporality

13   requirement in the regulation mandating the BLM create an HMAP prior to a gather plan.

14   (ECF No. 18 at 11-13.) In support of its argument that a separate HMAP is not required—

15   as opposed to a combination of the EA, the RMP, and the established AML range—the

16   government cites to an IBLA decision. The IBLA found in another instance that the BLM

17   was not required to prepare an HMAP prior to removing wild horses "so long as the record

18   otherwise substantiates compliance with the statute." *See Animal Prot. Inst. of Am.*, 109

19   IBLA            112            (1989),            available            at

20   https://www.oha.doi.gov/ibla/ibladecisions/109ibla/109ibla112.pdf.[5] The Court is not yet

21   convinced that a separate HMAP is required prior to implementing a gather plan, or that

22   a combined established AML, RMP, and EA cannot support a valid gather plan that

23   satisfies the BLM's regulatory mandate. *See Friends of Animals v. United States Bureau*

24   _____

25   [4]An "authorized officer" is "any employee of the Bureau of Land Management to
     whom has been delegated the authority to perform the duties described herein." 43 C.F.R.

26   § 4700.0-5(b).

27   [5]At the Hearing, the government noted that if the text of a regulation is ambiguous
     the Court is required to defer to an agency's interpretation of its own regulation under
28   *Auer v. Robbins*, 519 U.S. 452 (1997). Whether the IBLA decision constitutes an
     interpretation by the Secretary of the Interior that is entitled to *Auer* deference was not
     briefed, and the Court will not weigh in on that issue unless and until it is briefed.

1   *of Land Mgmt.*, --F. Supp. 3d--, 2021 WL 2935900, at *20 (D.D.C. Jul. 14, 2021)

2   (reasoning the BLM has "considerable flexibility in choosing which types of plans to use

3   and what to put in them . . . [i]t might, for example, use a land use plan, an EA, an

4   established AML, and a gather plan . . . [o]r the Bureau might us an AML, an HMAP, and

5   a gather plan . . . [o]r some other combination"); *see also Friends of Animals v. Pendley*,

6   523 F. Supp. 3d 39, 56 n.3 (D.D.C. 2021) (reasoning that a 2019 action could be in

7   compliance with portions of a 1989 HMAP or a 2008 resource management plan,

8   depending on the relevant aspect of compliance). Plaintiffs' argument is largely

9   formalistic, and they do not address whether the EA satisfies the same substantive

10   requirements that would be achieved through an HMAP. Accordingly, the Court concludes

11   that Plaintiffs have not shown they are likely to succeed on the merits of the declaratory

12   judgment claim.

13                    **c.      Requirement to Humanely Gather**

14          Plaintiffs also contend that the lack of an HMAP for the Pancake Complex resulted

15   in an inhumane gather process in violation of the Wild Horse Act. Specifically, Plaintiffs

16   assert that without an HMAP, the BLM failed to account for the freezing-thawing

17   conditions on the Pancake Complex which created increased risk for horses when

18   running. (ECF No. 4 at 18.) The Court is not persuaded that an HMAP would have cured

19   these specific difficulties, and finds that Plaintiffs have not demonstrated they are likely to

20   succeed on the merits of this claim.

21          First, Noyes states in his declaration that the daily freezing-thawing cycle is

22   common for the Pancake Complex region in the winter, and that the horses are

23   accustomed to running on thawing muddy ground in the winter season. (ECF No. 18-1 at

24   4.) Second, the government argues that the EA did contemplate other times of year that

25   gathers could occur, but due to the risk of potentially fatal heat stress the BLM determined

26   a winter gather was preferable. (ECF No. 18 at 15; Exh. B, ECF No. 4-2 at 48.) Spring

27   helicopter gathers are likewise not possible because the BLM has a moratorium on the

28   use of helicopters between March 1 and June 30 to protect pregnant mares during the

1   foaling season.[6] (ECF No. 18-1 at 5.) The Court inquired at the Hearing whether there

2   was a more suitable timeframe for the BLM to conduct a gather at the Pancake Complex,

3   but Plaintiffs argued only that the BLM should have prepared an HMAP so that public

4   comment could have been received. Because the BLM did consider the timing of their

5   proposed gathers in the EA, the Court is not persuaded at this time that an HMAP would

6   have provided a unique opportunity for public comment that was not achievable through

7   the EA.

