DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, THE CENTER FOR A HUMANE ECONOMY, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, and the<br><br>Defendants. | Case No. 3:22-cv-00034<br><br>**PLAINTIFFS' NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEROF**<br><br>Complaint Filed: January 21, 2021 |

1   To all parties and their attorneys of record:

2       PLEASE TAKE NOTICE that Plaintiffs Animal Wellness Action, Cana Foundation, the

3   Center for a Humane Economy, Laura Leigh, and Wild Horse Education, by and through their

4   counsel, Danielle M. Holt, Esq., and Jessica L. Blome, Esq. hereby move this court for summary

5   judgment on their First, Second, Third, Fourth, and Fifth causes of action as raised in their First

6   Amended Complaint against Defendants United States Department of Interior, Bureau of Land

7   Management, and Jon Raby, Nevada State Director of the Bureau of Land Management.

8       Pursuant to the Court's July 5, 2023 scheduling order (Dkt. 60), Rule 56 of the Federal

9   Rules of Civil Procedure, and local rule Rule 56-1, Plaintiffs' motion is supported by the

10  accompanying Memorandum of Points and Authorities; the declarations of Laura Leigh, Scott

11  Beckstead, Scott Edwards, and Manda Kalimian; Plaintiffs' Motion for Judicial Notice with

12  corresponding Notice, Memorandum of Points and Authorities, Declaration of Jessica L. Blome

13  with exhibits (filed concurrently); Plaintiff's First Amended Complaint (Dkt. 31); the certified

14  Administrative Record (Dkt. Nos. 44–44-2, 55–55-6); and any written and oral argument and

15  authorities that are presented at or before the hearing on this motion.

16  DATED: August 10, 2023              Respectfully Submitted,

17                                      */s/ Danielle M. Holt*
                                        Danielle M. Holt
18                                      (Nevada Bar No. 13152)
                                        DE CASTROVERDE LAW GROUP
19                                      1149 S Maryland Pkwy
                                        Las Vegas, NV 89104
20                                      (702) 222-9999
21                                      danielle@decastroverdelaw.com

22                                      */s/ Jessica L. Blome*
                                        Jessica L. Blome
23                                      (Cal. Bar No. 314898, admitted pro hac vice)
                                        GREENFIRE LAW, PC
24                                      2748 Adeline Street, Suite A
                                        Berkeley, CA 94703
25                                      (510) 900-9502
26                                      jblome@greenfirelaw.com

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**Table of Contents**

I.  INTRODUCTION ...................................................................................................... 1

II. STATEMENT OF FACTS ......................................................................................... 1

    A.  WHA and Implementing Regulations ............................................................. 1

    B.  National Environmental Policy Act (NEPA) .................................................. 2

    C.  Pancake Complex Gather-EA .......................................................................... 3

    D.  Differences Between HMAPs and Gather-EAs ............................................... 4

III. LEGAL FRAMEWORK ........................................................................................... 6

    A.  Mandamus and Venue Act ............................................................................... 6

    B.  Administrative Procedure Act .......................................................................... 7

IV. STANDING ............................................................................................................... 7

    A.  Zone of Interest ............................................................................................... 7

    B.  Article III ......................................................................................................... 9

        1.  Injury in Fact ........................................................................................ 9

            a)  Declaration of Laura Leigh, Individually, and on Behalf of Wild Horse Education (WHE) ...................................................... 11

            b)  Declaration of Scott Edwards on Behalf of Animal Wellness Action (AWA) ................................................................. 12

            c)  Declaration of Manda Kalimian on Behalf of the CANA Foundation (CANA) ............................................................. 13

            d)  Declaration of Scott Beckstead on Behalf of the Center for a Humane Economy (CHE) ............................................. 14

        2.  Injury Fairly Traceable to Challenged Conduct and Likely to Be Redressed by Favorable Court Decision .................................. 15

    C.  Exhaustion of Administrative Remedies ....................................................... 15

    D.  The WHA and Its Implementing Regulations Establish a Mandatory, Non-Discretionary Duty to Prepare an HMAP Prior to Engaging in Management Activities Such as Plans Providing for the Gather and Removal of Wild Horses ............................................................................................................ 15

        1.  Language of the WHA and Its Implementing Regulations ..................... 17

        2.  Regulatory History ................................................................................ 18

        3.  BLM's Interpretation ............................................................................ 19

    E.  Summary Judgment is Appropriate on Plaintiffs' First Cause of Action Based Upon the Mandamus and Venue Act. ................................................. 22

    F.  Summary Judgment is Appropriate on Plaintiffs' Second Cause of Action Based Upon the APA. ..................................................................................... 23

    G.  Summary Judgment is Appropriate on Plaintiffs' Third Cause of Action Based Upon the APA. ..................................................................................... 25

H.  Summary Judgment is Appropriate on Plaintiffs' Fourth Cause of Action Based Upon the APA. ...................................................................... 28

I.  Summary Judgment is Appropriate on Plaintiffs' Fifth Causes of Action Based Upon the APA. ...................................................................... 29

1.  Defendants' Failed to Take a Hard Look at Alternative Methods of Habitat Management and Population Control .......................................... 32

a)  Impacts of a drastic reduction of population size on population growth rate ...................................................................... 33

b)  Impacts of horse removal of horse removal on wildfire risks ...... 33

c)  Addressing population management without removals by implementing reductions in livestock grazing on the land ........... 34

d)  Addressing population management through rewilding ............... 35

2.  Defendants' Failed to Take a Hard Look at Appropriate AMLs ............. 35

3.  Defendants Failed to Take a Hard Look at the Impact of Returning Geldings to the Pancake Complex ........................................................... 37

V.  CONCLUSION ........................................................................................ 38

1

## Table of Authorities

2

**Cases**

3  *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022) ...................................................... passim
*Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206 (D. Nev. 1975) ................................... 10, 11
4  *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127 (D.D.C. 2020) ......................... 11
*Andujar v. Weinberger*, 69 F.R.D. 690 (S.D.N.Y. 1976) ..................................................... 7, 16
5  *Animal Prot. Inst. of Am.*, 109 IBLA 112 (1989) ............................................................... 20, 21
*Auer v. Robbins*, 519 U.S. 452, 461 (1997) ........................................................................... 17
6  *Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F. Supp. 3d 949
7     (D. Colo. 2022) .................................................................................................................. 9
*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002) ..................................... 24
8  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ................. 38
*Bruce v. First Fed. Sav. & Loan Asso.*, 837 F.2d 712 (5th Cir. 1988) ..................................... 18
9  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ........................................ 26
*Castillo v. Ridge*, 445 F.3d 1057 (8th Cir. 2006) ........................................................... 6, 23
10 *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d
11    104 (2d Cir. 2017) ......................................................................................................... 10, 11
*Cetacean Cmty. v. Bush*, 386 F.3d 1169 (9th Cir. 2004) ......................................................... 10
12 *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) ............................... 17, 21, 29
*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013) ...................... 20
13 *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) ................................................................... 8
14 *Coal. For a Sustainable 520 v. United States DOT*, 881 F.Supp.2d 1243 (W.D. Wash.
      2012) ................................................................................................................................ 4
15 *Davidson v. United States Dep't of State*, 113 F. Supp. 3d 183 (D.D.C. 2015) ......................... 7
16 *Doe v. Risch*, 398 F. Supp. 3d 647 (N.D. Cal. 2019) ............................................................ 25
*E.W. Bliss Co. v. United States*, 77 F.3d 445 (Fed. Cir. 1996) ............................................... 26
17 *Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287 (5th Cir. 2018) ............ 9
*Envtl. Defense Fund, Inc. v. U.S. Army Corps of Engrs.*, 492 F.2d 1123 (5th Cir. 1974) ........... 30
18 *ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513 (3d Cir. 1998) ............................................. 18
*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118 (2d Cir. 2020) ......................... 8
19 *Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000) ....................................... 18
20 *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939 (9th Cir. 2021) ............................ 11
*Giddings v. Chandler*, 979 F.2d 1104 (5th Cir. 1992) ............................................................. 8
21 *Gonzalez v. United States Dep't of Homeland Sec.*, 500 F. Supp. 3d 1115 (E.D. Cal.
      2020) ................................................................................................................................ 24
22 *Greene v. Costle*, 577 F. Supp. 1225 (W.D. Tenn. 1983) ........................................................ 16
*Hamazaspyan v. Holder*, 590 F.3d 744 (9th Cir. 2009) ........................................................... 16
23 *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................................... 11
*Hernandez-Avalos v. INS*, 50 F.3d 842, (10th Cir. 1995) ......................................................... 8
24 *Idaho Conserv. League v. Mumma*, 956 F.2d 1508 (9th Cir. 1992) .............................. 30, 31, 36
*Independence Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ........................................ 24
25 *Kingman Reef Atoll Invs., L.L.C. v. DOI*, 195 F. Supp. 2d 1178 (D. Haw. 2002) ..................... 10
*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ....................................................................... 17, 20
26 *Knuckles v. Weinberger*, 511 F.2d 1221, 1222 (9th Cir. 1975) ............................................... 16
27 *Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556 (S.D.N.Y. 2018) ............................... 7

28

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................... 9, 11

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989)............................................ passim

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012).................................................................................................................... 8

*McGarry v. Sec'y of the Treasury*, 853 F.2d 981 (D.C. Cir. 1988)............................ 10

*McMahon v. Califano*, 476 F. Supp. 978 (D. Mass. 1979)................................... 7, 16

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000).................................................... 31

*Michigan Head Start Directors Asso. v. Butz*, 397 F. Supp. 1124 (W.D. Mich. 1975)................. 7

*Mitchael v. Colvin*, 809 F.3d 1050 (8th Cir. 2016)................................................. 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).................... 26

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999)............... 30, 31, 36

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2011) ...................... 10

*Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds., Inc.*, 937 F.2d 1572 (Fed. Cir. 1991).............................................................................................................. 21

*National Parks & Conservation Ass'n. v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)...... 31, 33, 37, 38

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005).......................... 3

*New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019)............. 7

*New York v. United States HHS*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) ......................... 16

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011)........................................................... 11

*R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542 (9th Cir. 2022)...................... 20

*Rice v. Vill. of Johnstown*, 30 F.4th 584 (6th Cir. 2022) ............................................ 10

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ................................. 2

*Schulke v. United States*, 544 F.2d 453 (10th Cir. 1976).......................................... 6, 23

*Sec'y of Labor v. Seward Ship's Drydock, Inc.*, 937 F.3d 1301 (9th Cir. 2019) ...................... 17

*Service v. Dulles*, 354 U.S. 363, 370 (1957).......................................................... 22

*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) ......................................... 30

*Sierra Club v. United States DOT*, 753 F.2d 120 (D.C. Cir. 1985)............................ 30, 33

*Singh v. Still*, 470 F. Supp. 2d 1064 (N.D. Cal. 2007)............................................. 6, 23

*Telecommunications Research & Action v. FCC (TRAC)*, 242 U.S. App. D.C. 222, (D. C. Cir. 1984)....................................................................................... 24

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)............................................................. 20

*U.S. v. American Trucking*, 310 U.S. 534 (1940)..................................................... 25

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ............................ 22, 23

*United States v. Henry*, 1 F.4th 1315, 1333 (11th Cir. 2021) ..................................... 16

