TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Section Chief
BRIDGET K. MCNEIL, Assistant Section Chief
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
SAMANTHA G. PELTZ (IL Bar No. 6336536)
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section, Natural Resources Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 598-9736 (Carrara)
Fax: (202) 305-0275
Email: christian.carrara@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, THE CENTER FOR A HUMANE ECONOMY, a non-profit corporation LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation, ) ) ) ) ) ) ) | Case No: 3:22-cv-00034-MMD-CLB |
| *Plaintiffs*, ) ) ) | |
| *v.* ) ) | **MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, ) ) ) ) ) ) | |
| *Defendants*. ) ) ) | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

  I. STATUTORY BACKGROUND ..................................................................................... 2

    A. The Wild Free-Roaming Horses and Burros Act .......................................................... 2

    B. The National Environmental Policy Act ...................................................................... 3

  II. FACTUAL BACKGROUND ........................................................................................... 4

    A.  The Pancake Complex Wild Horse Gather Plan ............................................................ 4

    B.  The 2022 Gather .......................................................................................................... 8

STANDARD OF REVIEW ................................................................................................... 8

ARGUMENT ........................................................................................................................ 9

  I.  Because the 2021 Gather Decision complies with the Wild Horse Act, the Court should grant summary judgment in favor of BLM. ...................................................................... 9

    A.  The 2021 Gather Decision and 2022 Gather are consistent with the Wild Horse Act and its regulations ....................................................................................................... 9

    B.  Plaintiffs fail to show the Wild Horse Act or its regulations require BLM to prepare an HMAP prior to gathering excess horses. ................................................................... 11

      a.  There is no requirement in the Wild Horse Act that an HMAP be prepared prior to the removal of excess wild horses. ...................................................................... 12

b.   There is no requirement in the Wild Horse Act's implementing regulations that an HMAP be prepared prior to the removal of excess wild horses. ............................ 14

C.   The Court should reject Plaintiffs' remaining Wild Horse Act arguments. ................ 17

a.   Plaintiffs fail to show that BLM unlawfully withheld or unreasonably delayed the creation of an HMAP. .............................................................................................. 17

b.   The BLM Wild Horse and Burro Handbook complies with the Wild Horse Act and Plaintiffs' challenges to it fail as a matter of law. ........................................................ 20

c. Plaintiffs' argument that they lacked the opportunity to comment on the 2022 Gather Plan without an HMAP lacks merit. ............................................................................. 22

II.   Because the 2021 Gather Decision complies with NEPA, the Court should grant summary judgment in favor of BLM. ........................................................................... 24

A.   BLM's EA complied with NEPA. ............................................................................. 25

B.   BLM considered a reasonable range of alternatives. ................................................. 25

C.   BLM's reliance on well-established AMLs for the 2022 Gather complied with NEPA. ..................................................................................................................................28

D.   BLM considered the relevant factors when analyzing alternatives. ........................... 29

E.   BLM's consideration of impacts of gelding satisfies NEPA. .................................... 30

CONCLUSION ................................................................................................................. 32

# TABLE OF AUTHORITIES

| Case | Page |
| --- | --- |

*Accardi v. Shaughnessy*,
   347 U.S. 260 (1954) ............................................................................ 16

*Am. Horse Prot. Ass'n v. Watt*,
   694 F.2d 1310 (D.C. Cir. 1982) ......................................... 2, 11, 12, 13

*Am. Horse Prot. Ass'n, Inc. v. Frizzell*,
   403 F. Supp. 1206 (D. Nev. 1975) ..................................................... 11

*Am. Wild Horse Campaign v. Bernhardt*,
   963 F.3d 1001 (9th Cir. 2020) ............................................. 22, 30, 31

*Am. Wild Horse Campaign v. Zinke*,
   353 F. Supp. 3d 971 (D. Nev. 2018) ................................................. 31

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,
   462 U.S. 87 (1983) ............................................................................... 8

*Bennett v. Spear*,
   520 U.S. 154 (1997) ..................................................................... 20, 21

*Blake v. Babbitt*,
   837 F. Supp. 458 (D.D.C. 1993) .......................................................... 2

*Cal. Sea Urchin Comm'n v. Bean*,
   828 F.3d 1046 (9th Cir. 2016) ........................................................... 21

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) ............................................................. 25

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ...................................................................... 8, 31

*Cloud Found. v. U.S. Bureau of Land Mgmt.*,
   802 F. Supp. 2d 1192 (D. Nev. 2011) .................................................. 2

*Cloud Found. v. U.S. Bureau of Land Mgmt.*,
   No. 3:11-CV-00459-HDM, 2013 WL 1249814 (D. Nev. Mar. 26, 2013) ...................... 12, 27

*Colo. Wild Horse & Burro Coal. v. Jewell*,
   130 F. Supp. 3d 205 (D.D.C. 2015) ................................................... 20

*Ctr. for Cmty. Action & Env't Just. v. BNSF R. Co.*,
   764 F.3d 1019 (9th Cir. 2014) ..................................................... 14

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004)..................................................................... 3

*Forest Guardians v. Animal & Plant Health Inspection Serv.*,
   309 F.3d 1141 (9th Cir. 2002) ..................................................... 20

*Friends of Animals v. Bureau of Land Management*,
   Case No: 16-CV-0199, 2017 WL 5247929, *8 (D. Wyo. Mar. 20, 2017) ........................... 28

*Friends of Animals v. Culver*,
   610 F. Supp. 3d 157 (D.D.C. 2022) ............................................. 31

*Friends of Animals v. Pendley*,
   523 F. Supp. 3d 39 (D.D.C. 2021) ............................................... 9

*Friends of Animals v. Silvey*,
   353 F. Supp. 3d 991 (D. Nev. 2018) ..................................... 12, 27, 31

*Friends of Animals v. United States Bureau of Land Mgmt.*,
   548 F. Supp. 3d 39 (D.D.C. 2021) ......................................... 9, 10, 15

*Grunewald v. Jarvis*,
   776 F.3d 893 (D.C. Cir. 2015) ..................................................... 28

*Headwaters, Inc. v. BLM*,
   914 F.2d 1174 (9th Cir. 1990) ..................................................... 25

*In Defense of Animals v. U.S. Dep't of Interior*,
   751 F.3d 1054 (9th Cir. 2014) .............................................. passim

*In Def. of Animals v. U.S. Dep't of Interior*,
   909 F. Supp. 2d 1178 (E.D. Cal. 2012).................................... 2, 13

*In re A Cmty. Voice*,
   878 F.3d 779 (9th Cir. 2017) ................................................. 18, 19

*Kern v. U.S. Bureau of Land Mgmt.*,
   284 F.3d 1062 (9th Cir. 2002) ..................................................... 3

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)................................................................ 16

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ............................................................................................ 8

*Laguna Greenbelt, Inc. v. U.S. Dep't. of Transp.*,
  42 F.3d 517 (9th Cir. 1994) .............................................................................. 26

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) .............................................................................. 8

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ................................................................................. 8, 29, 30

*Mining Co. v. Babbitt*,
  105 F.3d 502 (9th Cir. 1997) ................................................................. 17, 18, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................. 8

*Native Ecosystems Council v. U.S. Forest Serv.*,
  866 F. Supp. 2d 1209 (D. Idaho 2012) .............................................................. 3

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ..................................................................... 4, 25

*North Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980) ..................................................................... 24, 28

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ....................................................................................... 17, 18

*R.T. Vanderbilt Co. v. Babbitt*,
  113 F.3d 1061 (9th Cir. 1997) .......................................................................... 17

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ................................................................................... 3, 4, 24

*Rojas v. Sea World Parks & Ent., Inc.*,
  538 F. Supp. 3d 1008 (S.D. Cal. 2021) ............................................................ 15

*Schweiker v. Hansen*,
  450 U.S. 785 (1981) .......................................................................................... 21

*Service v. Dulles*,
  354 U.S. 363 (1957) .......................................................................................... 16

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) .................................................................. 24

*Telecommunications Research and Action Center v. F.C.C.*,
   750 F.2d 70 (D.C. Cir. 1984) ............................................................... 18, 19

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
   671 F.3d 1113 (9th Cir. 2012) ............................................................. 24, 25

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents*,
   508 U.S. 439 (1993) ................................................................................... 14

*Vaz v. Neal*,
   33 F.4th 1131 (9th Cir. 2022) ..................................................................... 17

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ................................................................................... 28

*W. Radio Servs. Co. v. Espy*,
   79 F.3d 896 (9th Cir. 1996) ................................................................. 20, 21

*W. Rangeland Conservation Ass'n v. Zinke*,
   265 F. Supp. 3d 1267 (D. Utah 2017) ......................................................... 3

*W. Watersheds Proj. v. Abbey*,
   719 F.3d 1035 (9th Cir. 2013) ................................................................... 27

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ..................................................................... 25

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
   5 F.4th 997 (9th Cir. 2021) ........................................................................ 20