8          Moreover, it is not clear that the Gather was "inhumane" in violation of the statute,

9   resulting in turn in a violation of the APA. It is not disputed that some horses have been

10  euthanized during the Gather, at least three of which for injuries directly attributable to the

11  Gather. (ECF No. 18-1 at 4.) However, it also not in dispute that every gather carries

12  some risk, and that a small number of wild horse injuries and deaths are likely inevitable.

13  Noyes stated in his declaration that the mortality rate for the 2022 Gather as of January

14  24 was approximately 1%, with only 0.3% of deaths directly attributable to the Gather.

15  (*Id.*) Both the EA and a study supplied by the government estimate that the expected

16  mortality rate for BLM horse gathers is between 0.5% and 1.1%. (Exh. B, ECF No. 4-2 at

17  45; Exh. 7, ECF No. 18-3 at 11-13.) Although the incident Kaluza observed involving the

18  colt breaking its leg is distressing and tragic, it is not clear that the BLM has conducted

19  an inhumane Gather on the whole, and Plaintiffs have not established that one or two

20  incidents of harm would constitute "inhumane" treatment under the Wild Horse Act.

21         For these reasons, the Court finds that Plaintiffs have not shown they are likely to

22  succeed on their claim that an HMAP would have produced a more humane gather, or

23  that the 2022 Gather is inhumane.

24  ///

25  

26         [6]Plaintiffs argued at the Hearing that mares in the Pancake Complex foal early and
    the best time of year to conduct a gather is therefore more herd-specific than the BLM's
27  policy accounts for. This may be the case, and may be relevant as to whether the
    documents the BLM relied on in preparing the EA sufficiently addressed the potential risks
28  to the Pancake Complex herds. However, Plaintiffs have not at this time offered any
    evidence of the foaling period at the Pancake Complex, or why a planned gather in
    January is uniquely harmful to these herds.

1

2. **NEPA**

Plaintiffs also argue that the decision to initiate the 2022 Gather was arbitrary and capricious because the BLM violated the NEPA by failing to analyze the significant environmental impacts of removing all the allegedly excess horses at once, rather than over a 10-year period. (ECF No. 1 at 12.) NEPA is a procedural statute that requires federal agencies to "asses the environmental consequences of their actions before those actions are undertaken." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). NEPA provides for public participation in assessing a proposed action's environmental consequences, enabling the public to "play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

Although NEPA lacks a substantive mandate, its "action-forcing" procedural requirements help carry out a "national commitment to protecting and promoting environmental quality." *Id.* at 348. As part of these action-forcing requirements, NEPA mandates that agencies considering "major Federal actions significantly affecting the quality of the human environment" must, to the fullest extent possible, prepare an environmental impact statement ("EIS"). *See* 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1508.11. "To decide whether an EIS is required because the agency's action 'significantly affect[s] the quality of the human environment,' an agency may first prepare an Environmental Assessment ("EA"), which is a 'concise public document' that must '[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS].'" *In Defense of Animals, Dreamcatcher Wild Horse and Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (quoting 40 C.F.R. § 1508.9(a)(1)); *see also Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1119 (D. Mont. 2016) (acknowledging that the BLM regularly prepares an EA to evaluate potential environmental impacts before initiating wild horse gathers). If the agency determines that no EIS is required, it must issue a FONSI describing why the action "will not have a significant effect on the human environment." 40 C.F.R. § 1508.13. "In reviewing a

1  decision not to prepare an EIS under NEPA, the reviewing court 'employ[s] an arbitrary

2  and capricious standard that requires us to determine whether the agency has taken a

3  'hard look' at the consequences of its actions, based [its decision] on a consideration of

4  the relevant factors, and provided a convincing statement of reasons to explain why a

5  project's impacts are insignificant.'" *In Defense of Animals*, 751 F.3d at 1068 (quoting

6  *Envt'l Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006)).