*United States v. Nixon*, 418 U.S. 683 (1974) ....................................................... 22, 23

*Vaz v. Neal*, 33 F.4th 1131 (9th Cir. 2022)............................................................ 25

*W. Watersheds Project v. Kraayenbrink*, 620 F.3d 1187 (9th Cir. 2010) ..................... 31, 37

*Williams v. Hanover Hous. Auth.*, 871 F. Supp. 527 (D. Mass. 1994) ..................... 21, 29

*Workman v. Mitchell*, 502 F.2d 1201 (9th Cir. 1974) ............................................ 7, 16

**Statutes**

5 U.S.C. § 551(13) .......................................................................................... 7

5 U.S.C. § 556 ................................................................................................ 7

5 U.S.C. § 557 ................................................................................................ 7

5 U.S.C. § 701(b)(2) ...................................................................................... 7

5 U.S.C. § 702 ................................................................................................ 7

5 U.S.C. § 706 ................................................................................................ 7

5 U.S.C. § 706(1) ........................................................................................ 24
5 U.S.C. § 706(2)(A) ................................................................................... 26
5 U.S.C. § 706(2))(C) .................................................................................. 29
6 U.S.C. § 706 ............................................................................................... 1
16 U.S.C. § 1331 ..................................................................................... 1, 25
16 U.S.C. § 1331(a) .................................................................................... 20
16 U.S.C. § 1333 ................................................................................... 27, 29
16 U.S.C. § 1333(a) ............................................................................ 1, 4, 17
16 U.S.C. § 1333(b). ................................................................. 1, 17, 22, 23
16 U.S.C. § 1361 ........................................................................................... 1
17 U.S.C. § 1331 ........................................................................................... 9
17 U.S.C. § 1333(a). .................................................................................... 9
28 U.S.C. § 1361 ..................................................................................... 6, 23
42 U.S.C. § 4321 ........................................................................................... 1
42 U.S.C. § 4332(2)(C) ........................................................................... 2, 30
42 U.S.C. § 4332(E) ............................................................................... 30, 33

**Regulations**
40 C.F.R. § 1501.3 ....................................................................................... 2
40 C.F.R. § 1501.54 ..................................................................................... 3
40 C.F.R. § 1501.7 ....................................................................................... 4
40 C.F.R. § 1508.9(a)(1) ............................................................................. 3
43 C.F.R. § 1501.0-5 ................................................................................... 2
43 C.F.R. § 4700.0-1 ............................................................................... 1, 9
43 C.F.R. § 4700.0-2 ................................................................................... 2
43 C.F.R. § 4700.0-3 ............................................................................... 1, 9
43 C.F.R. § 4710 ......................................................................................... 17
43 C.F.R. § 4710.1 ................................................................................... 2, 4
43 C.F.R. § 4710.3-1 .......................................................................... passim
43 C.F.R. § 4710.4 .............................................................................. passim

1

## I.     Introduction

2       Plaintiffs' Amended Complaint seeks to hold Defendants accountable for their separate

3   statutory obligations to provide for *both* the humane treatment and management of wild free-

4   roaming horses *and* the protection of the environment. Plaintiffs' claims are brought under the

5   Mandamus and Venue Act, 28 U.S.C. §1361 et seq., the Administrative Procedure Act (APA), 6

6   U.S.C. §706, alleging violations of the Wild Free-Roaming Horses and Burros Act (WHA), 16

7   U.S.C. §1331 *et seq*., and the National Environmental Policy Act (NEPA), 42 U.S.C. §4321 *et*

8   *seq*. *See* Dkt. 31.

9   ## II.    Statement of Facts

10      ### A.     WHA and Implementing Regulations

11      Finding that "wild free-roaming horses and burros are living symbols of the historic
            and pioneer spirit of the West," and that "they contribute to the diversity of
12          life forms within the Nation and enrich the lives of the American people,"
            Congress enacted the WHA to ensure that "wild-free roaming horses and
13          burros shall be protected from capture, branding, harassment, [and] death,"
            and will "be considered in the area where presently found, as an integral
14          part of the natural system of the public lands." 16 U.S.C. §1331. The WHA
            provides the statutory authority by which the Secretary of the Interior
15          "protect[s] and manage[s]" wild horses and burros on public lands, with the
            restriction that '[a]ll management activities shall be at the minimal feasible
16          level. *Id.* at §1333(a). In managing wild horses and burros, the Act also
            provides the statutory authority by which the Secretary can remove
17          "excess" wild horses from public lands. *Id.* at §1333(b).

18      The Secretary delegated responsibility for administering the WHA to the BLM. *See* 43

19  C.F.R. §4700.0-3. BLM has adopted regulations, the purpose of which "is to implement the laws

20  relating to the protection, management, and control of wild horses and burros under the

21  administration of the Bureau of Land Management." *Id.* at §4700.0-1. Their stated objective is

22  the "management of wild horses and burros as an integral part of the natural system of the public

23  lands under the principle of multiple use; protection of wild horses and burros from unauthorized

24  capture, branding, harassment or death; and humane care and treatment of wild horses and

25  burros[,]" which shall be done pursuant to the establishment of herd management areas (HMAs)

26  and herd management area plans (HMAPs). *See id.* at §§4700.0-2, 4710.3-1, 4710.4.

27  Management also must be undertaken in conformance with land use plans (LUPs), commonly

28

1    called resource management plans (RMPs). *See id.* at §§1501.0-5, 4710.1, 4710.4.

2         An LUP establishes general habitat and population management goals and objectives for

3    a given area, which may contain multiple HMAs. *See* AR1359, 1407. An HMAP, which may

4    cover more than one HMA, "establishes management actions and short- and long-term

5    management and monitoring objectives for a specific [wild horse and burro] herd and its habitat.

6    HMAPs also identify the actions to be taken to accomplish herd and habitat management

7    objectives." AR1360; *see also* 43 C.F.R. §4710.3-1. Population management may be a

8    component of both LUPs and HMAPs. *See* AR1360. Importantly, HMAPs are created with

9    public involvement, including development through a public scoping process. *See* AR1386. They

10   also require, as one component of their creation, NEPA review. *See* AR1386-87.

11        **B.     National Environmental Policy Act (NEPA)**

12        NEPA governs decisions by the BLM to gather horses. *See* 42 U.S.C. §4321 *et seq*. It

13   requires federal agencies to take a "hard look" at the environmental consequences associated

14   with proposed action. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989). NEPA serves the

15   dual purpose of, first, informing agency decisionmakers of the significant environmental effects

16   of proposed major federal actions and, second, ensuring that relevant information is made

17   available to the public so that it "may also play a role in both the decision-making process and

18   the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S.

19   332, 349 (1989); *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022).

20        To meet these goals, NEPA requires a comprehensive Environmental Impact Statement

21   (EIS) for "major Federal actions significantly affecting the quality of the human environment."

22   42 U.S.C. §4332(2)(C); 40 C.F.R. §1501.3. To determine whether a proposed action will have

23   significant effects, an agency may prepare an Environmental Assessment (EA). *See* 40 C.F.R.

24   §1501.54.

25        Where the government makes a finding that no significant impact will occur as a result of

26   proposed action, this decision must be based on a consideration of all relevant factors and

27   supported by a convincing statement of reasons. *See Marsh*, 490 U.S. at 373-74; *350 Montana*,

28

50 F.4th at 1265. After conducting a proper EA and upon finding that the proposed action will not significantly affect the human environment, the government may issue a finding of no significant impact (FONSI). *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. §1508.9(a)(1)); *see also* 40 C.F.R. §1501.6(e).

### C.     Pancake Complex Gather-EA

The Pancake Complex is made up of the Pancake Herd Management Area (HMA), the Sand Springs West Wild Horse HMA, the Jakes Wash Herd Area (HA), and the Monte Cristo Wild Horse Territory (WHT). See AR03501. It consists of 1,228,739 acres of land, the majority of which is directly managed by the Bureau of Land Management (BLM).[1] See AR03501, 03503.

No Herd Management Area Plan (HMAP) exists to govern management activities for the Pancake Complex. Despite this, on May 5, 2021, the BLM adopted the Pancake Complex Gather Plan Environmental Assessment (Pancake Gather-EA or Pancake Gather Plan), which allows for a significant management action – the removal of "approximately 2,342 excess wild horses within the Complex . . . over a period of ten years from the initial gather." AR3507. The initial gather was conducted between January 10, 2022 and February 14, 2022, with 2030 horses removed from the Complex.[2] *See* AR3725, 3814-3819.

Gather-EAs, such as the Pancake Gather-EA, are – by their very nature – management activities and must conform with existing LUPs and HMAPs[3]. *See* 43 C.F.R. §§4700.0-2,

---

[1] The Monte Cristo WHT, which consists of 93,640 acres, is managed in accordance with an Interagency Agreement between the BLM and the US Forest Service. *See* AR3501, 3503.

[2] 1751 were removed from the Pancake HMA, 125 removed from the Sand Springs HMA, 120 removed from the Jakes Wash HA, and 34 removed from the Monte Cristo WHT. *See* AR3815.

[3] There is no HMAP for the Pancake Complex. The Complex falls within three separate resource management plans (RMPs): the 2008 Ely District RMP applies to over 11 million acres of land, which land contains six HMAs, including the Pancake HMA; the 1986 Humboldt National Forest Land & RMP applies to over 2 ½ million acres of land in the Humboldt National Forest, which land contains five WHTs, including the Monte Cristo WHT, and the 1997 Tonopah RMP applies to over 6 million acres of land, which land contains 16 HMAs, including the Sand Springs West Wild Horse HMA. *See* AR33-345, 532-724, 871-1349, 3501-3503. The 2008 Ely District RMP changed the Jakes Wash HMA to an HA, finding that it did not provide sufficient habitat resources to sustain healthy wild horse populations. *See* AR941-942, 3502.

4710.1, 4710.3-1, 4710.4; AR1397. They must ensure that all gathers are managed at the minimal feasible level. *See* 16 U.S.C. §1333(a); 43 C.F.R. §4710.4.

In adopting the Pancake Gather-EA, BLM acted without first creating an HMAP, without providing public scoping, and without considering whether the 10-year gather plan was ensuring management at the minimum feasible level possible. BLM also failed to take a "hard look" at the environmental consequences associated with proposed action.

### D.  Differences Between HMAPs and Gather-EAs

The differences between an HMAP and a Gather Plan/Gather-EA are significant, and the BLM acknowledges that the Pancake Gather-EA is not an HMAP.[4] First, as addressed above, BLM requires public scoping for HMAPs, whereas this is not required for Gather-EAs. *See* AR1386. Scoping is the process by which a lead Federal agency solicits input from the public and other agencies regarding the breadth and depth of issues to be addressed. *See* 40 C.F.R. §1501.7. It "ensures that interested parties are aware of and able to participate meaningfully" in the at-issue review. *Coal. For a Sustainable 520 v. United States DOT*, 881 F.Supp.2d 1243, 1248 (W.D. Wash. 2012).