**Statutes**

5 U.S.C. § 706(1) .......................................................................... 16, 17, 18, 21

5 U.S.C. § 706(2)(A) ............................................................................................ 8

5 U.S.C. § 706(2)(C) .......................................................................................... 21

16 U.S.C. § 1331 ................................................................................................. 1

16 U.S.C. § 1332(a) ............................................................................................ 1

16 U.S.C. § 1333 .............................................................................................. 11

16 U.S.C. § 1333(a) ........................................................................................ 2

16 U.S.C. § 1333(b)(1) ............................................................................... 3, 22

16 U.S.C. § 1333(b)(2) ....................................................................... 3, 9, 11, 12

28 U.S.C. § 2401(a) ...................................................................................... 21

42 U.S.C. § 4332(C) ....................................................................................... 3

**Regulations**

40 C.F.R. § 1501.3 ......................................................................................... 3

40 C.F.R. § 1501.4 ...................................................................................... 3, 4

40 C.F.R. § 1508.9(a) ..................................................................................... 3

40 C.F.R. § 1508.9(a)(1) .................................................................................. 3

40 C.F.R. § 1508.9(b) ..................................................................................... 3

40 C.F.R. § 1508.13 ....................................................................................... 4

43 C.F.R. § 4180 .......................................................................................... 6

43 C.F.R. § 4710.3-1 ............................................................................... passim

43 C.F.R. § 4710.4 ............................................................................... 10, 13, 14

43 C.F.R. § 4720.1 ......................................................................................... 9

**MOTION**

Federal Defendants move, under Federal Rule of Civil Procedure 56, for summary judgment, against Plaintiffs on each of their claims for relief under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, the Mandamus and Venue Act, 28 U.S.C. § 1361, the Wild and Free Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340, and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370m-11. The grounds for this motion are set forth in detail in the memorandum submitted herewith. Accordingly, Federal Defendants request that the Court deny Plaintiffs' motion for summary judgment, ECF No. 64, grant Federal Defendants' motion for summary judgment, and enter judgment for Federal Defendants on all claims.

**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs challenge the Bureau of Land Management's ("BLM") decision to address the severe wild horse overpopulation issue on the Pancake Complex in central eastern Nevada through gather and removal management actions. BLM determined there were over three times as many horses as the Pancake Complex can sustainably support, resulting in insufficient forage and water for wild horses, among other ecological imbalances. Consequently, annual emergency gathers have been required to prevent individual animals from suffering or dying. The Wild Free-Roaming Horses and Burros Act ("Wild Horse Act") requires BLM to remove wild horses and burros from a given area of the public lands when an overpopulation exists. And so, after considering public comments and alternatives, BLM reasonably chose to remove excess wild horses from the Pancake Complex to achieve the appropriate management level ("AML") and to maintain a thriving natural ecological balance. Plaintiffs may disagree with this decision, but that does not make BLM's decision arbitrary and capricious. BLM complied with the Wild Horse Act and National Environmental Policy Act ("NEPA") in applying the expertise of its specialists and appropriately exercised its discretion to manage the herd

management areas ("HMAs") within the Pancake Complex by removing excess horses. Federal Defendants therefore request that the Court deny Plaintiffs' Motion for Summary Judgment, grant this Cross-Motion for Summary Judgment, and uphold the challenged decision.

## BACKGROUND

### I. STATUTORY BACKGROUND

#### A. The Wild Free-Roaming Horses and Burros Act

In 1971, Congress passed the Wild Horse Act, 16 U.S.C. §§ 1331-1340, to preserve such animals as "living symbols of the historic and pioneer spirit of the West," and directed the Secretary[1] to provide for their protection and management. 16 U.S.C. § 1331. Within only a few years of the Wild Horse Act's passage, however, the wild horse population had grown dramatically, "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (quoting H.R. Rep. No. 95-1122, 23 (1978)); *see also Blake v. Babbitt*, 837 F. Supp. 458, 459 (D.D.C. 1993) ("[e]xcess numbers of horses and burros pose a threat to wildlife, livestock, the improvement of range conditions, and ultimately [the horses themselves]") (citation omitted). Accordingly, in 1978, Congress passed amendments to the Wild Horse Act, which provided the Secretary with greater authority and discretion to manage and remove excess horses from rangeland. *Am. Horse Prot. Ass'n*, 694 F.2d at 1316-18.

The Wild Horse Act grants the Secretary jurisdiction over all wild free-roaming horses and burros on federal lands and directs the Secretary to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Pursuant to this statutory mandate, BLM sets AMLs of wild horses within each HMA. *Id.* § 1333(b)(1); *Cloud Found. v. U.S. Bureau of Land Mgmt.*, 802 F. Supp. 2d 1192, 1199–200 (D. Nev. 2011). AML is defined by BLM as "the number of wild horses that can be sustained within a designated HMA which achieves and

---

[1] Relevant here, "Secretary" means "the Secretary of the Interior when used in connection with public lands administered by [her] through the Bureau of Land Management[.]" 16 U.S.C. § 1332(a).

maintains a thriving natural ecological balance in keeping with the multiple-use management concept for the area." AR_3502. "Range AMLs may be established in several ways, including through the preparation of 'resource management plans' ("RMPs")," prior agency decision, and environmental assessments. *See, e.g.*, *Cloud Found.*, 802 F. Supp. 2d at 1199 (RMP); *In Def. of Animals v. U.S. Dep't of Interior*, 909 F. Supp. 2d 1178, 1184 (E.D. Cal. 2012) (prior agency decision), *aff'd sub nom. In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054 (9th Cir. 2014); *In Def. of Animals*, 751 F.3d at 1063 (environmental assessment).

Once BLM sets an AML for a given HMA, the agency must "determin[e] where wild horse ... overpopulations exist." *Am. Horse Prot. Ass'n*, 694 F.2d at 1317 (citing 16 U.S.C. § 1333(b)(1)). Where BLM determines that "an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [BLM] shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2). In doing so, BLM must determine the necessity of the removal based on current information, *id.*, but "the agency has wide discretion in how it addresses [an identified] overpopulation." *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282 (D. Utah 2017). To assist with planning and implementation, BLM developed an agency handbook and instruction memoranda—the Wild Horse and Burro Comprehensive Animal Welfare Program ("CAWP")—which provides guidance on how agency personnel should manage HMAs and carry out necessary animal removals. AR_3393-3437.

### B. The National Environmental Policy Act

NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, insuring that relevant information is made available to the public that they "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these goals, NEPA requires a comprehensive Environmental Impact Statement ("EIS") only for "major Federal actions" expected to "significantly affect[] the quality of the human environment." 42 U.S.C. §

4332(C); 40 C.F.R. § 1501.3. To determine whether a proposed action will have significant effects, an agency may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4. An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)). It includes "brief discussions of the need for the proposal, of alternatives as required by [statute], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). "In reviewing a challenge to the adequacy of an EA, courts apply a 'rule of reason' to determine whether the agency took a 'hard look' at a proposed action." *Native Ecosystems Council & All. for the Wild Rockies v. U.S. Forest Serv.*, 866 F. Supp. 2d 1209, 1224 (D. Idaho 2012) (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002)).

NEPA does not impose any substantive obligations upon an agency but requires that an agency take a "hard look" at the environmental consequences of its decisionmaking. *Robertson*, 490 U.S. at 350. If, in its EA, the agency finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact ("FONSI") in lieu of an EIS. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(a)(1)); *see also* 40 C.F.R. § 1501.4. A FONSI "briefly present[s] the reasons why an action … will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.13.

## II. FACTUAL BACKGROUND

### A.  The Pancake Complex Wild Horse Gather Plan

The Pancake Complex consists of the Pancake and Sand Springs West Wild Horse HMAs, the Jakes Wash Herd Area ("HA"), and the Monte Cristo Wild Horse Territory. AR_3501. It is located approximately 30 miles west, southwest of Ely, Nevada in White Pine and Nye Counties. *Id*. The Pancake Complex is administered by the Ely and Battle Mountain

BLM Districts as well as the U.S. Forest Service Humboldt-Toiyabe National Forest[2] and consists of just over 1.2 million acres of private and public land. AR_3501-03.

In accordance with the Wild Horse Act, BLM set the AML for the entire Pancake Complex at 361 to 638 wild horses. AR_3502. This AML range was established through land use plans, Final Multiple Use Decisions, and a Wild Horse Territory Management Plan. *Id*. The AML range for the Pancake HMA was set as 240 to 493 wild horses to "maintain healthy wild horses and rangelands over the long-term based on monitoring data collected over time as well as an in-depth analysis of habitat suitability." *Id*. The range was established through prior decision-making processes and re-affirmed through the 2008 Record of Decision and 2008 Ely District RMP. *Id*. The 2008 Ely District RMP also determined that no wild horses should be managed in the Jakes Wash HA after analyzing habitat suitability and monitoring data which indicated insufficient forage, water, space, cover, and reproductive viability to maintain healthy wild horses and rangelands over the long-term. *Id*. The Sand Springs West HMA was determined to have an AML of 49 horses through a stipulated agreement between BLM and private landowners through the Department of Interior Office of Hearings and Appeals, Hearings Division and later confirmed in the 1997 Tonopah RMP. AR_3503. And the Monte Cristo Wild Horse Territory has an AML of 72 to 96 wild horses, which was established through the Humboldt National Forest Land & Resource Management Plan in 1986. *Id*. This range is based on proper use studies conducted on the natural horse concentration areas which were adjusted to help improve range conditions. *Id*.