7       The BLM here prepared its EA and issued a FONSI. (Exhs. B and D, ECF No. 4-2

8  at 12-208, 215-218.) Plaintiffs do not expressly argue that the BLM should have prepared

9  an EIS, but rather claim that the BLM's EA contemplated a different action than that which

10  took place in the 2022 Gather. Plaintiffs argue that that the EA contemplated a gather of

11  approximately 2,342 over a phased ten-year period and does not consider the impact of

12  removing 2,030 wild horses at once, or the effect of removing 85% of the population over

13  a three-week period. (ECF No. 4 at 10.) The government responds that the EA does not

14  specify how many horses may be removed from the Pancake Complex at a time and

15  focuses instead on the purpose of the gather plan, which is to bring the population within

16  the AML range. (ECF No. 18 at 17.)

17       The language the parties cite to in the EA could support either interpretation. The

18  EA's description of the Proposed Action contemplates "a period of ten years," "phased

19  gathers," and "gather[ing] and remov[ing] approximately 2,342 excess wild horses within

20  the Complex." (Exh. B, ECF No. 4-2 at 22.) But additional language in that section reveals

21  that the BLM's purpose is to "achieve and maintain AML." (*Id.*) The EA further concedes

22  that "[i]t is expected that gather efficiencies and holding space during the initial gather

23  would not allow for the removal of sufficient excess animals during the initial gather to

24  reach or maintain low AML." (*Id.*) This prediction is supported by the conclusion in Noyes'

25  declaration that even if the BLM removes 2,030 wild horses, the population for the

26  Pancake Complex would be almost double the high-end of the AML range. (ECF No. 18-

27  1 at 3.) Because the EA expressly contemplated that multiple gathers may be necessary

28  to achieve an AML within the established range—which is required by the BLM's

1
2

regulation—the Court is persuaded by the government's interpretation that the EA did consider removing approximately 2,000 wild horses in a single gather.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

Similarly, the Court finds Plaintiffs have not shown they are likely to succeed as to their argument about removal of a large percentage of the Pancake Complex population. Noyes estimates that the 2022 Gather will remove 63% of the current population, a much lower estimate than Plaintiffs' alleged 85% estimate. (ECF No. 18-1 at 3.) But the EA does contemplate in its description of the Proposed Action that a proportion of the population, estimated at 15-20%, would not be captured or treated over the 10-year period. (Exh. B, ECF No. 4-2 at 23.) It is unclear if this paragraph of the EA clearly anticipates that 80-85% of the population would be gathered at once, or if over several gathers some minority of the population would never be gathered. Regardless, Plaintiffs have not shown, at this time, that such a consideration was necessary prior to issuing the FONSI. The agency is required to take a "hard look," not exhaust every possible alternative. *See In Defense of Envt'l Prot. Info. Ctr.*, 451 F.3d at 1009. To the extent that Plaintiffs are arguing that the removal of such a large percentage of the population would be detrimental to the herd itself, it is unclear whether the EA and FONSI must address that question. *See* 40 C.F.R. § 1508.13 (requiring an explanation why an action "will not have a significant effect on the human environment"). Based on the information before the Court at this early stage, Plaintiffs have not shown they are likely to succeed on their NEPA claim.

20

### 3.   First Amendment

21
22
23
24
25
26

Plaintiffs also allege that the BLM is infringing upon their First Amendment right to observe the Gather by refusing them access to certain aspects of the Gather and only providing access to vantage points with obstructed views. (ECF No. 1 at 13.) The government responds that Plaintiffs have failed to show they are likely to succeed on their First Amendment claim because they have not explained why the present viewing opportunities were insufficient.[7] (ECF No. 18 at 19.) Because the Court finds the

27

28

[7]The Court notes that it is the government's burden to prove any restrictions are narrowly tailored to an overriding interest, not Plaintiffs' burden to show they are not or

1   government's proffered interests of safety and efficacious gathers are recognized
2   "overriding interests," Plaintiffs have not shown they are likely to succeed on the merits
3   of their First Amendment claim. However, because it is not clear whether the restrictions
4   on access to the holding corral are "narrowly-tailored," the Court will deny Plaintiffs'
5   Motion without prejudice.