Second, an HMAP takes into consideration a broader array of issues related to herd health over the short and long-term than a Gather-EA. By way of example, Plaintiffs refer to BLM's creation of an HMAP for the Fifteenmile HMA[5] in comparison to the Pancake Gather-EA. *See* Exh. A (Fifteenmile Herd Management Area Plan, August 2019) to Plaintiffs' Request for Judicial Notice (RJN).

The Fifteenmile HMAP was created to "establish short and long-term management objectives for the wild horse herd and their habitat within lands administered by the Bureau of

---

[4] The preliminary EA for the Pancake Complex was entitled "Pancake Complex Preliminary Environmental Assessment." After public comment regarding the purpose and scope of the EA, BLM changed the title "Pancake Complex Wild Horse Gather Final Environmental Assessment." AR3382, 3658.

[5] While not every HMAP is the same, the Fifteenmile HMAP is an example of the type of short and long-term objectives that can be set for an HMA and its herds–objectives that are created only after allowing for public scoping.

Land Management (BLM) Worland Field Office (WFO).  These objectives will guide management of the Fifteenmile Herd Management Area (HMA), and the wild horses within the HMA, over the life of the plan." *Id.* at p. 1. It provides guidance for future gathers under either a gather plan or in cases of emergency. *See id.* at pp.7-9. The Pancake Gather-EA's purpose, on the other hand, was to conduct an environmental assessment of a plan "to gather and remove excess wild horses from within and outside the Pancake Complex and to reduce the wild horse population growth rates to achieve and maintain established AML ranges." AR3504. It was not intended to address management of wild horses long-term, instead only focusing on the current status of the herd and the gather of excess horses over a 10 year period.

For population management, the Fifteenmile HMAP analyzed AML ranges and stated that wild horse populations should be established "within the established AML range to protect the range from deterioration associated with overpopulation." Exh. A to Plaintiff's RJN at p. 8. But, it further provides guidance regarding the need to assure that all age classes are represented in the HMA and identifies implementation objectives for maintaining adequate levels of genetic diversity. *See id.* at pp. 4, 7, 9. To sustain the health of the herd, the HMAP contains objectives regarding wild horse body conditions and the maintenance/development of water conditions to ensure good wild horse distribution throughout the HMA. *See id.* at pp. 3, 7, 9-10. One objective focuses on management of "livestock grazing within the HMA to avoid and minimize the conflict with wild horses and wildlife." *Id.* at p. 3. Rangeland health and vegetation objectives also are addressed. *See id.* at p. 9. Significantly, future gather plans, which are identified as "management actions," must conform with the Fifteenmile HMAP objectives, as well as various BLM instruction memoranda and directives. *Id.* at pp. 7-15.

The Pancake Gather Plan, on the other hand, does not have comparable objections to tier to since no HMAP exists for the Complex. Nor did the LUPs, which the BLM considered to some extent, have comparable objectives. *See* AR33-345, 532-724, 871-1349, 3501. BLM's use of Gather-EAs without an HMAP circumvents the need to consider gathers within the larger context of herd health over the long-term.

In so doing, BLM also refuses to consider public comment of important key issues[6]. For example, the public asked the BLM to address the management of livestock grazing and industry, which is affecting rangeland health and impacts horse AMLs. *See* AR2091, 2126-27, 3384. BLM responded that this issue was not within the scope of the Pancake Gather-EA as it involved land-use planning, and "[t]he purpose of the EA is not to adjust livestock use." AR3519-3520, 3657, 3661, 3678-80. (The narrow focus of the Pancake Gather-EA is addressed further, below, in Section V.F.)

BLM's actions have resulted in wild horses being removed through an environmental review process that does not robustly consider the health of the horses nor allow for meaningful public participation.

## III.     Legal Framework

### A.     Mandamus and Venue Act

Under the Mandamus and Venue Act, [d]istrict courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. §1361. Mandamus relief awarded through summary judgment is appropriate where a plaintiff establishes a defendant owes a clear, nondiscretionary duty to perform an act. *See Castillo v. Ridge*, 445 F.3d 1057, 1060 (8th Cir. 2006); *Schulke v. United States*, 544 F.2d 453, 455 (10th Cir. 1976); *Singh v. Still*, 470 F. Supp. 2d 1064, 1072 (N.D. Cal. 2007). In making such a determination, courts often engage in statutory and regulatory construction. *See Workman v. Mitchell*, 502 F.2d 1201, 1205 (9th Cir. 1974); *McMahon v. Califano*, 476 F. Supp. 978, 982 (D. Mass. 1979); *Andujar v. Weinberger*, 69 F.R.D. 690, 693-94 (S.D.N.Y. 1976); *Michigan Head Start Directors Asso. v. Butz*, 397 F. Supp. 1124, 1138 (W.D. Mich. 1975).

---

[6] Not only was there no HMAP to provide guidance, but because there was no public scoping for the Pancake Gather-EA, the public had no opportunity to provide input on the scope of the Pancake Gather Plan. *See* AR3522-3524; Declaration of Laura Leigh, individually and on behalf of Wild Horse Education at ¶¶19-25; Scott Beckstead on Behalf of the Center for a Humane Economy at ¶¶6-8; Scott Edwards on Behalf of Animal Wellness Action at ¶¶11, 13-15; and Manda Kalimian on Behalf of the CANA Foundation at ¶¶10-11, 15-18.

**B.     Administrative Procedure Act**

The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. §702. The APA defines "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* §§551(13) 701(b)(2).

Under the APA:

> The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>> (D) without observance of procedure required by law;
>> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute . . .

*Id.* §706.

When addressing a summary judgment motion in an APA case, the court acts more like an appellate tribunal than a trial court because the scope of its review is limited to reviewing the administrative record, deciding relevant questions of law, interpreting statutory and regulatory provisions, and determining the meaning or applicability of agency action. *See* 5 U.S.C. §706; *Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556 (S.D.N.Y. 2018); *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019); *Davidson v. United States Dep't of State*, 113 F. Supp. 3d 183 (D.D.C. 2015).

**IV.    Standing**

Plaintiffs have filed, concurrent with this Motion, the declarations of Laura Leigh, individually and on behalf of Wild Horse Education (WHE Decl.); Scott Beckstead on Behalf of the Center for a Humane Economy (CHE Decl.); Scott Edwards on Behalf of Animal Wellness Action (AWA Decl.); and Manda Kalimian on Behalf of the CANA Foundation (CANA Decl.) to establish standing in this matter.

**A.     Zone of Interest**

Under both the Mandamus and Venue Act and the APA, the first step in establishing standing requires a demonstration that plaintiff fall within the "zone of interest" protected by the at-issue law, which may include statutes or regulations. *See Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020); *Hernandez-Avalos v. INS*, 50 F.3d 842, 846-847 (10th Cir. 1995); *Giddings v. Chandler*, 979 F.2d 1104, 1108-1110 (5th Cir. 1992).

The "zone of interest" test "is not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). The Supreme Court has emphasized that a plaintiff's claim need only "arguably" fall within the zone of interest, which "indicate[s] that the benefit of any doubt goes to the plaintiff." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d at 128 (2d Cir. 2020) (citing to *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224-225 (2012).) Further, "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987. However, the interests of a plaintiff cannot be inconsistent with the purpose of the at-issue statute. *Id.* at 399.

Plaintiffs' First, Second, Third, and Fourth Causes of Action consist of Mandamus and Venue Act or APA claims based upon the WHA and its implementing regulations. The WHA provides the statutory authority by which the BLM manages wild horses and burros on public lands. 16 U.S.C. §1331 et seq. The congressional findings and declaration of policy for the WHA states:

> Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands.

17 U.S.C. §1331. This Congressional finding requires that management activities affecting wild horses be conducted at the minimal feasible level. *Id.* at §1333(a). BLM's regulations mandating LUPs and HMAPs were adopted to implement the WHA. 43 C.F.R. §§4700.0-1, 4700.0-3. Plaintiffs consist of American people with an interest in ensuring that wild free-roaming horses

are treated as an integral part of public lands and that management activities are conducted at the minimal level feasible. See e.g., WHE Decl. at ¶¶2-5, 7-10, 16-25; CHE Decl. at ¶¶3-10; AWA Decl. at ¶¶3-13 ; and CANA Decl. at ¶¶4-5. As such, they arguably are within the zone of interests to be protected and have a clear right to pursue the relief requested.

Plaintiffs' Fifth Cause of Action is an APA claim based upon NEPA.

Congress's purpose in enacting NEPA was to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; . . . promote efforts which will prevent or eliminate damage to the environment and biosphere . . . ; [and] enrich the understanding of the ecological systems and natural resources important to the Nation." Naturally, NEPA's zone of interests covers environmental injuries and not purely economic ones. . . . Environmental injuries include, but are not necessarily limited to, detrimental effects upon a plaintiff's "recreational use and aesthetic enjoyment."

*Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 294-95 (5th Cir. 2018) (internal citations omitted). Conservational interests also are recognized under NEPA. *Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F. Supp. 3d 949, 963 (D. Colo. 2022).

Plaintiffs consist of an individual and organizations averring environmental, aesthetic, and conservational injuries that fall within NEPA's zone of interests. See e.g., WHE Decl. at ¶¶2-5, 7; CHE Decl. at ¶¶3-7; AWA Decl. at ¶¶  ; and CANA Decl. at ¶¶ . Thus, they have a clear right to pursue the relief requested.

## B.   Article III

To demonstrate Article III standing to sue, plaintiffs must show (1) they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to defendants' challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

### 1.   Injury in Fact

Standing can apply to an individual, or where an organization is the plaintiff, there are two types of standing:  organizational and associational (or representative). *See N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011); *Warth v. Seldin*, 422

U.S. 490, 511 (1975). Organizational standing exists where an organization sues in its own right to seek judicial relief from injury to itself. *See id.* Alternatively, an organization can assert associational standing to "sue on behalf of its members . . . ." *N.Y. Civil Liberties Union*, 684 F.3d at 294. Further, "[i]t is well settled that where multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (citations omitted).

The injury in fact requirement of standing can be established when a plaintiff is deprived of a procedural right that is connected to the protection of an established interest (such as those established to be within the "zone of interest" of applicable law). *See Rice v. Vill. of Johnstown*, 30 F.4th 584, 591 (6th Cir. 2022); *Kingman Reef Atoll Invs., L.L.C. v. DOI*, 195 F. Supp. 2d 1178, 1187 (D. Haw. 2002); *Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206, 1213 (D. Nev. 1975). For example, "[i]nterpreting NEPA broadly, [courts] have recognized standing for individuals and groups of individuals who sue to require preparation of an EIS, when they contend that a challenged federal action will adversely affect the environment." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004). Additionally, standing exists where plaintiffs challenges an agency action that deprived them of their opportunity to comment. *See McGarry v. Sec'y of the Treasury*, 853 F.2d 981, 984 (D.C. Cir. 1988), holding that in such cases, plaintiffs need only state that "had the opportunity been made available, it would have commented upon" the agency action.

For cases involving the WHA and NEPA, "[i]t is clear that the person who observes . . . a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist." *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 144 (D.D.C. 2020), quoting *Lujan*, 504 U.S. at 566. *See also Am. Horse Prot. Asso.*, 403 F. Supp. at 1214, finding an injury in fact where aesthetic or environmental interests has been impacted.