In 2020 and 2021, BLM conducted several flights to confirm the number of wild horses within the Pancake Complex. *Id*. The 2020 flight resulted in a direct count of 2,262 wild horses, and the February 2021 flight was conducted to confirm those numbers. *Id*. As both flights used the "direct count method," however, they did not account for unseen horses, meaning the actual number of wild horses within the complex is likely higher. *Id*. Considering

---

[2] The gather and removal of excess wild horses from the U.S. Forest Service's Monte Cristo Wild Horse Territory is included in the Proposed Action and EA and is covered under a separate Forest Service decision not challenged by Plaintiffs. AR_3501.

all available information, BLM determined that at least 2,342 excess wild horses above the

"low AML" exist in the complex. *Id*. These figures are reflected in Table 1 in the Final EA:

**Table 1.** Herd Management Area, Acres, AML, Estimated Population, and Estimated Numbers for Removal

| Herd | Total Acres Private/Public land | Appropriate Management Level | 2020 Flight Direct Count Population | 2021 Flight Direct Count Population | Removal to Achieve Low AML (based on 2021 flight count) |
|---|---|---|---|---|---|
| Pancake | 824,000 | 240-493 | 1,829 | 2301 | 2061 |
| Sand Springs West | 157,436 | 49 | 155 | 145 | 96 |
| Jakes Wash | 153,663 | 0 | 46 | 169 | 169 |
| Monte Cristo WHT | 93,640 | 72-96 | 232 | 88 | 16 |
| Total | 1,228,739 | 361-638 | 2,262 | 2,703 | 2,342 |

*Id*. Additionally, BLM determined that excess horses need to be removed in order to achieve a

thriving natural ecological balance based on factors including but not limited to: (1) excess

horses establishing populations outside of HMA and HA boundaries; (2) evidence of moderate,

heavy, and severe forage utilization in the Complex; (3) wild horses contributing—and in some

cases serving as the sole contributor—to not meeting Rangeland Health Standards;[3] (4) water

source damage at several springs; and (5) the need for emergency water trap gathers in 2017,

2018, and 2020, and the anticipated need for future emergency removals within the Pancake

Complex if action is not taken. AR_3503-04.

BLM analyzed the likely effects of the proposed Pancake Complex Wild Horse Gather

Plan ("2022 Gather Plan") in a preliminary EA that was made available for public comment on

November 12, 2020. AR_1924-2079. During the 30-day comment period, BLM received

comments from approximately 3,600 individuals or organizations (primarily as form letters)

and eight agencies. AR_3654; *see also* AR_2080-3392 (public comments). BLM consolidated

those comments into 92 distinct topics, considered all the comments received, provided

responses, made minor, non-substantive changes, then released the Final EA on May 4, 2021.

---

[3] These are standards and guidelines for rangeland health required by 43 C.F.R. Subpart 4180 that BLM uses to evaluate and assess livestock grazing management practices. AR_3606-11.

1  *See* AR_3654-93 (responses to comments); AR_3097-3693 (Final EA). BLM signed the

2  FONSI and issued its Decision Record ("Decision") on the same day. AR_3694-96 (FONSI);

3  AR_3491-95 (Decision).

4          In the EA, BLM explained that the purpose of the 2022 Gather Plan is "to gather and

5  remove excess wild horses from within and outside the Pancake Complex and to reduce the

6  wild horse population growth rates to achieve and maintain established AML ranges."

7  AR_3504. The 2022 Gather Plan is needed "to prevent undue or unnecessary degradation of

8  the public lands associated with excess wild horses, and to restore a thriving natural ecological

9  balance and multiple-use relationship on public lands," consistent with the Wild Horse Act. *Id*.

10 The Proposed Action includes gather and removal of excess wild horses to achieve population

11 within the AML range, application of fertility control methods consisting of vaccines and/or

12 intrauterine devices ("IUDs") to released mares, maintenance of a sex adjustment ratio of 60%

13 male to 40% female, and release of a small non-reproducing component of males of up to 138

14 geldings to bring the population up to mid-AML. AR_3507. Gathered horses would be

15 transported to off-range corrals where they would be prepared for adoption, sale to qualified

16 individuals, or transfer to off-range pastures. AR_3516. BLM also analyzed three other action

17 alternatives: Alternative B that would not include the non-reproducing portion of the

18 population; Alternative C that would gather and remove excess animals without fertility

19 control, sex ratio adjustments, or geldings; and Alternative D that involved capture 100% of

20 the current population of excess wild horses from within and outside the Jakes Wash HA. *Id*.

21 And pursuant to NEPA, the EA considered a no action alternative. *Id*. Other alternatives were

22 considered but not carried through for detailed analysis, including reduction of livestock within

23 the Pancake Complex, gathering horses to the AML upper limit, fertility control only, and

24 raising the AML. AR_3518-22. On May 4, 2021, BLM's Decision approved both the Proposed

25 Action and Alternative D as part of the 2022 Gather Plan, which will occur over a 10-year time

26 period following the initial gather operation and achieve management objectives identified in

27 decision records and RMPs for the Pancake Complex. AR_3492.

28

**B.  The 2022 Gather**

On January 6, 2022, BLM announced that it would gather up to 2,060 horses and remove up to 2,030 excess wild horses. AR_3725. As explained by BLM, the gather is needed both to protect public lands from the effects of excess horses on the range, but also to reduce overpopulation of wild horses where there is not enough water or forage to support the number of horses currently present. *Id*. The action was analyzed and authorized as part of the Pancake Complex EA and Decision Record ("2021 Gather Decision"), *id*, and incorporated planning and guidance materials such as the CAWP. AR_3533. From January 10, 2022, through February 14, 2022, BLM conducted gather operations resulting in a total of 2,054 wild horses gathered ("2022 Gather"). AR_3814, 3819.

## STANDARD OF REVIEW

Wild Horse Act and NEPA claims are reviewed under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. *See In Def. of Animals*, 751 F.3d at 1061. Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this narrow standard of review, "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The burden of proof remains on the plaintiff. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

The "arbitrary and capricious standard" is necessarily deferential. A decision is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). In other words, there must be a "clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)

(citation omitted). "[A] reviewing court must generally be at its most deferential" when reviewing determinations involving agencies' technical expertise and scientific judgments. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).

## ARGUMENT

**I.    Because the 2021 Gather Decision complies with the Wild Horse Act, the Court should grant summary judgment in favor of BLM.**

In relying on the EA for the 2022 Gather, decision records, and RMPs, which showed overutilization of forage, deteriorating ecological conditions, and wild horse populations substantially over the AMLs for each HMA, BLM reasonably concluded that an excess of wild horses exists on the Pancake Complex and that their removal through gathers is necessary to achieve and maintain a thriving ecological balance. BLM thus proceeded to conduct a gather over January and February 2022 to remove excess wild horses and move toward an AML pursuant to objectives in the above-mentioned documents and management standards in the CAWP, ensuring they were completed at the minimal feasible level. These actions are consistent with the Wild Horse Act and its regulations which require BLM to immediately remove excess horses based on information currently available to the agency. They likewise comply with BLM's regulations concerning the management of HMAs. Accordingly, Plaintiffs' claim that BLM violated the Wild Horse Act by not creating a herd management area plan ("HMAP") for the Pancake Complex prior to the 2022 Gather must fail.

**A.   The 2021 Gather Decision and 2022 Gather are consistent with the Wild Horse Act and its regulations.**

The Wild Horse Act is clear: where BLM determines that an overpopulation exists and action is necessary to remove excess animals based on information currently available to it, BLM "shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2). BLM's regulations confirm this mandate. 43 C.F.R. § 4720.1. And while 43 C.F.R. § 4710.3-1 generally requires that an HMAP be created,[4]

_____

[4] As Federal Defendants have maintained, this general obligation is not in dispute in this matter. *See* March 30, 2023, Order at 5, ECF No. 54 (noting the same and clarifying the issue is whether "BLM had to prepare a HMAP before the gather").

relying on the plain text of the statute and regulation, courts have found that "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the [Wild Horse Act]." *Animal Prot. Inst. of Am.,* 109 IBLA 112, 127 (1989); *accord Friends of Animals v. United States Bureau of Land Mgmt.*, 548 F. Supp. 3d 39, 67 (D.D.C. 2021) (finding a combination of materials may be used to manage an HMA); *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 56 n.3 (D.D.C. 2021) (reasoning that a 2019 action could be in compliance with portions of a 1989 HMAP or a 2008 RMP). These findings reflect the discretion Congress has afforded, long recognized by courts, to BLM in removing excess animals from an HMA. *In Def. of Animals*, 751 F.3d at 1065; *see also id*. at 1065 n.16 (collecting cases). And so, where BLM considers "the [AML] for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the [minimal feasible level][5]," 43 C.F.R. § 4710.3-1, the court should uphold BLM's management decisions to remove excess wild horses. *Friends of Animals*, 548 F. Supp. 3d at 67.