6          There is a well-established "qualified right of access for the press and public to
7   observe government activities." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012). The
8   Ninth Circuit has applied the two-step test articulated in *Press-Enterprise Company v.*
9   *Superior Court* ("*Press-Enterprise II*"), 478 U.S. 1, 8-9 (1986), to right of access claims
10  involving wild horse gathers. *See id.* at 898-900. "First, the court must determine whether
11  a right of access attaches to the government proceeding or activity by considering 1)
12  'whether the place and process have historically been open to the press and general
13  public' and 2) 'whether public access plays a significant positive role in the functioning of
14  the particular process in question.'" *Id.* at 898 (quoting *Press-Enterprise II*, 478 U.S. at 8-
15  9). "Second, if the court determines that a qualified right applies, the government may
16  overcome that right only by demonstrating 'an overriding interest based on findings that
17  closure is essential to preserve higher values and is narrowly tailored to serve that
18  interest.'" *Id.* (quoting *Press-Enterprise II*, 478 U.S. at 9).

19         The government does not dispute that a qualified right exists to view wild horse
20  gathers. (ECF No. 18 at 19.) Indeed, another judge in this District agreed with that
21  conclusion in a wild horse gather case. *See Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1100-
22  01 (D. Nev. 2013). The government argues instead that any restriction to the temporary
23  holding corrals are narrowly tailored to the twin overriding interests of safety and efficacy.
24  (ECF No. 18 at 19-21.) The Court is satisfied that the government will likely be able to
25  show safety and effective gathering procedure are overriding interests. Plaintiffs do not
26  dispute that these justifications are valid, overriding interests. However, it is less clear

27

28  that viewing opportunities are sufficient despite restrictions. *See Press-Enterprise*
    *Company v. Superior Court* ("*Press-Enterprise II*"), 478 U.S. 1, 8-9 (1986).

1  whether the restrictions on viewing in the holding corrals are narrowly tailored to serve
2  those aims.

3      It is not in dispute that the BLM provides some opportunities to view the holding
4  corrals, first at a distance of a couple hundred yards, then after the horses have been fed,
5  watered, and secured, at an estimate of 20 feet. (ECF No. 18 at 21.) BLM Wild Horse and
6  Burro Specialist Noyes explained more fully in his declaration that some distance is
7  necessary while securing the horses after a gather to ensure their safety, as well as the
8  safety of personnel and the public. (ECF No. 18-1 at 4.) At the Hearing, the government
9  explained further that limiting viewings of corralled horses is necessary because
10  sometimes BLM personnel work the horses up until dark, precluding earlier viewing.
11  Additionally, it is not in dispute that there were several opportunities to view the holding
12  corrals. Moreover, Noyes noted he offered observer Kaluza additional viewing
13  opportunities of the holding corral, which she declined. The Court finds that Plaintiffs have
14  failed to show they will likely succeed in arguing the BLM imposed restrictions that are
15  not narrowly tailored.[8] (*Id.*)

16      Because the Court has established that a qualified right of access exists to observe
17  the Gather, and because the Gather is ongoing, the Court will deny Plaintiffs' Motion
18  without prejudice as the First Amendment claim.

19      **B.    Irreparable Harm**

20      Apart from arguing that Plaintiffs' expressed harm is more aesthetic than
21  environmental, the government does not seriously dispute that permitting an agency
22  action that allegedly violates the Wild Horse Act and NEPA to proceed would constitute
23  irreparable harm. (ECF No. 18 at 21-22.) In any event, the language of the Wild Horse

24  ─────────────

25  [8]It remains unclear, however, exactly why only five holding corral viewing days
   were available to observers over the course of two weeks. Because the Gather is ongoing,
26  and the Court has established there is a qualified right for the public to view the Gather,
   Plaintiffs' motion with respect to their First Amendment claims will be denied without
27  prejudice. Plaintiffs may renew their request for mandatory preliminary injunctive relief
   requiring the BLM to provide access if Plaintiffs can show that restrictions are in place
28  that they contend are not narrowly tailored to the government's overriding interest in
   safety and effective gathering. If such an occasion arises, the Court will likely consider
   the request an emergency and will hear the matter on an expedited schedule.

1   Act's purpose and policy—that "wild free-roaming horses and burros are living symbols

2   of the historic and pioneer spirit of the West . . . [and] enrich the lives of the American

3   people"—runs counter to the government's "aesthetic" argument. *See* 16 U.S.C. § 1331.