For organizations, standing exists where the challenged violation results in an impairment

of the organization's ability to fulfill its mission or has resulted in a diversion of resources from other activities of the organizations. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017)*; Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).

a) *Declaration of Laura Leigh, Individually, and on Behalf of Wild Horse Education (WHE)*

Plaintiff Laura Leigh, individually, has suffered injury because of Defendants' failure to create an HMAP and failure to adequately conduct an environmental review under NEPA. Ms. Leigh has visited, observed, and photographed the wild horses at the Pancake Complex so many times that she has formed unique and special relationships with individual horses. *See* WHE Decl. at ¶¶12-14. Her presence in the Complex includes being present during the January 2023 gather and thereafter. *See id.* at ¶¶13, 66.

Ms. Leigh experiences great enjoyment from watching young foals born in the Pancake Complex become curious and strong adult horses who then create their own families. (*See id.* at ¶14.) But, BLM's action (or inaction) threatens Ms. Leigh's ability to recreate and enjoy these horses. *See id.* at ¶15, 33-50, 52-58, 63-65. In the first gather undertaken pursuant to the Pancake Complex-EA, she witnessed horses being inhumanely treated, severely injured and captured for euthanasia. *See id.*

Further, by failing to create an HMAP prior to gathering horses in the Complex, Ms. Leigh's right to comment has been impaired. *See id.* at ¶¶17-25. Had BLM done otherwise, Plaintiff would have been able to submit comments during the appropriate scoping period. *See id.* at ¶17. Without this, BLM prevented Ms. Leigh from submitting comments necessary to consideration of whether or not horses should be gathered, such as comments to close public lands to livestock grazing for protection of wild horses. *See id.* at ¶¶17-25.

By failing to adhere to the procedural requirements of the WHA and NEPA, Ms. Leigh suffered injury to her aesthetic and procedural interests—interests that are recognized under the

WHA and NEPA as challenged by the Mandamus and Venue Act and APA.

WHE is a national nonprofit corporation whose mission is to protect and preserve wild horses and burros on range, during and after capture. *See id* at ¶¶14-5. It aims to remove the curtain that veils governmental activities against wild horses from the public eye in order to advance wild horse advocacy and support. It also aims to facilitate public awareness and participation in wild horse issues. *See id.* at ¶5. "Advocating for the wild horses in the Pancake Complex is a past, present, and future important issue for [Laura Leigh], for WHE, and for [WHE's] members." *Id.* at ¶8.

Members of the WHE have suffered injury to their aesthetic and procedural interests, including their individual right to comment upon management practices associated with the Pancake Complex and protect their aesthetic interest in the herd. *See id.* at ¶¶11, 33-50, 52-58, 63-65. Because of this, WHE has established injury in fact for associational standing.

The WHE also has organizational standing because the Pancake Gather Plan and its implementation have caused the organization to divert an inordinate amount of resources in staff time and attention to the Pancake Complex. *See id.* at ¶51.

> b)   *Declaration of Scott Edwards on Behalf of Animal Wellness Action (AWA)*

AWA "is a national nonprofit organization with the mission of promoting animal welfare by advocating for the passage and enforcement of laws, regulations, and policies that protect animals. AWA maintains 135,000 supporters across America, with several thousand in Nevada." AWA Decl. at ¶3. In accomplishing this mission, AWE's focus includes ending horse slaughter, keeping wild horses in their natural habitats, and creating humane fertility control strategies to limit horse reproduction. *See id.* at ¶4. "AWA has been directly injured by the actions of the defendants because it has diverted significant organizational resources to identify, remedy and counteract unlawful and improper actions related to wild horse roundups, including the types of activities that are alleged in the current litigation." *Id.* at ¶5.

Further, the organization's right to publicly comment on management plans for the

1    Pancake Gather Complex has been impaired by Defendants' failure to create an HMAP. "If the

2    BLM had prepared and published an HMAP for the Pancake Complex, AWA would have

3    submitted comments during the appropriate public commenting period. Like previous AWA

4    comments on HMAPs, our comments would have addressed concerns about the cruelty and

5    inhumane nature of BLM round-ups, the need to reduce excessive livestock grazing rather than

6    reducing the number of wild horses when land suffers degradation, and argued for the use of

7    safe, reversible PZP for fertility control if and when population management becomes

8    necessary." *Id.* at ¶13-14.

9         These injuries establish injury in fact for AWA's organizational standing.

10            *c)    Declaration of Manda Kalimian on Behalf of the CANA
                     Foundation (CANA)*

11

12        "CANA is a non-profit corporation whose mission is conserve and restore the North

13    American landscape by creating sustainable environmental ecosystems through restoring and

14    preserving biodiversity and native species (also known as "rewilding"); in particular, CANA's

15    focus is on the reintroduction and continuing survival of wild horses as a keystone species within

16    their ecosystems. CANA believes that reintroducing and sustaining wild horses in their historic

17    habitats can improve the overall health and vitality of North American grasslands. CANA's

18    initiatives to achieve this mission foster community empowerment, land conservation, and the

19    sustainable management and preservation of America's wild horse populations." CANA Decl. at

20    ¶4. This mission includes monitoring and advocating for wild horses in the Pancake Complex.

21    *See id.* at ¶5.

22        CANA suffered organizational injury to their right to publicly comment on management

23    strategies for wild horses in the Pancake Complex by Defendant's failure to create an HMAP.

24    *See id.* at ¶¶10-11. Had an HMAP had been created, CANA would have submitted comments during

25    the scoping period, with comments addressing rewilding as an alternative management strategy for

26    wild horses and burros. *See id.* at ¶10. These comments would have provided CANA the

27    opportunity to address rewilding as an alternative management strategy. *See id.* at ¶¶10-11. Not

28

only did this result in CANA's right to comment being injured, but as a result, CANA's primary organization mission was thwarted.

Accordingly, Plaintiffs have established injury in fact for CANA's organizational standing.

> d)   *Declaration of Scott Beckstead on Behalf of the Center for a Humane Economy (CHE)*

CHE is a non-profit organization with the mission of forging a more humane economy for animals, including wild horses on public lands. *See* CHE Decl. at ¶¶3-4. It "believes that wild horse welfare and survival are inextricably linked with commercial livestock ranching, and for this reason, the plight of American wild horses does, indeed, implicate the American economy and the commercial livestock industry. The Center engages regularly on horse protection efforts, including promoting responsible policies in wild horse management and fighting for federal safeguards under the Wild Free-Roaming Horses and Burros Act." *Id.* at ¶4.

CHE suffered organizational injury to their right to publicly comment on management strategies for wild horses in the Pancake Complex by Defendant's failure to create an HMAP. *See id.* at ¶¶5-8. Had it been allowed, CHE "would have argued that excessive livestock grazing, rather than wild horses, is a significant reason why a majority of BLM land does not meet its own land health standards, and that any Pancake Complex HMAP should consider and invoke, if necessary, the BLM's authority under the Wild Horse Act to close public lands to livestock grazing when necessary to protect wild horses." *Id.* at ¶7. The inability to meaningfully address this served to frustrate CHE's mission. *See id.* at ¶8.

Further, the Pancake Gather Plan has injured the scientific interests of CANA and its ability to use scientific evidence to advance its mission. *See id.* at ¶14. "For example, CANA's ability to support the scientific study of the Pancake Complex herds' range, the heat dome over the range, and the drought experienced by the range was impacted." *Id.*

CHE's members also suffered injury to their individual interests, forming the basis of associational standing for CHE. *Id.* at ¶9-25. Specifically, Defendants' action (or inaction) has

affected their aesthetic interest, right to ensure treatment of wild horses is predicated upon all management activities being conducted at the minimal feasible level, and right to be free from observing particular horses suffering perceptible harm. *See id.*

        2.      <u>Injury Fairly Traceable to Challenged Conduct and Likely to Be Redressed by Favorable Court Decision</u>

Each and every injury addressed above is predicated upon Defendants' failure to follow the WHA and its implementing regulations as regards the creation of HMAPs and directive to conduct gathers at the minimum feasible level and/or upon Defendants' failure to conduct an appropriate environmental review.  The relief being sought would result in the prohibition of any future gathers (and corresponding future injuries) until Defendants complied with the WHA, NEPA, and APA.  By doing so, injury to Plaintiffs' individual, associational, and organizational interests would be rectified.

**C.    Exhaustion of Administrative Remedies**

On June 2, 2021, Plaintiffs Wild Horse Education and Ms. Leigh timely appealed Defendants' May 4, 2021 approval of the Gather EA to the United States Interior Board of Land Appeals and petitioned for an order staying the decision. On July 7, 2021, the petition for stay was denied by the United States Interior Board of Land Appeals (IBLA). On January 6, 2022, Plaintiffs Wild Horse Education and Ms. Leigh filed a Motion to Reconsider the Stay of the Gather EA. Plaintiffs Wild Horse Education and Ms. Leigh saw the Pancake Complex Gather on the BLM's annual schedule that day and immediately filed the motion since the IBLA still had not rendered its decision over Plaintiffs' appeal. Plaintiffs filed an Amended Motion to Reconsider the Stay Due to New Circumstances on January 10, 2022. The IBLA denied Plaintiffs' Amended Motion to Reconsider the Stay on January 14, 2022, after the gather had already begun.

Argument

**D.    The WHA and Its Implementing Regulations Establish a Mandatory, Non-Discretionary Duty to Prepare an HMAP Prior to Engaging in Management Activities Such as Plans Providing for the Gather and Removal of Wild Horses**

Plaintiffs' First, Second, Third, and Fourth Causes of Action are based upon Defendant violating its mandatory duties as established by WHA and BLM's implementing regulations. In determining whether agency action is in violation of a mandatory duty, courts must often interpret the meaning of statutory or regulatory provisions to determine if an agency's actions contradict a legal mandate. *See Knuckles v. Weinberger*, 511 F.2d 1221 (9th Cir. 1975); *New York v. United States HHS*, 414 F. Supp. 3d 475, 517-18 (S.D.N.Y. 2019); *Greene v. Costle*, 577 F. Supp. 1225, 1228 (W.D. Tenn. 1983). "In statutory construction the function of the court is to give effect to legislative intent 'and there is no invariable rule for the discovery of that intent.'" *Greene*, 577 F. Supp. at 1228 (quoting *U.S. v. American Trucking*, 310 U.S. 534, 542 (1940)). Regulations have the same effect as statutes, since the agency has a duty to comply with regulations it has established. *See Workman v. Mitc*hell, 502 F.2d 1201, 1205 (9th Cir. 1974); *McMahon v. Califano*, 476 F. Supp. 978, 982 (D. Mass. 1979); *Andujar v. Weinberger*, 69 F.R.D. 690, 693-94 (S.D.N.Y. 1976).

Initially, courts should look to the wording of the law. *See id.* A well-settled principle of statutory construction is that each word of a statute must be accorded meaning. *See Hamazaspyan v. Holder*, 590 F.3d 744, 749 (9th Cir. 2009). Statutory titles and headings also can be viewed to establish meaning. *See United States v. Henry*, 1 F.4th 1315, 1333 (11th Cir. 2021). Where statutory language appears clear and ambiguous, courts normally look no further, but "[w]hen aid to construction of the meaning of the words . . . is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *Train v. Colorado Pub. Int. Research Group*, 426 U.S. 1, 10 (1976) (quoting *United States v. American Trucking Assns*., 310 U.S. 534 (1940)).