Here, the 2022 Gather Plan and 2022 Gather are consistent with the Wild Horse Act and its regulations. The AML range for the Pancake Complex was established through the Record of Decision and 2008 Ely District RMP, 1997 Tonopah RMP, and 1986 Humboldt National Forest Land & Resource Management Plan. AR_3502-03. In setting the AML for each HA, the RMPs and EA considered the range necessary to "maintain healthy wild horses and rangelands over the long-term based on monitoring data collected over time as well as an in-depth analysis of habitat suitability," AR_3502, prior agreements between BLM and private landowners, AR_3503, and proper use studies focused on improving range conditions. *Id*. Consistent with 43 C.F.R. § 4710.3-1, the 2021 EA considers habitat requirements of the animals, AR_3529-30 (discussing current habitat conditions leading to "increased stress and

---

[5] 43 C.F.R. § 4710.3-1 directs that "the constraints contained in § 4710.4" also be considered, which refers to the requirement that management be "at the minimum level necessary to attain the objectives identified in approved land use plans and [HMAPs]." 43 C.F.R. § 4710.4.

possible death as a result of increased competition for water and/or forage"), relationships with other uses of the public and adjacent private lands, AR_3538 (discussing concerns regarding public safety along highways and conflicts with public land as the wild horse populations increase), and the minimal feasible level for the gather, AR_3689 (responding to comments and assuring the proposed actions are at the minimum feasible level). Moreover, the CAWP provides standards for BLM to follow during gathers to limit any impacts on the health or welfare of wild horses. AR_3397-3436. This includes standards governing all facets of gathers such as, off-range holding facility design, capture technique, veterinary care, handling, and transportation—ensuring gathers are at the minimal feasible level. *Id*. These RMPs, decisions, and EA substantially comply with the Wild Horse Act and its regulations. *Animal Prot. Inst. of Am.,* 109 IBLA at 127. They consider the relevant information pursuant to 43 C.F.R. § 4710.3-1 and conclude that an overpopulation exists in the complex and action is necessary to achieve the AML consistent with the Wild Horse Act. 16 U.S.C. § 1333(b)(2). This determination complies with the law and the broad discretion Congress has long afforded BLM in making removal decisions. *Am. Horse Prot. Ass'n*, 694 F.2d at 1318; *see also Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975) (noting the "high degree of discretionary authority" BLM has in carrying out its mandate to remove excess horses) (quoting 1971 U.S. Code Cong. & Admin. News, p. 2160).

**B. Plaintiffs fail to show the Wild Horse Act or its regulations require BLM to prepare an HMAP prior to gathering excess horses.**

Plaintiffs' First, Second, Third, and Fourth Causes of Action are all based upon the same flawed assertion: that the 2021 Gather Decision must be invalidated because BLM is required under the Wild Horse Act and its implementing regulations to prepare an HMAP prior to removing excess wild horses. Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for Summary Judgment ("Pls.' Br.") at 23,[6] ECF No. 64. Plaintiffs attempt to

---

[6] This brief references the ECF-generated page numbers for court filings.

rewrite the regulations and improperly refer to extra-record materials[7] to misdirect the Court from this threshold inquiry, but these attempts fail to satisfy Plaintiffs' burden of proof.

### a. There is no requirement in the Wild Horse Act that an HMAP be prepared prior to the removal of excess wild horses.

First, Plaintiffs argue the language of the Wild Horse Act mandates that an HMAP be prepared prior to gathering and removing excess horses. Pls.' Br. 24, 30. This argument is unsupported by either the text of the Wild Horse Act or its legislative history. As a threshold matter, Plaintiffs do not identify any text in the Wild Horse Act that requires BLM to prepare an HMAP prior to a gather. That is because there is none. Plaintiffs merely cite to 16 U.S.C. § 1333 for the requirement that BLM conduct all management activities at the minimal feasible level. Pls.' Br. 24. But that is a far cry from mandating that the agency prepare an HMAP prior to removing excess horses. The Wild Horse Act's minimal feasible level requirement simply means that "BLM shall use '[t]he minimum number of habitat or population management tools or actions necessary to attain the objectives' for an HMA." *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1009 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020). Minimal management tools can be deployed through EAs and CAWP standards, and objectives for an area can be identified from a combination of materials. *Animal Prot. Inst. of Am.,* 109 IBLA at 127. Thus, in order to abide by the "minimal feasible level" language, BLM is not required to prepare a separate HMAP prior to implementing a gather decision.

Plaintiffs' argument is also belied by the statute's legislative history. The 1978 amendments added language to specify "what information the Secretary must possess—or, more accurately, the information the Secretary need *not* possess—before removing wild horses deemed to be in excess." *Am. Horse Prot. Ass'n*, 694 F.2d at 1317–18 (citing 16 U.S.C. § 1333(b)(2)). Relevant here, Section 1333(b)(2) lists the information BLM may use to determine that a wild horse overpopulation exists in a specific area. BLM is encouraged to consider (i) the inventory of federal public land, (ii) land use plans, (iii) information from

---

[7] *See* Federal Defendants' Response to Plaintiffs' Motion for Judicial Notice (ECF No. 65), ECF No. 68.

environmental impact statements, and (iv) the inventory of wild horses. But, "in the absence of the information contained in (i–iv)[,]" BLM is expressly authorized to proceed with the removal of horses on the basis of whatever information BLM has at the time of the decision that an overpopulation exists. 16 U.S.C. § 1333(b)(2). The statute thus "clearly conveys Congress's view that BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information." *Cloud Found. v. U.S. Bureau of Land Mgmt.*, No. 3:11-CV-00459-HDM, 2013 WL 1249814, at *5 (D. Nev. Mar. 26, 2013) (quoting *Am. Horse Prot. Ass'n*, 694 F.2d at 1318). It is thus consistent with the statute and Congress's intent that BLM be given discretion to rely on a combination of materials to manage the horse population to maintain a thriving natural ecological balance.

This tracks the discretion that courts have long afforded BLM in removing excess horses under the Wild Horse Act. For example, *In Def. of Animals v. U.S. Dep't of Interior,* the Ninth Circuit explained that the Wild Horse Act "directs that horses 'shall' be removed 'immediately' once the Secretary determines, *on the basis of whatever information he has at the time of his decision*, that an overpopulation exists." 751 F.3d at 1064 (quoting *Am. Horse Prot. Ass'n*, 694 F.2d at 1318) (emphasis in original). In applying this reasoning, the Ninth Circuit upheld BLM's reliance on a 2008 RMP in setting the AML. 751 F.3d at 1064 n.13. In the underlying district court's decision, the court also acknowledged that the Wild Horse Act "unequivocally provide[s] that if the current population inventory for an HMA reveals that overpopulation exists, and if the BLM determines that "action is necessary to remove excess animals," it "shall immediately remove excess animals from the range so as to achieve appropriate management levels." *In Def. of Animals,* 909 F. Supp. 2d at 1189 (citation omitted). Like these decisions, the Court should afford BLM deference in managing and removing excess horses and reject Plaintiffs' argument that the Wild Horse Act requires the preparation of an HMAP prior to implementing gather decisions.

**b. There is no requirement in the Wild Horse Act's implementing regulations that an HMAP be prepared prior to the removal of excess wild horses.**

Plaintiffs next turn to the Wild Horse Act's implementing regulations in support of their argument that BLM was required to create an HMAP for the complex prior to conducting the 2022 Gather. Primarily, Plaintiffs argue that, when read together, the wording of 43 C.F.R. §§ 4710.3-1 and 4710.4 establishes that HMAPs are a prerequisite for gathers since the regulations require both the creation of HMAPs and that management be based upon objectives in HMAPs. Pls.' Br. 25. Thus, Plaintiffs aver, an HMAP is necessary since gather operations are a form of management. *Id*. But this theory fares no better than Plaintiffs' statutory argument. Nowhere in the regulations is there an express requirement that an HMAP be prepared prior to removing excess horses nor do Plaintiffs point to one. Plaintiffs instead rewrite the regulations in an attempt to manufacture one. This argument is contradicted by the regulatory text and case law and should be rejected.

Beginning with the text, there is no express requirement that an HMAP be prepared prior to the removal of excess horses. Section 4710.4 states "[m]anagement shall be at the minimum level necessary to attain the objectives identified in *approved* land use plans and herd management area plans." 43 C.F.R. § 4710.4 (emphasis added). Thus, Section 4710.4 does not mandate the creation and approval of new plans; it only pertains to previously *approved* plans, if they exist for the relevant area. *Cf*. Pls.' Br. 25 (omitting "approved"). Section 4710.3-1 requires HMAs be established for the maintenance of wild horse herds and lists information BLM must consider in doing so. Both requirements exist separate from the general mandate that BLM create HMAPs. 43 C.F.R. § 4710.3-1; *see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents*, 508 U.S. 439, 454 (1993) ("A statute's plain meaning must be enforced . . ., and the meaning of a statute will typically heed the commands of its punctuation."). Indeed, based on a plain reading, the regulations do not specify what may constitute an HMAP; only what BLM must consider in establishing HMAs for maintenance of herds. *See* 43 C.F.R. § 4710.3-1 (requiring consideration of the AML, the habitat requirements

of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in § 4710.4). Nor do the regulations provide a time period in which BLM must create an HMAP.[8] Plaintiffs cannot simply rearrange the wording within the regulations to manufacture a mandate where none exists. *See Ctr. for Cmty. Action & Env't Just. v. BNSF R. Co.*, 764 F.3d 1019, 1024 (9th Cir. 2014) (declining to adopt plaintiffs' interpretation, which, "would effectively be to rearrange the wording of the statute—something that we, as a court, cannot do").