4   The harm Plaintiffs claim to have suffered (or may suffer in the future) is fairly

5   characterized as irreparable in the sense that environmental injury can seldom be

6   adequately remedied with money damages. *See All. for the Wild Rockies v. Cottrell*, 632

7   F.3d 1127, 1136 (9th Cir. 2011). However, the Court agrees with other courts that have

8   considered this issue and found that alleging emotional injury by observing wild horse

9   gathers may not alone justify a finding of irreparable harm that satisfies the *Winter* test.

10  *See Friends of Animals v. United States Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 66

11  (D.D.C. 2017) (collecting cases and finding that where the BLM does not intend to kill or

12  seriously injury significant numbers of healthy animals, individuals with sincere emotional

13  ties to horses had not established a level of "certain and great" irreparable injury).

14      But the Court need not address whether Plaintiffs' claimed injuries are irreparable,

15  substantial, and certain because Plaintiffs cannot satisfy the other three *Winter* prongs.

16  In addition to the first prong, the Court finds that Plaintiffs have not shown an injunction

17  is in the public interest or that the balance of equities weighs in their favor. *See Winter*,

18  555 U.S. at 23 (explaining that even when a plaintiff shows irreparable injury, the other

19  factors must also be satisfied before a preliminary injunction may issue).

20      **C.    Balance of the Equities and Public Interest**

21      The government argues that the balance of harms favors denying the Motion

22  because delaying the 2022 Gather would effectively cancel it for this year, exacerbating

23  the harms over the next year and placing "many horses at a catastrophic risk." (ECF No.

24  18 at 22-23.) Plaintiffs argue that delay would be a "slight inconvenience" to the BLM and

25  that the Court should enjoin gathering until the BLM complies with NEPA, the Wild Horse

26  Act, and humane handling requirements, as articulated in the complaint. (ECF No. 4 at

27  15.) The Court disagrees that the inconvenience would be slight, and finds that on

28

1
2
balance, enjoining the Gather would likely create greater harm than permitting it to proceed.

3
4
5
6
7
8
9
10
11
12
13
The government has established that Nevada, and the Pancake Complex specifically, has been subjected to years of severe, "exceptional" drought, and that forage has been harmed as a result. (Exh. 3, ECF No. 18-2 at 11-12; Exh. 5, ECF No. 18-2 at 2.) Even permitting the 2022 Gather to proceed would leave over 1,200 wild horses going into the next foaling season, more than double the high-end of the Pancake Complex's established AML range. (ECF No. 18-1 at 3.) The need to complete the Gather prior to the helicopter moratorium adds an increased urgency for the BLM to act, heightening the potential consequences of delay. Ultimately, the Court disagrees that enjoining the BLM from gathering wild horses until the BLM establishes an HMAP and/or submitting another EA for public notice and comment would be a "slight inconvenience" to the BLM's objectives of stabilizing the herd population levels in the Pancake Complex.

14
15
16
17
18
19
20
21
22
23
24
Although the Court agrees with Plaintiffs that there is a strong public interest in preventing harm to wild horses and that intense scrutiny of the BLM's actions is warranted, it does not follow that enjoining the Gather would be in the public interest. The death of the colt that Kaluza observed is unquestionably concerning and tragic. But permitting horses to starve while their numbers multiply and their forage disappears is tragic as well. The Wild Horse Act requires that the Secretary of the Interior manage wild horses in a manner designed to maintain a "thriving natural ecological balance"—a status that cannot currently be ascribed to the Pancake Complex. *See* 16 U.S.C. § 1333(a). While the Court is receptive to Plaintiffs' arguments relating to future gathers under the EA, the Court concludes that enjoining the 2022 Gather is not in the public interest and the balance of equities weighs against granting Plaintiffs' Motion.

25
**V.    CONCLUSION**

26
27
The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and

28

1    determines that they do not warrant discussion as they do not affect the outcome of the

2    issues before the Court.

3          It is therefore ordered that Plaintiffs' motion for temporary restraining order (ECF

4    No. 4) and Plaintiffs' motion for preliminary injunction (ECF No. 6) are denied. Preliminary

5    injunctive relief on Plaintiffs' First Amendment claim is denied without prejudice.

6          DATED THIS 28th Day of January 2022.

7

8                                              _____
                                               MIRANDA M. DU
9                                              CHIEF UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28