Supreme Court doctrine, established in *Auer v. Robbins*, provides that courts also may examine an agency's interpretation of its own regulations where genuine ambiguity exists. *See Auer v. Robbins*, 519 U.S. 452 (1997); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *Christopher v. SmithKline Beecham Corp*., 132 S. Ct. 2156, 2166 (2012). In such circumstances, deference should be given to reasonable agency interpretation, although deference does not apply

where such interpretation is plainly erroneous or inconsistent with the regulation. *See Kisor*, 139 S. Ct. at 2415; *Christopher*, 132 S. Ct. at 2166; *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Nor does such deference mean that the court shouldn't first rely on the ordinary tools of construction, such as looking at the "text, structure, purpose, and regulatory history" of a regulation. *Sec'y of Labor v. Seward Ship's Drydock, Inc.*, 937 F.3d 1301, 1310 (9th Cir. 2019); *see also Kisor*, 139 S.Ct. at 2415-2416.

       1.   <u>Language of the WHA and Its Implementing Regulations</u>

The WHA provides the statutory authority by which the Secretary of the Interior "is authorized and directed to protect and manage wild free-roaming horses and burros as components of the public lands." 16 U.S.C. §1333(a). "All management activities shall be at the minimal feasible level." *Id.* This includes management activities related to the removal of excess animals. *See id.* at §1333(b).

The Secretary has delegated its responsibilities to the BLM, which in response has adopted implementing regulations. *See* 43 C.F.R. §4700 et seq. Subpart 4710 of BLM's regulations, entitled "Management Considerations" addresses HMAs and HMAPs as follows:

> §4710.3-1  Herd management areas.
> Herd management areas shall be established for the maintenance of wild horse and burro herds. In delineating each herd management area, the authorized officer shall consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in §4710.4. The authorized officer shall prepare a herd management area plan, which may cover one or more herd management areas.

> §4710.4  Constraints on management.
> Management of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas. Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans.

Section 4710.3-1's use of the word "shall" creates a mandatory duty for the BLM to create HMAs "for the maintenance of wild horse and burro herds" and a mandatory duty to create HMAPs for these HMAs. *See Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573-74 (9th Cir. 2000) ("[t]he term 'shall' is usually regarded as making a provision mandatory, and

the rules of statutory construction presume that the term is used in its ordinary sense unless there is clear evidence to the contrary"); *cf. Mitchael v. Colvin*, 809 F.3d 1050, 1054 (8th Cir. 2016) (finding that the term "may" does not establish a "clear and non-discretionary duty.")

And, the wording of Section 4710.4 establishes, <u>as a constraint on management</u>, that both LUPs and HMAPs are a prerequisite for making management actions since management "shall" be undertaken based upon objectives in land use plans (LUPs) "and" HMAPs. *See Bruce v. First Fed. Sav. & Loan Asso.*, 837 F.2d 712, 714-15 (5th Cir. 1988) (finding that the use of the word "and" is "to be accepted for its conjunctive connotation rather than as a word interchangeable with 'or'"); *see also ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513, 516 (3d Cir. 1998) (holding that effect must be given to all of a law's provisions, "so that no part will be inoperative or superfluous, void, or insignificant.")

### 2.   Regulatory History

The clear and plain language of BLM's regulations creates a mandatory duty for BLM to create HMAPs before engaging in management activities; therefore, there is no need to look further for purposes of statutory construction.  But, to the extent the court seeks to look deeper into the intent of the regulations, the regulatory history further establishes BLM's duty is ministerial.

The current BLM regulations were adopted in 1986, as amended in 1991. *See* Notes for 43 CFR Subtit. B, Ch. II, Subch. D, Group 4700; 51 Fed. Reg. 7410, Mar. 3. 1986; 56 Fed. Reg. 786, January 9, 1991; 43 C.F.R. §4700 *et seq.* (1985); and 49 Fed. Reg. 49252, Dec. 18, 1984, attached as Exh.s B-F to RJN. Prior to 1986, the regulations did not provide that HMAs "shall be established for the maintenance of wild horse and burro herds," did not contain any language regarding HMAPs, and did not connect any land use or management plans with HMAs[7]. *See* 43

---

[7] The pre-1986 regulations provided that the BLM "may designate and maintain specifically designated ranges principally for the protection and preservation of wild free-roaming horses and burros." Exhibit D at §4730.5.  Herd management areas are mentioned once, without context. *Id.* The regulations stated that the BLM "shall, in connection with the designation of a specific range, develop a proposed wild free-roaming horse or burro management plan designed to protect, manage, and control wild free-roaming horses and burros on the area on a continuing basis." *Id.* at §4730.6. These plans are not tied to ensuring

CFR §4700 et seq. (1983), attached as Exh. E to RJN.

In 1984, BLM proposed changes to its regulations, introducing the requirements for HMAs and HMAPs, which were published for comment. *See* 49 Fed. Reg. 49252 at proposed §§4710.3-1, 4710.4, attached as Exh. F to RJN.

This proposed rulemaking revises the provisions on wild free-roaming horses and burros in Part 4700 to reduce the regulatory burden on the public, to clarify the management procedures of the Bureau of Land Management as they affect the public, to remove unnecessary self-regulating provisions, and to arrange the regulations by subject. *Id.* at Summary on p. 49252. Specific to management considerations:

The proposed rulemaking, amends existing Subpart 4730 as new Subpart 4710 to link the management of wild free-roaming horses and burros with the Bureau's planning system; to identify precisely the lands that will be considered for wild horse and burro management; <u>to require that herd management area plans be prepared for all herd management areas</u> . . . " *Id.*, emphasis added. In so doing, the requirement to consult both LUPs and HMAPs was created under a section entitled "Constraints on management," – a title that was non-existent in the earlier regulations. *See* 43 C.F.R. §4710.4; *cf.* Exh. E. Thus, the regulatory history further establishes that HMAPs were purposely included in the regulations as a mandatory duty for all herd management areas and for the purpose of management activities affecting wild horses.

### 3. BLM's Interpretation

The BLM's implementing regulations clearly establish that HMAPs must be created for the management of HMAs, and thus, no *Auer* deference should be granted to any BLM interpretation that is in contradiction. As the U.S. Supreme Court has elucidated:

First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous. If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law. . . . Deference in that circumstance would "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Auer* does not, and indeed could not, go that far.

that maintenance activities are "undertaken with the objective of limiting the animals' distribution to herd areas" nor at ensuring that management "shall be at the minimum level necessary." *Id.* at §4700 et seq.

*See Kisor*, 139 S. Ct. at 2415, internal citations omitted.

In Defendants' opposition to Plaintiffs' Request for Temporary Restraining Order and Preliminary Injunction, Defendants argued that because there is no deadline provided for the creation of HMAPs, they are without effect in this case. Dkt. 18 at 11:21-22. Such interpretation is incorrect. While the Section 4710.3-1 mandate to create an HMAP has no identifiable deadline, Section 4710.4 establishes the deadline by tying management to "the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. 4710.4. To find otherwise would make the regulatory mandate to create HMAPs for all HMAs a nullity. *See R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542, 559 (9th Cir. 2022), declining statutory interpretation that renders sections superfluous; *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 965 (9th Cir. 2013), holding that "[i]n interpreting statutes, we observe the 'cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'", quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Further, to find that there is no deadline to create an HMAP undermines the regulations' stated purpose of having it considered for the purpose of managing wild horses "at the minimum level necessary." *Id. See also* 16 U.S.C. §1331(a), stating that the goal of the WHA is to ensure the protection and management of wild horses so as to ensure that "[a]ll management activities" are "at the minimal feasible level."

Defendants' reliance on the Interior Board of Land Appeals decision in *Animal Prot. Inst. of Am.*, 109 IBLA 112 (1989) does not alter the conclusion that an HMAP must be created before undertaking management actions (which include gather actions). Dkt. 18 at 11:22-12:8. IBLA decisions are not binding authority for the establishment of precedent, and furthermore, it is well established that "[w]hen an issue is not argued or is ignored in a decision, such decision is not precedent to be followed in a subsequent case in which the issue arises." *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds., Inc.*, 937 F.2d 1572, 1581 (Fed. Cir. 1991).  In *Animal Prot. Inst.*

*of Am.*, IBLA issued a 16-page order, one paragraph of which addressed HMAPs:

> Finally, API contends that BLM should not be permitted to proceed with removal of wild horses from the HMA/WHT's involved herein until it has prepared an HMAP in each case.  We note that 43 CFR 4710.3-1 requires preparation of an HMAP.  BLM and/or the Forest Service has prepared HMAP's only with respect to the Miller Flat and Nevada Wild Horse Range HMA's, Monte Cristo HMA/WHT, and Cherry Springs WHT.  No HMAP's have been prepared in the case of the other HMA/WHT's involved herein.  We conclude that it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the statute.  Indeed, 43 CFR 4710.3-1 does not require preparation of an HMAP as a prerequisite for a removal action.  Thus, we are not persuaded that preparation of an HMAP must in all cases precede the removal of wild horses from an HMA/WHT, and decline to order preparation of HMAP's.

*Animal Prot. Inst. of Am.*, 109 IBLA 112, 127 (1989). There is no discussion of Section §4710.4 or the regulatory history of the BLM's regulations. No mention is made of the tools of statutory construction that were argued (if they were). Accordingly, this paragraph in the decision provides no guidance[8].

In Defendants' opposition to Plaintiffs' Request for Temporary Restraining Order and Preliminary Injunction, Defendants also argued that management activities involving the gather and removal of wild horses could be undertaken by either "a land use plan, an EA, an established AML, and a gather plan, or some combination," with this interpretation based upon BLM's Wild Horse and Burro Management Handbook. Dkt. 18 at 12:12-16. But, again such argument is unavailing. The Handbook is not legally binding and cannot alter BLM's mandatory duties under WHA's implementing regulations. *See Christopher*, 567 U.S. at 155; *Williams v. Hanover Hous. Auth.*, 871 F. Supp. 527, 531 (D. Mass. 1994).

Finally, Plaintiffs anticipate Defendants arguing that Section 1333(b) of the WHA gives it discretionary authority regarding plans to remove excess wild horses in so far as it states the Secretary of the Interior may consider inventory, land use planning documents, and "such additional information as becomes available." 16 U.S.C. §1333(b).  The problem with this

---

[8] For the same reasons, Defendants reliance on Friends of Animals v. Bureau of Land Mgmt., No. CV 18-2029 (RDM), 2021 WL 2935900 (D.D.C. July 13, 2021) would be misplaced. It is not a published decision with precedential value, and it did not address the arguments that Plaintiffs now make.

interpretation and argument is that it ignores the effect of BLM's regulations.