Courts have consistently agreed with this reading of the regulations. The Interior Board of Land Appeals ("IBLA") has acknowledged 43 C.F.R. § 4710.3-1 "does not require preparation of an HMAP as a prerequisite for a removal action," and concluded, "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the statute." *Animal Prot. Inst. of Am.*, 109 IBLA 112. In response, Plaintiffs merely assert the decision is "not binding authority[,]" Pls.' Br. 27, and that there is no discussion of Section 4710.4, the regulatory history, or the tools of statutory construction. *Id.* 28. But these arguments are self-defeating. The IBLA's finding is persuasive because it is based on a plain reading of 43 C.F.R. § 4710.3-1, which shows that Plaintiffs' attempts to rewrite the regulation or rely on flawed statutory interpretation are unnecessary to resolve this legal question. *Animal Prot. Inst. Of Am.*, 109 IBLA at 127; *see also Rojas by & through Rojas v. Sea World Parks & Ent., Inc.*, 538 F. Supp. 3d 1008, 1017 (S.D. Cal. 2021) ("when the text of a statute is clear, as it is in this case, a court need look no further"). Thus, this is a straightforward question of law that can be settled by the plain text of the regulation.

Plaintiffs also attempt to bury the decision in *Friends of Animals v. United States Bureau of Land Mgmt.*, 548 F. Supp. 3d at 67, simply stating it is unpublished and does not address Plaintiffs' current arguments. Pls.' Br. 28 n.8. But these arguments fail, as the decision

---

[8] According to the regulatory text and Plaintiffs' own admission, there is "no identifiable deadline" for BLM to create an HMAP. Pls.' Br. 27; 43 C.F.R. § 4710.4.

is published and directly on point, addressing Plaintiffs' main dispute. In pertinent part, the *Friends of Animals* court explains:

> The [BLM Wild Horse and Burro Management] handbook, for example, contemplates that the Bureau could use an array of approaches to manage an HMA. It might, for example, use a land use plan, an EA, an established AML, and a gather plan. Or the Bureau might use an AML, an HMAP, and a gather plan. Or some other combination. Thus, although the categories may offer useful organizational tools, the handbook and manual leave the authorized officer with considerable discretion in framing her decision. [Plaintiff] points to nothing in either document that expressly forbids the authorized officer from issuing a long-term gather decision.

548 F. Supp. 3d at 67 (internal citations omitted). In short, BLM need not prepare an HMAP prior to implementing a gather decision. Rather, as it did for the 2022 Gather, the agency may rely upon a combination of land use plans, an EA, and an established AML in issuing a gather decision.

Plaintiffs nonetheless assert that Federal Defendants "ignore[d] the effect of BLM's regulations." Pls.' Br. 29. Relying on *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and *Service v. Dulles*, 354 U.S. 363 (1957), Plaintiffs assert BLM's duty to remove excess horses is constrained by Section 4710.4, but those cases are inapposite here. In *Shaughnessy*, "the Attorney General bound himself not to exercise his discretion until he had received an impartial recommendation from a subordinate board[,]" and in *Dulles*, "the Secretary bound himself not to act at all [in certain cases], except upon appeal by employee[.]" *Dulles*, 354 U.S. at 386–87. In contrast, here, the Secretary is not bound by regulation or statute to create an HMAP prior to conducting a gather. And Plaintiffs have failed to show otherwise. The Court, therefore, need not explore the agency's interpretation of law as Plaintiffs suggest—this is not a question of deference to agency interpretation of the regulations, because the agency's action is in accord with the plain language of the regulations. Pls.' Br. 27; *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) ("the possibility of deference can arise only [when language is] genuinely ambiguous. And when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation"). Accordingly, the Court

should reject Plaintiffs' argument that the Wild Horse Act and its regulations require the creation of an HMAP prior to BLM conducting a gather.

## C. The Court should reject Plaintiffs' remaining Wild Horse Act arguments.

In addition to Plaintiffs' main statutory and regulatory arguments addressed above, Plaintiffs advance a scattershot of arguments, hoping one will find the target. Pls.' Br. 29-36. Although these arguments generally fail for the same reasons as previously discussed, *supra* 13-18, they likewise lack legal and factual support. The Court should accordingly reject each argument.

### a. Plaintiffs fail to show that BLM unlawfully withheld or unreasonably delayed the creation of an HMAP.

Plaintiffs next argue BLM unlawfully withheld or unreasonably delayed the creation of an HMAP, in violation of 5 U.S.C. § 706(1), by not doing so prior to the removal of horses from the Pancake Complex. Pls.' Br. 30-32. In the same vein, Plaintiffs contend that pursuant to the Mandamus and Venue Act, the Court should compel BLM to "halt any future gathers" until it develops an HMAP for the Pancake Complex. *Id*. 30.

With regard to Plaintiffs' request for relief under the Mandamus and Venue Act, Plaintiffs appear to rely upon the general test for mandamus relief. Pls.' Br. 13, 29-30. But because "mandamus relief and relief under [5 U.S.C. § 706(1)] are 'in essence' the same," when a complaint seeks relief under the Mandamus and Venue Act and the APA and there is an adequate remedy under the APA, courts may elect to analyze the APA claim only. *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1065 (9th Cir. 1997) (quoting *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997)); *see also Vaz v. Neal*, 33 F.4th 1131, 1135 (9th Cir. 2022) (same). The extraordinary remedy of mandamus traditionally lies within the court's discretion. *Indep. Min. Co.*, 105 F.3d at 505. Here, Plaintiffs advance claims for relief under the Mandamus and Venue Act and the APA. *See* Pls.' Br. 29-32 (Plaintiffs' First and Second Causes of Action). Both claims, in essence, seek the same relief; that the court compel BLM to issue an HMAP. *Compare* Plaintiffs' First Amended Complaint ¶ 117, ECF No. 31 ("Plaintiffs seek a writ of prohibition" preventing gathers until BLM "develop[s] a [HMAP] for the

Pancake Complex") *with id*. ¶¶ 122-23 (requesting the same under the APA). And so, since there is an adequate remedy under the APA for the mandamus relief Plaintiffs request, review of both claims under Section 706(1) is appropriate.

A court's power to "compel agency action" under the APA is carefully limited to situations where an agency has ignored a specific legislative command. In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), the Supreme Court explained the two primary constraints on judicial review under Section 706(1). First, review of actions alleged to be unlawfully withheld or unreasonably delayed extends only to "discrete" actions, such as rules, orders, licenses, sanctions, and relief. *Id*. at 62–63. Second, the purportedly withheld action must not only be "discrete," but also "legally *required*"—"so that the agency's legal obligation is so clearly set forth that it could traditionally have been enforced through a writ of mandamus." *Id*. at 63.

As previously discussed, Plaintiffs have failed to show that BLM has a duty to prepare an HMAP *prior* to removing excess horses or that a deadline to create an HMAP prior to gathers exists. *See supra* 13-18. Plaintiffs merely assert that "BLM has a duty to develop HMAPs prior to engaging in the gather and removal of wild horses[,]" Pls.' Br. 30, but Plaintiffs "point[] to no specific statutory or regulatory deadline" requiring the agency to do so. *Indep. Min. Co. v. Babbitt*, 885 F. Supp. 1356, 1364 (D. Nev. 1995), *aff'd sub nom. Indep. Min. Co.*, 105 F.3d 502. Therefore, Plaintiffs' contention that a concrete deadline exists—and thus, the creation of an HMAP was unlawfully withheld—is without merit.

Plaintiffs argue in the alternative that, even if there is no concrete deadline, agency action has been unreasonably delayed. Pls.' Br. 30-32. But since there is no legal obligation to prepare an HMAP *prior to a gather*, the action is not subject to judicial review under Section 706(1). *See Norton*, 542 U.S. at 63 (constraining judicial review under 5 U.S.C. § 706(1) to "discrete" actions that are "legally *required*"); *see also In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) ("an agency cannot unreasonably delay that which it is not required to do").

Because Plaintiffs fail to make this initial showing, the Court need not consider

Plaintiffs' *TRAC* factors arguments. *See In re A Cmty. Voice*, 878 F.3d at 784 ("the first step

before applying the *TRAC* factors is necessarily to determine whether the agency is required to

act"); *see also Indep. Mining Co.*, 105 F.3d at 507 (adopting the *TRAC* factors). But even if the

Court were to do so, Pls.' Br. 31-32, those arguments would likewise fail. In assessing if an

agency's actions have been unreasonably delayed, courts apply a six-factor standard, known as

the *TRAC* factors, established in *Telecommunications Research and Action Center v. F.C.C.

("TRAC")*, 750 F.2d 70, 79-80 (D.C. Cir. 1984). The six TRAC factors are:

> (1) the time agencies take to make decisions must be governed by a rule of reason;
> (2) where Congress has provided a timetable or other indication of the speed with
> which it expects the agency to proceed in the enabling statute, that statutory scheme
> may supply content for this rule of reason; (3) delays that might be reasonable in
> the sphere of economic regulation are less tolerable when human health and welfare
> are at stake; (4) the court should consider the effect of expediting delayed action on
> agency activities of a higher or competing priority; (5) the court should also take
> into account the nature and extent of the interests prejudiced by delay; and (6) the
> court need not find any impropriety lurking behind agency lassitude in order to hold
> that agency action is unreasonably delayed.

*In re A Cmty. Voice*, 878 F.3d at 786 (citing *TRAC*, 750 F.2d at 80). Here, the first *TRAC* factor

necessarily weighs in favor of BLM because there is no requirement for BLM to issue an

HMAP prior to a gather.[9] The second *TRAC* factor—the lack of any Congress-provided

timetable—also weighs toward BLM, and the sixth *TRAC* factor—the impropriety of agency

lassitude—is irrelevant here, as there is no requirement that the agency has delayed fulfilling.