In *United States ex rel. Accardi v. Shaughnessy*, the Attorney General adopted regulations that limited certain of his discretionary powers relating to immigration. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-268 (1954). The Court held the Attorney General was unable to exercise the full discretion that was his prior to the regulation's enactment; should he wish to restore his full discretionary authority, he would need to amend the regulations. *See id; see also United States v. Nixon*, 418 U.S. 683, 695-96 (1974), finding that where the Attorney General delegated some of his powers to a Special Prosecutor via regulations, the Attorney General could not reassert these powers without amendment of the regulations. Similarly, in *Service v. Dulles*, Congress awarded the Department of State broad discretion in making determinations to terminate Department employees. *Service v. Dulles*, 354 U.S. 363 (1957). The Department thereafter adopted regulations that established standards and procedural requirements governing such termination, which regulations the Secretary of State did not follow. *See id.* at 387-388. The Court ruled that "[w]hile it is of course true that under the [statute] the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so . . . and having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them." *Id.* at 388.

The BLM made the decision to implement its authority under the WHA by adopting regulations that mandate management based upon both land use plans and HMAPs. This decision purposely established "constraints on management." Now, if BLM regrets that decision, it must go through the process of changing Section 4710.4 to allow consideration of Gather-EAs in the absence of HMAPs.

### E.   Summary Judgment is Appropriate on Plaintiffs' First Cause of Action Based Upon the Mandamus and Venue Act.

Under the Mandamus and Venue Act, [d]istrict courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. §1361. Mandamus relief

is appropriate where a plaintiff establishes a defendant owes a clear, nondiscretionary duty to perform an act. *See Castillo*, 445 F.3d at 1060; *Schulke*, 544 F.2d at 455; *Singh*, 470 F. Supp. 2d at 1072.

As established in Section V.A., above, WHA and its implementing regulations clearly establish a mandatory duty to create an HMAP before BLM can engage in management activities, which include plans to gather and remove horses. Without the relief requested, the BLM can continue to dodge the public scoping process and, further, will be allowed to remove and destroy wild horses without having to consider the full range of options available to control herd population and provide for herd health. It can ignore, for example, the impact of livestock grazing and industry upon wild horses, which also should be considered when determining AMLs. AR3384, 3657, 3661, 3678-80. It can make determinations regarding fertility control without public objection. AR3185, 3188, 3658.

HMAPs were incorporated into the WHA's implementing regulations for a reason: to ensure that gather plans and other management activities are done at the minimum feasible level possible. 43 C.F.R. §4710.4 This is consistent with Congress' direction to the Department of the Interior, as stated in the WHA itself. 16 U.S.C. §1333(b). Having adopted the regulations, BLM cannot now ignore them. *United States v. Nixon*, 418 U.S. at 695-96; *Service*, 354 U.S. at 387-388; *United States ex rel. Accardi*, 347 U.S. at 265-268.

For these reasons, Plaintiffs respectfully request that the court grant its request for summary judgment as to their First Cause of Action and order Defendants to halt any future gathers until such time as they develop an HMAP for the Pancake Complex.

**F.      Summary Judgment is Appropriate on Plaintiffs' Second Cause of Action Based Upon the APA.**

Plaintiffs' Second Cause of Action is based upon the APA's provisions regarding actions unlawfully withheld or unreasonably delayed. 5 U.S.C. §706(1).  The elements of this claim involve the establishment of a clear right to a mandatory duty, and as addressed in Section V.A., above, Plaintiffs have established that BLM has a duty to develop HMAPs prior to engaging in the gather and removal of wild horses. *See Gonzalez v. United States Dep't of Homeland Sec.,*

500 F. Supp. 3d 1115, 1131 (E.D. Cal. 2020), stating that "the APA commands courts to 'compel agency action unlawfully withheld or unreasonably delayed' when the agency is under a mandatory legal duty to act."

The 9th Circuit distinguishes between action that is "unreasonably delayed" and action that is "unlawfully withheld," with the former applying to agency inaction in the face of a discretionary deadline, and the latter applying to actions where a mandatory deadline exists. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002). For cases involving action "unreasonably delayed," courts balance the following "TRAC" factors:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"[;] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason [; ](3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake [;] (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority[;] (5) the court should also take into account the nature and extent of the interests prejudiced by the delay[;] and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 n. 7 (9th Cir. 1997) (quoting *Telecommunications Research & Action v. FCC (TRAC)*, 242 U.S. App. D.C. 222, (D. C. Cir. 1984). But where a deadline exists, courts do not consider the TRAC factors. *See Biodiversity*, 309 F.3d at 1176 and n.11.

Here, Section 4710.4 provides the deadline for BLM's duty to create an HMAP – before management of wild horses is undertaken. 43 C.F.R. §4710.4.  This is a concrete timeframe; the BLM has no discretion to create the HMAP after management of wild horses is undertaken. Therefore, the court is mandated by the APA to compel BLM's action, and Plaintiffs respectfully request that the court grant its request for summary judgment as to their First Cause of Action and order Defendants to halt any future gathers until such time as they develop an HMAP for the Pancake Complex.

However, even if the court were to find that the application of TRAC factors is warranted, the requested relief should still be granted.  The first and second TRAC factors

considers whether the time for agency action has been reasonable. *See Vaz v. Neal*, 33 F.4th 1131, 1138 (9th Cir. 2022); *Doe v. Risch*, 398 F. Supp. 3d 647, 656-657 (N.D. Cal. 2019). In this case, BLM has refused to create an HMAP, and this refusal occurred despite the public asking it to honor its statutory duty to create one. *See* e.g., AR3184-86, 3382-86. Indeed, in responding to such request, BLM refused to explain why it has not created one. *See* AR3654-3692. Nor does BLM mention HMAPs anywhere within the Pancake Gather-EA. Moreover, as illustrated by the Fifteenmile HMAP, BLM has the ability to create an HMAP before instituting a Gather Plan. *See* Exhibit A to RJN.

The third and fifth TRAC factors focus on human health and welfare, as well as the nature and extent of the interests prejudiced by the delay. *See Doe*, 398 F. Supp. 3d at 657. Here, the WHA's main interest is to protect wild horses, with a recognition that such interest is "an integral part of the natural system of the public lands." 16 U.S.C. §1331.  Further, Congress recognized that this interest is important to "enriching the lives of the American people." *Id.*  By not creating an HMAP for the Pancake Complex, BLM's actions do not consider the full range of management options available to protect wild horses, and delay goes against the interests specifically elucidated by Congress.

The fourth TRAC factor examines the effect of compelling action on other agency activities or priorities. *See id.* at 658. Plaintiffs are unaware of any negative effect associated with compelling BLM to create an HMAP. The sixth, and final TRAC factor, merely holds that courts need not find agency impropriety prior to compelling action. *See id.*

Taken together, contemplation of the TRAC factors leads to the conclusion that no reasonable justification exists for BLM's delay in creating an HMAP, and this delay flies in the face of Congress' stated intent for legislating the WHA. Thus, even if the court considers BLM's inaction as being "unreasonably delayed" versus "unlawfully withheld," Plaintiffs' request should be granted.

### G.   Summary Judgment is Appropriate on Plaintiffs' Third Cause of Action Based Upon the APA.

Plaintiffs' Third Cause of Action asserts that BLM acted in an arbitrary and capricious manner that was contrary to law and constitutes an abuse of their discretion when it interpreted its Handbook to conflict with its mandatory duty under 43 C.F.R. §4710.4 and by choosing to proceed with the gather and removal of more than 2,000 wild horses in the Pancake Complex prior to development of an HMAP[9]. The APA's arbitrary and capricious standard provides a court may set aside agency action where the there is no "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Such examination takes into consideration whether the government's action is consistent with applicable statutes or regulations, as well as its own internal criteria. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); 5 U.S.C. §706(2)(A). Where an agency has "entirely failed to consider an important aspect of the problem" that is at issue, courts have held action to violate the APA. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As addressed above in Section V.A., above, Defendants had a mandatory duty to compile an HMAP prior to any gather plan, with the objectives contained within the HMAP to be used to ensure "[m]anagement shall be at the minimum level necessary." 43 C.F.R. § 4710.4.  As such, BLM has no discretion, and its choice to proceed with the removal and killing of wild horses in the Pancake Complex was plain error contrary to law.

BLM's Handbook, which is not binding law, examines the policies and procedures by which the agency adheres to WHA and the implementing regulations, and it acknowledges that management "[a]ctivities are carried out with the objective of maintaining free-roaming behavior and at the minimum feasible level of management necessary to attain the objectives identified in approved land use plans (LUPs) <u>and</u> Herd Management Area Plans (HMAPs)." AR1355, emphasis added. Despite this, BLM interprets its own regulations to allow for Gather

---

[9] The law underlying this APA claim is the WHA and its implementing regulations. Plaintiffs also allege an arbitrary and capricious claims based upon NEPA, which is addressed below in Section V.F.

Plans/Gather-EAs without first creating an HMAP. Indeed, the Handbook seems to indicate that while a Gather Plan should tier to an LUP or an HMAP, "where appropriate," it need not tier to either, but instead may comport with "other relevant decision documents." AR1396.  There is no rational basis for such an interpretation.

To be clear, BLM interprets HMAPs as being important documents, but has repeatedly refused to create them. The BLM Handbook states that "HMAPs establish short- and long-term management and monitoring objectives for a specific WH&B herd and its habitat." AR1360. Normally, HMAPs also identify the actions to be taken to accomplish "herd or population management and monitoring objectives regarding the management of a specific HMA or complex of HMAs." AR1359. "An HMAP assists the authorized officer in tracking progress toward achieving LUP goals." AR1360. The "first step" in creating an HMAP involves the evaluation of existing management, which concludes with a report prepared and made available to the public as part of a public scoping period. AR1386. The "next step" is to conduct a NEPA analysis. AR1386-1387.

In adopting a gather plan based upon the Pancake Gather-EA, and without the benefit of an HMAP, BLM removal of horses was conducted without consideration of the full array of short- and long-term management and monitoring objectives governing the management and protection of wild horses in the Pancake Complex. Even if this court were to rule that a Gather Plan can be issued without the benefit of an HMAP, gather activities cannot be undertaken unless done so in a manner that accounts for managing at the minimum level feasible. See 16 U.S.C. § 1333; 43 C.F.R. § 4710.4.  This was not done.

As illustrated by the Fifteenmile HMAP, an HMAP's focus on short and long-term management objectives, can address future gather operations for either a Gather Plan or in cases of emergency. Exhibit A to RJN at p.1, 7-15.  In addressing the health of herds, it provides substantive guidance and implementation objectives. *Id.* at 3-4, 7-9. Because the Pancake Gather Plan does not have comparable objectives to tier to, BLM refused consideration of key issues. For example, BLM was asked to address the management of livestock grazing and industry,

which is affecting rangeland health and impacts horse AMLs. AR3384. BLM responded that this issue was not within the scope of the Pancake Gather-EA as it involved land-use planning, and "[t]he purpose of the EA is not to adjust livestock use." AR3657, 3661, 3678-80. Had BLM created an HMAP, Plaintiffs would have had the opportunity not only to address the impact of livestock grazing on herds in the Complex, but also they would have commented on the Pancake Complex's early foaling season, considerations of weather for gather operations, considerations for ensuring gathers are conducted in a humane manner, the use of reversible PZP for fertility control, rewilding as an alternative management strategy, considerations related to rare genetic lineages present in the Complex, and more. WHE Decl. at ¶¶19-25; CHE Decl. at ¶¶6-8; AWA Decl.¶¶11, 13-15; and CANA Decl. at ¶¶10-11, 15-18. Other examples are addressed in Section V.F., below. Taken together, the record unmistakably establishes that BLM's actions were arbitrary and capricious, in a manner that was contrary to law and constitutes an abuse of their discretion.