The third and fifth factors largely overlap. *Indep. Mining Co., Inc.*, 105 F.3d at 509. Under the

third factor, delays are less reasonable if "human health and welfare are at stake," than when

agency actions are delayed "in the sphere of economic regulation." *TRAC*, 750 F.2d at 80. The

fifth factor directs courts to "take into account the nature and extent of the interests prejudiced

---

[9] As previously mentioned, the question presented by Plaintiffs is not whether BLM has a
general duty to create an HMAP, which was unreasonably delayed, but rather whether there is
a duty to prepare such a plan prior to removing excess horses from the range. *See* Pls.' Br. 30
("BLM has a duty to develop HMAPs prior to engaging in the gather and removal of wild
horses"); *see also* Pls.' Am. Compl. ¶¶ 120-21.

FED. DEFS.' CROSS-MOT. FOR SUMM. J.
& OPP. TO PLS.' MOT. FOR SUMM. J.        19

by delay." Human lives are not at stake here. Nor do Plaintiffs convincingly point to any interests harmed by not creating an HMAP prior to gathers since management is ensured at the minimal feasible level by RMPs, the EA, and the CAWP. *Compare* Pls.' Br. 32 ("BLM's actions do not consider the full range of management options available"), *with supra* 12-13 (discussing management standards and tools). And the fourth factor—the effect of expediting delayed action on agency activities of a higher or competing priority—likewise weighs toward the agency. *See, e.g.*, AR_3502 (explaining that wild horses can increase their numbers by up to 25% annually which requires BLM to use discretion in managing herds). While Plaintiffs have not made the initial showing that BLM has a duty to prepare an HMAP prior to a gather, even if they had, the *TRAC* factors decisively favor rejecting Plaintiffs' argument that BLM should be compelled to prepare one prior to further implementation of the 2021 Gather Decision. Thus, Plaintiffs' arguments pursuant to Section 706(1) and the Mandamus and Venue Act should be rejected.

> **b. The BLM Wild Horse and Burro Handbook complies with the Wild Horse Act and Plaintiffs' challenges to it fail as a matter of law.**

Plaintiffs also challenge "BLM's interpretation" of the Wild Horse Act's regulations within the BLM Handbook as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and as exceeding "statutory jurisdiction, authority, or limitations." Pls.' Br. 33-36; *see also id.* (challenging the BLM Handbook as deviating from the Wild Horse Act's minimal feasible level and purported requirement to create an HMAP prior to a gather). These arguments, however, fail for the same reason as Plaintiffs' earlier arguments: there is no requirement that BLM create an HMAP prior to conducting a gather. *See supra* 13-18. Moreover, Plaintiffs' contentions are legally and factually inaccurate.

As a legal matter, Plaintiffs can only bring an APA claim against a final agency action. *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas,* 5 F.4th 997, 1007 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 713 (2021). For an agency action to be final, the action must "mark the consummation of the agency's decisionmaking process" and be one by which "legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Here,

BLM's Handbook does not meet that criteria and Plaintiffs' challenge to it must accordingly fail. The BLM Handbook does not constitute final agency action for two reasons. *See Forest Guardians v. Animal & Plant Health Inspection Serv.*, 309 F.3d 1141, 1143 (9th Cir. 2002) (per curiam) (holding that an agency manual "does not have the force of law and does not bind the agency"); *Colo. Wild Horse & Burro Coal. v. Jewell*, 130 F. Supp. 3d 205, 214 (D.D.C. 2015) (holding the provision of BLM's Wild Horse Handbook requiring population inventories every two years did not create "a legal duty" for BLM). First, it merely establishes guidelines for BLM's management of wild horses and burros and second, it was not published in the Federal Register and made subject to public notice and comment, nor was it promulgated under independent congressional authority. *See W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901-02 (9th Cir. 1996); *see also Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (per curiam). Thus, the BLM Handbook is not a final agency action reviewable under the APA. *Bennett v. Spear*, 520 U.S. at 178 (final agency action is an action "from which legal consequences will flow"). Confusingly, Plaintiffs appear to concede this, Pls.' Br. 33, but challenge it anyway. *See* Pls.' Br. 34 (arguing there is no rational basis for interpretations within the BLM Handbook). But because the BLM Handbook is not a final agency action, the Court does "not need to review" Plaintiffs' challenges to it under 5 U.S.C. § 706(1), (2)(C). *W. Radio Servs.*, 79 F.3d at 901. Moreover, even if Plaintiffs could challenge the BLM Handbook as a final agency action, which they cannot, Plaintiffs filed suit far outside of the six-year statute of limitations. *Compare* AR_1350-1429 (published in June 2010), *with* Plaintiffs' Complaint, ECF No. 1 (filed January 21, 2022); *see also* 28 U.S.C. § 2401(a). The Court can, therefore, refuse to hear Plaintiffs' claims challenging the BLM Handbook on timeliness grounds as well. *Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046, 1049 (9th Cir. 2016). And so, Plaintiffs' third and fourth causes of action which challenge the BLM Handbook fail as a matter of law.

Even so, as a factual matter, Plaintiffs' contention that BLM ignored guidance from the BLM Handbook concerning the consideration of monitoring objectives and the minimum

feasible level because it did not prepare an HMAP also fails.[10] Pls.' Br. 34. In responding to comments, the EA states the management actions proposed are tools to achieve management objectives contained in approved land use plans. AR_3659. And the approved management plans for HAs within the Pancake Complex contain numerous short and long-term objectives. *See, e.g.*, AR_17-22 (Monte Cristo HMA objectives); AR_84-101 (Humboldt National Forest LRMP objectives); AR_352-53 (South Pancake objectives); AR_541-61 (Tonopah RMP objectives). For example, within the Monte Cristo RMP, there are objectives for maintaining forage, cover, water, and the wild horse population. AR_17-24. Moreover, the Monte Cristo RMP contains direction for management and removal of excess horses at the minimal feasible level. *See, e.g.*, AR_22-23 (directing that "excess [horses] will be removed in the most humane manner possible" and providing instruction regarding holding facilities, the use of helicopters, and traps). And, as previously mentioned, the CAWP standards provide further direction on managing wild horses at the minimal feasible level. *See* AR_3393-3437 (discussing capture techniques and care, among other standards). The thorough analyses contained within these documents complies with the Wild Horse Act and its regulations. Thus, Plaintiffs' contention that herd objectives or the minimal feasible level of the 2022 Gather were not considered—or cannot be considered absent an HMAP— are simply inaccurate.[11]

> **c. Plaintiffs' argument that they lacked the opportunity to comment on the 2022 Gather Plan without an HMAP lacks merit.**

Plaintiffs also seemingly argue that if BLM is not required to prepare an HMAP prior to gathers, it "can continue to dodge the public scoping process[.]" Pls.' Br. 30; *see also id*. 13 n.6 ("the public had no opportunity to provide input on the scope of the Pancake Gather Plan").

---

[10] In addition to being factually inaccurate, Plaintiffs concede that an HMAP is not the only document BLM uses to establish objectives. *Compare* Pls.' Br. 9 (conceding that land use plans may establish habitat population goals and objectives for a given area, including HMAs), *with id*. 12 (arguing the Pancake Complex "does not have comparable objections … since no HMAP exists").

[11] For these reasons, as well as those outlined in Federal Defendants' Response to Plaintiffs' Motion for Judicial Notice (ECF No. 65), ECF No. 68, Plaintiffs' reliance upon the Fifteenmile HMAP is ineffective as well as inappropriate. Pls.' Br. 11-12, 34-35.

1  These arguments are contrary to the law and record. As a matter of law, the Wild Horse Act

2  does not require BLM to discuss explicitly all opinions submitted during the public-comment

3  period. *See* 16 U.S.C. § 1333(b)(1) (requiring that the agency consult individuals

4  recommended by the National Academy of Sciences but leaving it to the Secretary's discretion

5  whether to consult "other individuals" with "scientific expertise and special knowledge"); *see*

6  *also Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1013 (9th Cir. 2020)

7  (acknowledging the same).