Gather-EAs focus only on environmental review pursuant to NEPA and entirely fail to consider important aspects of herd management that are interconnected with population objectives; such failure violates the APA. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.

WHA's directive that BLM management activities be done at the minimum level feasible must be afforded meaning.  BLM's regulations, mandating HMAP creation for this purpose, must be afforded meaning.  Yet, BLM's interpretation (as stated in its Handbook) essentially abrogates such meaning. For gathers, BLM interprets the "minimum level feasible" directive to be optional.

BLM's interpretation contradicts binding law, and there is no reasonable basis for its conclusion that a Gather Plan can be issued with or without an LUP or HMAP. Accordingly, Plaintiffs respectfully request that the Court find Defendants' action to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### H. Summary Judgment is Appropriate on Plaintiffs' Fourth Cause of Action Based Upon the APA.

Plaintiffs' Fourth Cause of Action is based upon the APA's provision for a court to set aside actions "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2))(C). Specifically, "[t]o the extent Defendants have interpreted the BLM Handbook to conflict with Defendants' mandatory duty to comply with 43 C.F.R. §4710.4 to carry out management of wild horse herds at the minimum level necessary to attain the objectives identified in approved land use plans and herd management plans, Defendants have acted in excess of statutory jurisdiction, authority, or limitations." Dkt. 31.

A cause of action based upon this APA provision examines whether Defendants' actions contravene the meaning of a statute or regulation. As established in Section V.A., above, the WHA provides the statutory authority by which the Secretary of the Interior, as delegated to BLM, protects and manages wild horses, including the removal of horses from public lands. 16 U.S.C. §1333. This authority is limited by the provision that "[a]ll management activities shall be at the minimal feasible level." *Id.* The BLM adopted regulations to implement the WHA, and for the purposes of ensuring that management activities adhered to Section's 1333 limit on it authority, these regulations provide that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. 4710.4.

As addressed above in Section V.A., no deference should be given to any BLM interpretation that contradicts the WHA or its regulations. The content of BLM's Handbook is not legally binding and cannot alter BLM's mandatory duties. *See Christopher*, 567 U.S. at 155; *Williams v. Hanover Hous. Auth.*, 871 F. Supp. 527, 531 (D. Mass. 1994).

For these reasons, Plaintiffs respectfully request the court grant summary judgement for Plaintiffs' Fourth Cause of Action.

I.    **Summary Judgment is Appropriate on Plaintiffs' Fifth Causes of Action Based Upon the APA.**

Plaintiffs' Fifth Cause of Action focuses on whether Defendants' NEPA review, which resulted in the adoption of the Pancake Gather EA, was arbitrary and capricious, an abuse of discretion, and not in accordance with law in violation of Section §706(2) of the APA. Dkt. 31.

NEPA requires preparation of an environmental impact statement (EIS) for "every …
major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. §
4332(2)(C). An EA is done for the purpose of determining whether an EIS is required. *See* 40
C.F.R. § 1508.9. "If any 'significant' environmental impacts might result from the proposed
agency action then an EIS must be prepared before agency action is taken." *Sierra Club v.
Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).

In the context of a NEPA challenge, the APA's arbitrary and capricious standards
requires courts to determine whether an agency has taken a "hard look" at the actual
environmental consequences of its action (or inaction). *See Marsh*, 490 U.S. at 373-74; *350
Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022). Where the government makes a
finding that no significant impact will occur as a result of proposed action, this decision must be
based on a consideration of all relevant factors and supported by a convincing statement of
reasons. *See id.* In this regard, the agency must both accurately identify relevant environmental
concerns and analysis alternatives to the proposed action. 42 U.S.C. §4332(E); 40 C.F.R.
§1508.9; *Sierra Club v. United States DOT*, 753 F.2d 120, 127 (D.C. Cir. 1985).

"The purpose of NEPA's alternatives requirement is to ensure agencies do not undertake
projects "without intense consideration of other more ecologically sound courses of action,
including shelving the entire project, or of accomplishing the same result by entirely different
means." *Envtl. Defense Fund, Inc. v. U.S. Army Corps of Engrs.*, 492 F.2d 1123, 1135 (5th Cir.
1974). Federal courts have consistently held that an agency's failure to consider a reasonable
alternative is fatal to an agency's NEPA analysis. *See Muckleshoot Indian Tribe v. U.S. Forest
Serv.,* 177 F.3d 800, 814 (9th Cir. 1999); *Idaho Conserv. League v. Mumma*, 956 F.2d 1508,
1519-20 (9th Cir. 1992). If the agency rejects an alternative from consideration, it must explain
why a particular option is not feasible and was therefore eliminated from further consideration.
40 C.F.R. § 1502.14(a). The courts will scrutinize this explanation to ensure that the reasons
given are adequately supported by the record. *See Muckleshoot Indian Tribe*, 177 F.3d at 813-15;
*Idaho Conserv. League*, 956 F.2d at 1522.

Further, as it is a fundamental objective of NEPA is to ensure that an agency will not act on incomplete information, where critical information is missing, the government may not rely upon an EA to implement proposed action. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1990); *350 Montana*, 50 F.4th at 1263; *National Parks & Conservation Ass'n. v. Babbitt*, 241 F.3d 722, 732-33 (9th Cir. 2001). "The 'hard look' 'must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.'" *W. Watersheds Project v. Kraayenbrink*, 620 F.3d 1187, 1205 (9th Cir. 2010), quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

The Pancake Complex is made up of the Pancake Herd Management Area (HMA), the Sand Springs West Wild Horse HMA, the Jakes Wash Herd Area (HA), and the Monte Cristo Wild Horse Territory (WHT). AR03501. It consists of 1,228,739 acres of land, the majority of which is directly managed by the Bureau of Land Management (BLM).  AR03501, 03503.

The Pancake Gather-EA states the purpose of the 10-year Gather Plan "is to gather and remove excess wild horses from within and outside the Pancake Complex and to reduce the wild horse population growth rates to achieve and maintain established AML ranges." AR3504. The Gather Plan (identified as Alternative A) is described as: "Over a 10 year period, use phased gathers to removed excess animals in order to achieve and maintain the population within AML range, apply fertility control methods (vaccines and/or IUDs) to released mares, maintain a sex ratio adjustment of 60% male and 40% female, and release a small non-reproducing component of males (up to 138 geldings) that brings the population to mid-AML." AR3507.  It is stated to be in conformance with the 2008 Ely District RMP, 1997 Tonopah RMP, and 1986 Humboldt National Forest Land & RMP. AR3504-05. The EA relied upon AMLs[10] developed in these RMPs[11], and it assumed that without any gathers, "[t]he current wild horse population would continue to increase at a rate of 20-25% per year." AR3502-3503, 3507.

---

[10] BLM defines AML "as the number of wild horses that can be sustained within a designated HMA which achieves and maintains a thriving natural ecological balance in keeping with the multiple-use management concept for the area." AR3502.

[11] BLM states that "[t]he Pancake Complex has a cumulative AML range of 361-638 wild horses." AR3502.  This is consistent with the AMLs established through the three RMPs associated with the

1    The Pancake Gather-EA considered the following alternatives to the proposed one: a no

2    action alternative, Alternative B, which was the same as the proposed one sans the non-

3    reproducing geldings component, Alternative C, which was the same as the proposed one but

4    without fertility control methods, a sex ratio adjustment, or the non-reproducing geldings

5    component, and Alternative D, which was limited to the capture of wild horses associated with

6    the Jakes Wash HA. AR3502-3503, 3506-3507.

7    Public comments and BLM's responses are contained in Appendix XIII to the Pancake

8    Gather-EA. AR3654-3692.

9            1.    Defendants' Failed to Take a Hard Look at Alternative Methods of Habitat
                   Management and Population Control

10   Despite recognizing that the Pancake Gather-EA should analyze wild horses as a

11   resource, BLM disproportionately focused on the impact of horses upon public lands, ignoring

12   methods of habitat management and population control that could lower this impact without

13   having to remove and destroy over 2,000 horses. AR2080-3392, 3524, 3654-3692. As one

14   member of the public noted, the Plan's microscopic focus "favor[ed] livestock, mining, oil and

15   gas leasing, and other exploitive interests on the public lands and within the wild horses' legal

16   habitat." AR2089.

17   Defendants cannot demonstrate that they gave a "hard look" at potential impacts

18   associated with the Gather Plan because they failed to consider all relevant factors and analyze

19   appropriate alternatives. *See* 42 U.S.C. §4332(E); 40 C.F.R. §1508.9; *Marsh*, 490 U.S. at 371;

20   *National Parks & Conservation Ass'n.*, 241 F.3d at 732-33; *350 Montana*, 50 F.4th at 1263;

21   *Sierra Club*, 753 F.2d at 127. BLM failed to address the following factors and alternatives:

22      • Impacts of a drastic reduction of population size on population growth rate;

23      • Impacts of horse removal on wildfire risks;

24

25   Pancake Complex. The 2008 Ely District RMP identifies an AML range of 240-493 for the Pancake
     HMA, and it also changed the Jakes Wash HMA to an HA, finding that it did not provide sufficient
26   habitat resources to sustain healthy wild horse populations. AR941.  The 1997 Tonopah RMP identifies
     an AML of 49 for the Sand Springs West Wild Horse HMA, and the 1986 Humboldt National Forest
27   Land & RMP identifies an AML range of 72-96 for the Monte Cristo WHT. AR55, 551.

28

- Addressing population management without removals by implementing reductions in livestock grazing on the land;

- Addressing population management through rewilding.

    a)    *Impacts of a drastic reduction of population size on population growth rate*

Several members of the public asked BLM to consider recommendations made by the NAS in its 2013 report, "Using Science to Improve the BLM Wild Horse and Burro Program: A Way Forward," which can be found at AR2134-2530. In this report, NAS found that BLM management practices are actually causing high horse population growth rates. AR2150-51. In fact, regularly removing horses can cause "population levels below food-limited carrying capacity. Thus, population growth rate could be increased by removals through compensatory population growth from decreased competition for forage. As a result, the number of animals processed through holding facilities is probably increased by management."

The Pancake Gather-EA states that the purpose of the Gather Plan is "to reduce the wild horse population growth rates to achieve and maintain established AML ranges." AR3504. Yet, when the NAS finding regarding the impact of removals upon growth rates was brought to BLM's attention, it provided no response. AR2118.

    b)    *Impacts of horse removal of horse removal on wildfire risks*

One member of the public noted that wild horses are important to lowering the risk of wildfires on public lands:

> Wild horses act as major reducers of dry flammable vegetation, or what becomes such later in the year. The major reduction of wild horses proposed by the EA would alarmingly increase the risk of catastrophic wildfires in many places. Often wild horses reach areas that are inaccessible to other herbivores including domestic livestock. After their removal, lightning-sparked fires could occur more frequently. These are likely to be quite extensive, e.g. the Rush Peak Fires started in the Twin Peaks W.H. HMA in NE California in September, 2012 occurred shortly after a major BLM wild horse and burro roundup the removed most of the equids from this ca. 800,000-acre area. It ended up burning 315,000 acres and was caused by lightning combusting vegetation on a remote peak. Another important factor is that by building more moisture-retaining soils wild horses bolster watersheds. Much of this involves their balancing all the ruminant herbivores that are overly promoted by people. Truly, wild horses create moisture conditions that prevent serious wildfires and benefit a myriad of species."