8          Second, as a factual matter, BLM held a 30-day comment period and considered

9  comments from approximately 3,600 individuals or organizations (primarily as form letters)

10  and eight agencies. AR_3654; *see also* AR_2080-3392 (public comments). BLM consolidated

11  those comments into 92 distinct topics, considered all the comments received, provided

12  responses, made minor, non-substantive changes, then released the Final EA. *See* AR_3654-93

13  (responses to comments). Notably, the Final EA captures various comments from Plaintiffs and

14  provides BLM's response to those comments in an adjacent column. *See, e.g.*, AR_3658-61

15  (comments from Laura Leigh/Wild Horse Education and Marie Milliman). Still, Plaintiffs

16  argue BLM did not adequately address comments concerning fertility control and livestock

17  grazing.  Pls.' Br. 13, 30. This is inaccurate. BLM thoroughly responded to comments

18  concerning fertility controls, noting the EA is consistent with RMPs and the Wild Horse Act

19  Handbook. AR_3656-60. BLM also responded to concerns about livestock grazing, stating that

20  "resource damage is directly attributable to the wild horses" and that "changes to [forage

21  allocations in] livestock grazing cannot be made through a wild horse gather decision" but

22  through the revision of land use plans. AR_3678-80. Plaintiffs concede this.[12] Thus, Plaintiffs'

23
24  _____

[12] *See, e.g.*, Declaration of Laura Leigh, ECF No. 64-1 ¶¶ 18- 21. In addition to undermining
25  Plaintiffs' own argument that they were not afforded the opportunity "for meaningful public
participation," Pls.' Br. 13, these declarations impermissibly stray from asserting standing and
26  are used by Plaintiffs to support their Wild Horse Act argument. *See, e.g.*, *id.* 13 n.6 (citing
several declarations to support the argument that an HMAP is necessary to ensure management
27  is at the minimal feasible level); *see also* ECF No. 64-1 ¶ 16 (arguing "BLM failed to create an
[HMAP] for the Pancake Complex, as required by law"); Declaration of Scott Edwards, ECF

28

disagreement is with the content of BLM's responses; not the ability to comment. But this fundamentally misunderstands that even if an HMAP had been in existence at the time of the 2022 Gather, Plaintiffs would meet the same response as the "purpose of the EA is not to adjust livestock use"—it is to restore the thriving natural ecological balance in the complex. AR_3680; AR_3504 (Purpose and Need). And, as stated, the RMPs consider numerous objectives, goals, and impacts, including livestock grazing. AR_3679. Thus, Plaintiffs' contention that "the public had no opportunity to provide input on the scope of the Pancake Gather Plan" without an HMAP is without merit.

In short, Plaintiffs attempt to rewrite the regulations and manipulate the meaning of the Wild Horse Act, but these sources only speak to the question of whether BLM is *generally* required to create an HMAP. There is no requirement to create an HMAP *prior* to removing excess horses and Plaintiffs have failed to show otherwise. As Plaintiffs' Wild Horse Act claims all rest upon this flawed foundation, the Court should reject Plaintiffs' arguments under Counts I-IV.

## II.    Because the 2021 Gather Decision complies with NEPA, the Court should grant summary judgment in favor of BLM.

Plaintiffs next challenge the 2022 Gather Plan and 2022 Gather under NEPA. Plaintiffs advance three central claims: (1) that the EA should have analyzed additional alternatives, (2) that BLM should have reexamined the AML, and (3) that BLM did not adequately analyze the practice of "gelding" wild horses. Plaintiffs do not meet their burden to show that the agency's decisionmaking process failed to comply with NEPA. Rather than identifying an area where BLM's analysis has "undermine[d] informed public comment and informed decisionmaking," *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017), Plaintiffs discuss areas where they merely disagree with BLM's ultimate conclusion. However, it is inappropriate for Plaintiffs to substitute their judgment for that of the agency's. *See North Slope Borough v. Andrus*, 642 F.2d 589, 605 (D.C. Cir. 1980). The Court should, therefore, uphold BLM's

No. 64-3 ¶ 12. To the extent that paragraphs within these declarations stray from asserting standing, the Court should strike them. *See* March 30, 2023 Order, ECF No. 54 at 6 (limiting declarations "in scope to Plaintiffs' First Amendment claim").

1    thorough assessment of the environmental effects of the 2022 Gather Plan and its consideration
2    of reasonable alternatives.

3        **A. BLM's EA complied with NEPA.**

4        NEPA's purpose is to ensure that federal agencies take a "hard look" at the environmental
5    consequences of their proposed actions before deciding to proceed. *Robertson*, 490 U.S. at 350,
6    352. The purpose of an EA is "not to amass and disclose all possible details regarding a proposal,
7    but to create a 'concise public document' that serves to '[b]riefly provide sufficient evidence and
8    analysis for determining whether to prepare an [EIS] or a [FONSI].'" *Tri-Valley CAREs v. U.S.*
9    *Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (citations omitted).

10       The EA for the 2022 Gather more than satisfies NEPA's procedural requirements.
11   Consistent with the Wild Horse Act, the EA explains the purpose of the proposed action is to
12   gather and remove excess wild horses from the Pancake Complex and to reduce the horse
13   population's growth rates in order to achieve and maintain established AML ranges. AR_3504.
14   The EA discloses the action is needed to "prevent undue or unnecessary degradation of the public
15   lands associated with excess wild horses, and to restore a thriving natural ecological balance and
16   multiple-use relationship on public lands." *Id*. Consistent with this purpose and need, the EA
17   proposes a no action alternative and four action alternatives. AR_3506-07. Supported by an
18   extensive Administrative Record, the EA engages in a thorough analysis of the affected
19   environment, environmental consequences, and the individuals, agencies, and groups consulted.
20   AR_3522-58. This analysis allowed BLM to reasonably determine that the action will not
21   significantly affect the quality of the human environment. AR_3694-96 (FONSI). Plaintiffs'
22   challenges to the sufficiency of the EA's thorough analysis are without merit.

23       **B. BLM considered a reasonable range of alternatives.**

24       Plaintiffs first argue that BLM should have considered additional alternatives than those
25   analyzed in the EA. Pls.' Br. 39. As a general matter, when preparing an EA, agencies are only
26   required to analyze reasonably feasible alternatives that are reasonably related to the purpose of
27   the project. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir.

28

2004). Agencies need not "consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir. 1990) (citing *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)). An agency's "obligation to consider alternatives under an EA is a lesser one than under an EIS," and so long as "'reasonable alternatives' have been considered," there is no "minimum number of alternatives that an agency must consider." *Native Ecosystems Council*, 428 F.3d at 1246 (finding sufficient the consideration of two alternatives including the no-action alternative). In the EA at issue here, the action alternatives were informed by the purpose and need for the 2022 Gather Plan: to remove excess wild horses and to restore a thriving natural ecological balance. AR_3504. BLM analyzed a no action alternative, as required by NEPA, and four other alternatives. *See* AR_3506-07; *see also* ECF No. 18 at 7. The EA explains that each of the action alternatives would remove excess horses to achieve the AML. AR_3513. In contrast, under the no action alternative—where no gather would occur—the current wild horse population would increase at a rate of 20 to 25% each year. AR_3507. This would result in further deterioration of rangeland in the Pancake Complex, public safety concerns with the increase of horses along heavily traveled roads, and property issues. *Id*. And emergency gathers would still be necessary to address limitations on water and forage resources. *Id*. This alternative, therefore, would not meet the purpose and need for the 2022 Gather Plan to achieve a thriving natural ecological balance in the Pancake Complex. Accordingly, BLM sufficiently examined a range of "reasonable alternatives" in this EA. *Laguna Greenbelt, Inc. v. U.S. Dep't. of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994) (per curiam) (NEPA does not require agencies to consider alternatives that do not satisfy the purpose of the plan).

Further, Plaintiffs' suggested alternatives were either addressed and rejected by BLM or were simply not supported by any credible, peer-reviewed evidence that the alternative could be considered "reasonable." For example, Plaintiffs advance rewilding, which was raised by a single commenter without any support or peer-reviewed citations, as a "reasonable"

alternative that should have been considered. Pls.' Br. 35. But Plaintiffs' concept of rewilding—reducing livestock grazing, retiring mining, and other activities—would be inconsistent with the 2022 Gather Plan's purpose to create a thriving natural ecological balance and to allow for multiple use relationships within the Pancake Complex. AR_3504. It is also unclear how this alternative would resolve forage and water limitations as the wild horse population would continue to multiply if left unchecked. *See* AR_3507 (noting that within two years, the wild horse population could exceed 5,000 if no action is taken). Thus, because Plaintiffs cannot make even the threshold showing that the alternatives they posed were "reasonable," the agency is under no obligation to analyze them in the context of the EA.

Courts in the Ninth Circuit have consistently upheld agencies' refusal to consider alternatives in cases involving removal of animals and, specifically, as to proposed alterations to grazing practices because the alternatives were inconsistent with agency-defined objections. *W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1046 (9th Cir. 2013) (determining that "BLM's interpretation of the Proclamation to allow the continued use of its grazing management was reasonable under [applicable law]" and thus "BLM did not violate NEPA by excluding changes to its grazing practices from the scope and purpose of the Breaks Resource Plan"); *see also Silvey*, 353 F. Supp. 3d at 1015-16 ("[D]efendants explained that this alternative would simply exchange a limited amount of current forage used by livestock for use by wild horses, which would not meet the purpose and need of the project to reduce wild horse growth rates; moreover, the proposed alternative would not conform to existing land use plans."); *Cloud Found.*, 2013 WL 1249814, at *18 ("BLM provided an appropriate explanation as to why it rejected the livestock reduction alternative: it simply could not reduce livestock grazing allotments through the gather process."). Plaintiffs have provided the Court with no reason to deviate from that clearly established law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C. BLM's reliance on well-established AMLs for the 2022 Gather complied with NEPA.

Next, Plaintiffs argue that BLM did not consider reevaluating the AML as an alternative approach in the context of the 2022 Gather Plan and that the AML for the Pancake Complex is too low. Pls.' Br. 42-43. But this was not a reasonable alternative nor necessary for conducting the 2022 Gather. Range AMLs need not be adjusted each time a decision to gather excess horses is issued. *See In Def. of Animals*, 751 F.3d at 1064 (nothing in the Wild Horse Act requires BLM to determine new AMLs based on current conditions every time BLM decides to take action to restore the already-established AMLs). Instead, as discussed previously, the Wild Horse Act requires BLM to remove excess wild horses once it determines an overpopulation of wild horses exists. *See supra* 13-18. This is reinforced by the BLM Handbook. *See, e.g.*, AR_1416 (discussing the separate process for determining AML range). As noted, here, BLM reasonably determined that an overpopulation of wild horses existed in the Pancake Complex, which was leading to the deterioration of resources, threatening public safety, and resulting in emergency gathers to prevent needless suffering and death of the horses, so BLM was required to conduct a gather based on well-established AMLs from RMPs and decision documents within the Pancake Complex. *See supra* 6-8. Thus, reevaluation of the AML prior to the 2022 Gather was neither required nor a reasonable alternative. Instead, BLM was required to conduct a gather to remove excess horses under the Wild Horse Act and then the agency could reevaluate the AML, after doing so.