33  Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

AR2089. *See also* AR3026. In response, BLM stated:

> The EA noted potential impacts of high populations of wild horses on rangelands, including the spread of invasive plant species, which could increase wildfire risk. The supposition that large numbers of wild horses may reduce fuel loads could probably be said for all large grazing animals on the range (including livestock). However, there are many different factors that affect wildfire risk and it is an oversimplification and inaccurate to state that grazing – in and of itself – will reduce wildfire risk, since this is just one component relevant to wildfire risk.

AR3671. This reply may indicate that BLM provided at least some minimal analysis on the potentially significant impact associated with wildfire risk as a result of the Gather Plan, but this is not the case.  While the Gather-EA talks about invasive plant species, the connection between them and wildfires was not addressed. Wildfire risks, including those associated with removing wild horses, simply were never analyzed.

> c)  *Addressing population management without removals by implementing reductions in livestock grazing on the land*

BLM was asked to consider addressing "the current wild horse population without removals by implementing reductions in livestock grazing pursuant to 43 C.F.R. § 4710.5(a). The BLM has a statutory mandate to protect wild horses, while livestock grazing is permitted only at the discretion of the Interior Department. Livestock grazing is not required to fulfill the agency's 'multiple use' mandate." AR2081. *See also* AR2091, 2126-27, 3384.

As evidence that such an alternative could significantly alleviate the need to remove over 2,000 horses, one commenter wrote:

> Federal regulation 43 C.F.R. §4710.5 "Closure to livestock grazing" authorizes the BLM to "close appropriate areas of the public lands to grazing use by all or a particular kind of livestock" "[i]f necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury." . . . the BLM should pursue analysis of an alternative that considers how the agency could accommodate a larger wild horse population through adjustments to livestock stocking rates with options such as voluntary grazing retirement opportunities. . . .
>
> Although wild horses are allotted roughly 7,656 AUMs at the high AML of 638, ranchers are allotted roughly 59,427 AUMs in allotments that overlap or are completely within the Complex. Even at the BLM's 2020 estimated population of 2,262-3,864 adult wild

> horses, that's 27,14446,368 AUMs – meaning the authorized use for livestock is still more than that allotted for horses even if the estimation is correct. . . .
>
> Given that the BLM is claiming that range damage is caused by wild horses who are allotted for about 12 percent of the AUMs than livestock, it logically follows that the thousands of cow/calf pairs who graze in the Complex must be greatly reduced in number . . .

AR2126. A summary of rangeland health, contained in Appendix VII of the Pancake Gather-EA acknowledged that livestock were a contributing factor to not achieving a number of rangeland health standards. AR3606-3611.

BLM stated that this alternative was eliminated from further consideration because it would require revisions to applicable RMPs. AR3519-3520, 3657, 3661, 3678-80. As such, BLM stated this alternative was outside the scope of the EA. *Id.* (Such response is a perfect example of why an HMAP should be created, ensuring that population management is properly integrated with comprehensive herd and land use objectives.) If revision to RMPs can address population management without removing and killing thousands of horses, then BLM should so act. The requirement to consider appropriate alternatives does not cease simply because it involves action as a prerequisite to horse gathers.

### d)    *Addressing population management through rewilding*

Another alternative, similar to the above one, would be to reduce livestock grazing and "other conflicting monopolizers." AR3028. This could include retiring or restricting mining activity, OHV use, and more.  *Id.* Referred to as a rewilding strategy, this alternative would focus on returning the land to its natural state. *Id.* BLM simply ignored this alternative, without explanation.

### 2.    Defendants' Failed to Take a Hard Look at Appropriate AMLs

The BLM refused to consider what the appropriate AML for the Pancake Complex should be, but instead just added up AMLs created in old LUPs. The AMLs are exceptionally low for the amount of land at issue (AML range of 361-638 for 1,228,739 acres of public land).

AR2089-91, 3501-03. And, numerous members of the public challenged the AML range that BLM relied upon. AR2081, 2089-91, 2109, 2126

To the extent that BLM justifies the 371-638 AML range, NEPA requires the agency to support its conclusion. But, the administrative record does not contain such support. Instead, the EA states that "[m]onitoring and other historical data collected within the Complex does not indicate that an increase in AML is warranted at this time." AR3519; see also AR3503. It is unclear what this refers to.  The only data that is provided by BLM comes from a 2020 flight survey. AR3503. (BLM also identifies data from a 2021 flight survey; however, "[t]he data from the 2021 survey have not yet been analyzed." AR 3688.) As one commenter noted, the EA should have contained "all census data of the wild horse population for each of the past 10 years. Such a record would provide a clear picture of the population, how it has fluctuated over time, and would help the EA's analysis of population growth within the Complex." AR2130.

In discussing AMLs, BLM acknowledged that horse populations within the at-issue HMAs fluctuate "depending on the seasonal movement of these wild horses." AR3503. Horses also travel back and forth between HMAs. *Id.* BLM also recognized that rangeland health is an important consideration in determining AML levels, but even though "[a] Rangeland Health Evaluation is currently scheduled for the grazing allotments associated with the Sand Springs West HMA[,]" it did not consider adjusting the AML levels. *Id.*

The failure to identify the basis for its decision regarding AML and the decision to act even though relevant information is not yet available constitute a violation of NEPA; BLM must therefore conduct an EIS. *See Muckleshoot Indian Tribe*, 177 F.3d at 813-15; *Idaho Conserv. League*, 956 F.2d at 1522; *Marsh*, 490 U.S. at 371; *350 Montana*, 50 F.4th at 1263; *National Parks & Conservation Ass'n.*, 241 F.3d at 732-33. Where there is "lack of supporting data and cursory treatment of environmental effects[,]" an EIS is mandated. *National Parks & Conservation Ass'n.*, 241 F.3d at 732.

BLM's responses to the public and its cursory explanation regarding modification of AMLs does not demonstrate good faith. Rather, the EA appears to be "an exercise in form over

substance" that is disallowed under NEPA. *See W. Watersheds Project v. Kraayenbrink*, 620 F.3d at 1205.

        3.      <u>Defendants Failed to Take a Hard Look at the Impact of Returning Geldings to the Pancake Complex</u>

The Pancake Gather Plan calls for the re-introduction of hundreds of geldings into the Pancake Complex to assist in a "reduction in per-capita population growth rates." AR3511. But, the EA does not analyze the associated negative impacts on horses or herds.

Several members of the public commented on BLM's inadequate analysis. *See e.g.,* AR2120-2121, 3005-3006, 3132, 3386. One commented that BLM "should review the scientific controversy surrounding the proposed gelding. The impacts of gelding on stallions can be severe, affecting their physiology, behavior, environment and impact on the herd." AR2120-2121, referencing past BLM attempts to rely upon gelding, the 2013 NAS report findings regarding potential impacts associated with gelding, and the case of *AWHPC v. Jewell*, wherein a court "struck down the approach of creating sterile herds of wild horses in part because the agency failed to consider relevant input from the [2013] NAS report"; see also

In response, BLM stated that "[t]he long historical use of gelding and IUDs in domestic mares[12] . . . is adequate to conclude that use of [this method] is not scientifically controversial in terms of expected effects." AR3663. "There is no indication in the available scientific literature that would suggest that the inclusion of some gelded wild horses in a wild horse herd would prevent the formation of social bands, by those geldings and/or by other horses. There is no statute or regulation that requires BLM to perform or wait for the results of any study before it utilizes a particular population control method." AR3664. In support of this, BLM references Appendix XII. Id. That appendix, however, barely discusses the impacts of re-introducing geldings into wild herds, stating that how geld males would interact with intact stallions and mares is "unknown." AR3626. And:

---

[12] There is no such long historical use of using gelding in wild herds. BLM states that it has only re-introduced geldings into HMA populations on 3 occasions – in 2011, 2012, and 2016. AR3511.

. . . it is not clear how the behaviors of geldings would change, how quickly any change would occur after surgery, or exactly what effect gelding an adult stallion and releasing him back in to a wild horse population would have on his behavior and that of the wider population. These can be <u>hypothesized</u> from the limited existing literature. . . .

Wild horses are rarely gelded and released back into the wild, resulting in few studies that have investigated their behavior in free-roaming populations. . . . These few studies may not reflect behavior of free-roaming wild horses in the western US . . . Additionally, no study exists on the behavior of wild stallions pre- and post-castration, and what effects this would have on their group membership, home range, and habitat use.

AR3628-3629.

This "review" of impacts associated with gelding clearly is inadequate. Preparation of an EIS is required where impacts are "highly uncertain or involve unique or unknown risks." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 732, quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998).

## V.    Conclusion

Defendants have violated the mandates of the WHA and implementing regulations, as well as those in NEPA. The former establishes a robust system for considering population management choices, requiring gathers to consider objectives in both LUPs and HMAPs. By doing so, the public is allowed a meaningful opportunity to participate in the scope and substance of management activities. And, BLM is provided both short- and long-term objectives that take into account a broad range of issues relevant to herd and range health, supporting the recognition that wild horses must be protected as an integral part of the natural system of the public lands. Without HMAPs, gather decisions are made in a vacuum that allows BLM to pick and choose how objectives are created and what factors are relevant.

Even if HMAPs were not mandatory, the Pancake Gather-EA fails to comport with the WHA's requirement that all management activities occur at the minimum level feasible. For that requirement to mean anything, BLM must, at a minimum, taken into account all of the factors that affect the health of horses in their HMAs (such as the impact of livestock grazing). This conclusion is further supported by the requirements of NEPA, which BLM has not met insofar as

1    it ignored key issues, refused to consider important data, and failed to provide the basis for its

2    conclusions.

3              Plaintiffs therefore request that their motion for summary judgment be granted.

4    DATED: August 10, 2023                    Respectfully Submitted,

5
                                               *s/ Danielle M. Holt*
6                                              Danielle M. Holt
                                               (Nevada Bar No. 13152)
7                                              DE CASTROVERDE LAW GROUP
                                               1149 S Maryland Pkwy
8                                              Las Vegas, NV 89104
                                               (702) 222-9999
9                                              danielle@decastroverdelaw.com

10
                                               *s/ Jessica L. Blome*
11                                             Jessica L. Blome
                                               (Cal. Bar No. 314898, pro hac vice)
12                                             GREENFIRE LAW, PC
                                               2748 Adeline Street, Suite A
13                                             Berkeley, CA 94707
                                               (510) 900-9502
14                                             jblome@greenfirelaw.com

15
                                               *Attorneys for Plaintiffs*
16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2023, I electronically filed the foregoing Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof along with Standing Declarations in Support of Motion for Summary Judgment for Leigh, Beckstead, Edwards and Kalimian with the Clerk of the U.S. District Court in the District Court of Nevada using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Jessica L. Blome*
Attorney for Plaintiffs