Moreover, Plaintiffs' arguments have been rejected by other courts. In *Friends of Animals v. Bureau of Land Management*, the plaintiff, as here, argued that the EA violated NEPA because it did not adjust the AML in the gather plan. Case No: 16-CV-0199, 2017 WL 5247929, *8 (D. Wyo. Mar. 20, 2017). The Court found that the plaintiff "ha[d] not carried its burden to show BLM's failure to re-evaluate and readjust the AML ranges as a component of the 2016 gather decisionmaking process was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" because the "gather document is not the appropriate

mechanism for adjusting the AML of an HMA." *Id*. Rather, the court noted, BLM's AML determination "is a separate process distinct from the gather decision processes." *Id*. Thus, BLM was not required to adjust the AML as part of the gather process nor would doing so be a "reasonable" alternative within the purpose and need of the 2022 Gather Plan.[13]

### D. BLM considered the relevant factors when analyzing alternatives.

Plaintiffs also argue that BLM should have considered additional factors when analyzing alternatives for the 2022 Gather Plan. Pls.' Br. 39. But this argument is belied by the record. The court need only determine whether the agency has taken a "hard look" at the consequences of its actions, based its decision on a consideration of the relevant factors, and provided an explanation why a project's impacts are significant. *In Def. of Animals*, 751 F.3d at 1068 (internal citations and quotations omitted).

Here, BLM adequately considered the relevant factors associated with the alternatives under NEPA. For example, Plaintiffs claim that BLM did not consider the factor "that wild horses are important to lower[] the risk of wildfires on public lands[.]" Pls.' Br. 40. In support of this assertion, they reference the general comment of a single individual who speculates that "the major reduction of wild horses proposed by the EA would alarmingly increase the risk of catastrophic wildfires in many places" without adequate support for this contention. AR_3026. Even if this commentor had presented specific information concerning the HMAs at issue in this case, BLM has discretion to rely on the reasonable opinions of its own qualified experts, including agency experts. *Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *see*

---

[13] To the extent that Plaintiffs complain that the AML is too low, there is not an available remedy for Plaintiffs under NEPA. NEPA's mandate "is essentially procedural," *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978), and NEPA is "not intended to resolve fundamental policy disputes." *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (internal citations omitted). The Court may not "substitute [its] judgment for that of the decisionmaker" and mandate an alternative policy outcome. *North Slope Borough*, 642 F.2d at 605 n.93.

*also In Def. of Animals*, 751 F.3d at 1071 (citation omitted). And importantly, the EA explains that the belief that large numbers of wild horses may reduce fuel loads could be said about other large grazing animals, like livestock. *Id*. Moreover, there is the potential from high populations of wild horses to cause the spread of invasive plant species, which could *increase* wildfire risk. AR_3671. Thus, keeping large numbers of wild horses on the Pancake Complex would not necessarily decrease wildfire risk nor would it comply with the purpose and need of the 2022 Gather Plan.

Plaintiffs also argue that the EA failed to consider factors that affect herd health such as livestock grazing. Pls.' Br. 41. This assertion is likewise inaccurate. BLM considered livestock grazing and explained that "even with significantly reduced levels of livestock grazing within the gather area relative to the permitted levels authorized in the 2008 Ely RMP, there is insufficient habitat for the current population of wild horses, as confirmed by monitoring data." AR_3519. Thus, BLM considered livestock grazing, but reasoned that even if there were less livestock present, an ecological imbalance would remain in the Pancake Complex.

Plaintiffs' suggestion that BLM refused consideration of "genetic lineages present in the Complex," Pls.' Br. 34-35, is similarly contradicted by the record. The EA discusses the "history, context, and periodic introductions" of wild horses in the Pancake Complex. AR_3528. Relying on several studies, it explained that the horses should not be considered as truly isolated populations, but rather, part of a "larger metapopulation (NRC 2013) that has demographic and genetic connections with other BLM-managed herds in Nevada, Utah, and beyond." *Id*. And the EA further discusses the genetic effects of fertility control measures. AR_3638-40. Thus, Plaintiffs' assertion that BLM failed to consider genetics, or any relevant factors, in its analysis of reasonable alternatives is without merit.

**E.  BLM's consideration of impacts of gelding satisfies NEPA.**

In addition, Plaintiffs argue that an EIS must be prepared because BLM failed to take a "hard look" at the impacts of "gelding" or surgical sterilization of male horses. Pls.' Br. 44-45. However, as Plaintiffs acknowledge, BLM responded to comments concerning gelding. *See id*.

44. In fact, the EA discusses gelding in depth: Appendix XII of the EA exclusively addresses the "Environmental Effects of Geldings and Contraception Use in Wild Horse Management", *see* AR_3623-3653, including a discussion of gelding behavior and effects of family structure among wild horses, AR_3629-3630.

Further, the Ninth Circuit has upheld BLM's NEPA analysis of gelding impacts. In *American Wild Horse Campaign v. Bernhardt*, the plaintiffs argued that BLM failed to meet the "hard look" standard in its NEPA analysis of a gelding plan. 963 F.3d at 1012. On the basis of a record similar to the one at issue here, the Ninth Circuit concluded that BLM had performed adequate analysis to justify the practice of gelding to control the wild horse population and did not need to perform an EIS. *Id.* at 1001.

Therefore, Plaintiffs fail to show that the EA's consideration of gelding was "arbitrary or capricious." *Marsh*, 490 U.S. at 378. In making this determination, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.'" *Id.* (*quoting Citizens to Pres. Overton Park*, 401 U.S. at 416). As discussed above, the EA treats gelding in depth, relying on sound scientific information to inform the prospective plan. Plaintiffs' critiques of the EA's gelding analysis fail to identify "clear error" in decisionmaking. Instead, Plaintiffs discuss areas where they merely disagree with BLM's ultimate conclusion on the basis of the available data. But it is not the Court's role to substitute its judgment—much less Plaintiffs'—for that of the agency's expert resolution of an issue. And so, consistent with various other courts, this Court should reject Plaintiffs' baseless argument. *See, e.g., Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 172 (D.D.C. 2022) (noting "the record is replete with scientific discussion on the consequences of the fertility controls …[and] that no EIS was required after detailed review in an Environmental Assessment"); *Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 3d 971, 988 (D. Nev. 2018) (finding BLM's discussion of the behavioral effects of gelding sufficient and did not "trigger the preparation of an EIS"), *aff'd sub nom., Am. Wild Horse Campaign*, 963 F.3d 1001; *Silvey*, 353 F. Supp. 3d at 1013 (explaining "[g]elding horses is hardly a new

1    process and is a common surgical procedure used by BLM" which does not require the

2    preparation of an EIS).

3        In sum, the Court should deny Plaintiffs' NEPA claims. Plaintiffs fail to show that

4    BLM failed to consider a reasonable range of alternatives or that it did not consider the

5    relevant factors or environmental effects associated with the 2022 Gather Plan.

6                                    <u>**CONCLUSION**</u>

7        For the foregoing reasons, Federal Defendants respectfully request that the Court grant

8    their cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

9        Respectfully submitted this 11th day of October, 2023.

10

11                                    TODD KIM
                                      Assistant Attorney General
12                                    U.S. Department of Justice
                                      Environment & Natural Resources Division
13                                    S. JAY GOVINDAN, Section Chief
                                      BRIDGET K. MCNEIL, Assist. Section Chief
14

15                                    */s/  Christian Carrara*
                                      CHRISTIAN CARRARA, Trial Attorney
16                                    (NJ Bar No. 317732020)
                                      Wildlife & Marine Resources Section
17

18                                    */s/  Samantha Peltz*
                                      SAMANTHA PELTZ, Trial Attorney
19                                    (IL Bar No. 6336536)
                                      Natural Resources Section
20                                    Ben Franklin Station
                                      P.O. Box 7611
21                                    Washington, D.C. 20044
                                      Tel: (202) 598-9736 (Carrara)
22                                    Fax: 202-305-0275
                                      Christian.carrara@usdoj.gov
23

24                                    *Of Counsel:*
                                      Janell M. Bogue
25                                    U.S. Dep't of the Interior
                                      Office of the Solicitor
26                                    Pacific Southwest Region

27                                    *Attorneys for Federal Defendants*

28

1

2

**CERTIFICATE OF SERVICE**

3          I hereby certify that on October 11, 2023, I electronically filed the foregoing document

4   with the Clerk of the Court for the United States District Court for the District of Nevada using

5   the Court's CM/ECF system.  Participants in the case who are registered CM/ECF users will be

6   served by the appellate CM/ECF system, which includes counsel of record for all parties in the

7   case.

8

9                                            */s/ Christian Carrara*
                                            CHRISTIAN CARRARA
10                                           Attorney for Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28