TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Section Chief
BRIDGET K. MCNEIL, Assistant Section Chief
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
Wildlife and Marine Resources Section
SAMANTHA G. PELTZ (IL Bar No. 6336536)
Natural Resources Section
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, DC 20044
Phone: (202) 598-9736 (Carrara)
Fax: (202) 305-0275
Email: christian.carrara@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, THE CENTER FOR A HUMANE ECONOMY, a non-profit corporation LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>    *Plaintiffs,*<br><br>    *v.*<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>    *Defendants.* | Case No: 3:22-cv-00034-MMD-CLB<br><br><br>**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT (ECF No. 70)** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 1

    I.     BLM is entitled to summary judgment on Plaintiffs' Wild Horse Act claims ............................................................................................................ 2

          A.     The 2022 Gather complied with the Wild Horse Act and its implementing regulations.......................................................... 2

          B.     The Wild Horse Act's implementing regulations do not require BLM to create an HMAP before conducting a gather of excess horses. ..................................................................................... 3

          C.     Plaintiffs' interpretation of BLM's regulations contradicts the Wild Horse Act and congressional intent ................................. 7

          D.     Plaintiffs' claim that BLM unlawfully withheld or unreasonably delayed the creation of an HMAP fails as a matter of law. ................. 12

          E.     The Court should reject Plaintiffs' remaining Wild Horse Act arguments. .................................................................................. 14

    II.    BLM is entitled to summary judgment on Plaintiffs' NEPA claims ................. 16

CONCLUSION .............................................................................................................. 18

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Accardi v. Shaughnessy,*
347 U.S. 260 (1954).................................................................................. 6, 7

4

*Alaska v. Haaland,*
5
No. 3:21-CV-0158-HRH, 2022 WL 772968 (D. Alaska Mar. 14, 2022) ............................ 14

6

*Am. Horse Prot. Ass'n v. Watt,*
694 F.2d 1310 (D.C. Cir. 1982)............................................................ 10, 11

7

*Bartell Ranch LLC v. McCullough,*
8
2023 U.S. Dist. LEXIS 19280 (D. Nev. Feb. 6, 2023) ...................................... 16

9

*Blake v. Babbitt,*
837 F. Supp. 458 (D.D.C. 1993)................................................................. 9

10

*Brown v. Haaland,*
11
604 F. Supp. 3d 1059 (D. Nev. 2022)..................................................... 3, 12

12

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971).............................................................................. 16

13

*Cloud Found. v. BLM,*
14
No. 3:11-CV-00459-HDM-VPC, 2013 WL 1249814 (D. Nev. Mar. 26, 2013) .................. 10

15

*Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.,*
764 F.3d 1019 (9th Cir. 2014) ........................................................... 2, 4

16

*Earth Island Inst. v. Carlton,*
17
626 F.3d 462 (9th Cir. 2010) ................................................................ 18

18

*Ecology Ctr. v. Castaneda,*
574 F.3d 652 (9th Cir. 2009) ................................................................ 18

19

*Exportal Ltda. v. United States,*
20
902 F.2d 45 (D.C. Cir. 1990)............................................................... 4, 7

21

*Fed. Express Corp. v. Holowecki,*
552 U.S. 389 (2008)............................................................................. 12

22

*Friends of Animals v. BLM,*
23
232 F. Supp. 3d 53 (D.D.C. 2017)............................................................ 6

24

*Friends of Animals v. BLM,*
548 F. Supp. 3d 39 (D.D.C. 2021)........................................................ 3, 9

25

*Friends of Animals v. Culver,*
26
610 F. Supp. 3d 157 (D.D.C. 2022).......................................................... 8

27

*Friends of Animals v. Pendley,*
523 F. Supp. 3d 39 (D.D.C. 2021).................................................... 3, 10

28

*Friends of Animals v. Silvey*,
    353 F. Supp. 3d 991 (D. Nev. 2018) ................................................................ 11, 13

*Friends of Animals v. United States Bureau of Land Mgmt.*,
    No. 16-CV0199, 2017 WL 5247929 (D. Wyo. Mar. 20, 2017) ............................ 10

*Friends of Southeast's Future v. Morrison*,
    153 F.3d 1059 (9th Cir. 1998) ............................................................................ 17

*Gonzalez v. Cuccinelli*,
    985 F.3d 357 (4th Cir. 2021) .............................................................................. 14

*In Def. of Animals v. U.S. Dep't of Interior*,
    751 F.3d 1054 (9th Cir. 2014) ................................................................... 9, 17, 18

*In re A Cmty. Voice*,
    878 F.3d 779 (9th Cir. 2017) .............................................................................. 13

*Inhabitants of Montclair Twp. v. Ramsdell*,
    107 U.S. 147 (1883) ............................................................................................. 7

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ........................................................................................... 16

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ........................................................................................... 16

*Native Ecosystems Council v. Marten*,
    209 F. Supp. 3d 1168 (D. Mont. 2016) ............................................................... 2

*Native Ecosystems Council v. Marten*,
    719 F. App'x 715 (9th Cir. 2018) ........................................................................ 2

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) .................................................................................. 12, 13, 14

*Pac. Gas & Elec. Co. v. United States*,
    664 F.2d 1133 (9th Cir. 1981) .............................................................................. 8

*Romo v. Barr*,
    933 F.3d 1191 (9th Cir. 2019) .............................................................................. 5

*Sec'y of Labor v. Twentymile Coal Co.*,
    411 F.3d 256 (D.C. Cir. 2005) ............................................................................. 5

*Service v. Dulles*,
    354 U.S. 363 (1957) .......................................................................................... 6, 7

*Stevens v. Corelogic, Inc.*,
    899 F.3d 666 (9th Cir. 2018) ................................................................................ 7

*Swanson v. U.S. Forest Serv.*,
    87 F.3d 339 (9th Cir. 1996) ............................................................................... 17

*Telecomms. Rsch. & Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ................................................................ 13

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
    671 F.3d 1113 (9th Cir. 2012) .............................................................. 17

*United States v. Larionoff*,
    431 U.S. 864 (1977) ............................................................................... 8

*Viet. Veterans of Am. v. CIA*,
    811 F.3d 1068 (9th Cir. 2016) .............................................................. 13

**Statutes**

16 U.S.C. § 1333 ...................................................................................... 8

16 U.S.C. § 1333(a) ................................................................................. 8

16 U.S.C. § 1333(b)(2) .............................................................. 2, 5, 8, 10

5 U.S.C. § 706(1) ............................................................................ 12, 14

5 U.S.C. § 706(2)(A) ............................................................................. 13

**Regulations**

43 C.F.R. § 4700.0- 6(c) ......................................................................... 11

43 C.F.R. § 4710 ..................................................................................... 5

43 C.F.R. § 4710.4 ............................................................................. 4, 10

43 C.F.R. § 4720 ..................................................................................... 5

43 C.F.R. § 4720.1 .............................................................................. 2, 6

43 C.F.R. §§ 4710.3-1 .......................................................... 2, 4, 6, 10, 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

The Bureau of Land Management's ("BLM") 2022 Gather that addressed the severe wild horse overpopulation on the Pancake Complex in central eastern Nevada through gather and removal actions complied with the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), its implementing regulations, and the National Environmental Policy Act ("NEPA").

Congress granted BLM a high degree of discretion in carrying out its mandate to remove excess wild horses once an overpopulation determination is made. The Wild Horse Act's implementing regulations support this authority, and echo Congress' command that the agency immediately remove excess animals based on information currently available. Plaintiffs' response continues to argue that BLM failed to create a Herd Management Area Plan ("HMAP") prior to removing excess horses and failed to consider enough factors while doing so. But there is no such requirement to create an HMAP before a gather and Plaintiffs fail to show BLM did not take a hard look when analyzing the 2022 Gather. Instead, on top of attempting to rewrite the regulations to support their claims, Plaintiffs now try to rewrite their claims, contending for the first time that their unreasonable delay claim is tied to the general obligation that BLM prepare an HMAP. Pls.' Opp. to Defs.' Cross-Mot. for Summ. J. and Reply in Support of Pls.' Mot. for Summ. J. ("Pls.' Reply"), ECF No. 71 at 14.[1] But it is far too late for Plaintiffs to revise their claims. And, in any event, Plaintiffs' claims are unsupported by fact and law. Accordingly, the Court should reject Plaintiffs' arguments, deny their motion for summary judgment, and grant summary judgment for Federal Defendants.

## ARGUMENT

Plaintiffs' response brief merely rearranges the same arguments from the past two years. Here, again, Plaintiffs' argument boils down to three contentions: (1) the Wild Horse Act's implementing regulations require BLM to create an HMAP prior to removing excess horses, (2) BLM's failure to create an HMAP before the 2022 Gather constitutes action

---

[1]This brief references the ECF-generated page numbers for court filings.

unlawfully withheld or unreasonably delayed under the Administrative Procedure Act ("APA"), and (3) BLM violated NEPA by failing to consider enough factors. Each proposition fails as there is simply no requirement in the Wild Horse Act or its implementing regulations that BLM first prepare an HMAP before the removal of excess horses. Thus, BLM could not have unlawfully withheld or unreasonably delayed doing so. Additionally, Plaintiffs fail to show BLM did not take a hard look under NEPA when analyzing the 2022 Gather Plan. The Court should accordingly reject Plaintiffs' arguments to the contrary.

## I.       BLM is entitled to summary judgment on Plaintiffs' Wild Horse Act claims.

Plaintiffs insist that the Wild Horse Act's implementing regulations require BLM to create HMAPs before the removal of excess horses. Pls.' Reply at 6, 10-12. To reach this conclusion, Plaintiffs twist the language contained in 43 C.F.R. §§ 4710.3-1 and 4710.4 and brush aside the regulatory text and scheme, the Wild Horse Act itself, and congressional intent. But Plaintiffs cannot simply rearrange the wording within the regulations to manufacture a mandate where none exists. *See Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*, 764 F.3d 1019, 1024 (9th Cir. 2014) (declining to adopt the plaintiffs' interpretation, which, "would effectively be to rearrange the wording of the statute—something that we, as a court, cannot do"). Nor can they ignore the regulatory and statutory scheme that contradicts their claims. *See Native Ecosystems Council v. Marten*, 209 F. Supp. 3d 1168, 1177 (D. Mont. 2016) (plaintiffs cannot isolate words from their context), *aff'd*, 719 F. App'x 715 (9th Cir. 2018). The Court should therefore reject each of Plaintiffs' challenges to the 2022 Gather under the Wild Horse Act as without merit.

### A.  The 2022 Gather complied with the Wild Horse Act and its implementing regulations.

As a threshold matter, the 2022 Gather complied with the Wild Horse Act, its implementing regulations, and congressional intent by removing excess wild horses from the Pancake Complex once BLM determined that an overpopulation existed based on the information available to it. 16 U.S.C. § 1333(b)(2); 43 C.F.R. § 4720.1. Although Plaintiffs continue to contend that the 2022 Gather violated the requirement that BLM create HMAPs,

Pls.' Reply at 5, "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the [Wild Horse Act]." *Animal Prot. Inst. of Am.,* 109 IBLA 112, 127 (1989)[2]; *accord Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 67 (D.D.C. 2021) (finding a combination of materials may be used to manage a herd management area ("HMA")); *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 56 n.3 (D.D.C. 2021) (reasoning that an action could use an HMAP or a resource management plan ("RMP") to comply with the Wild Horse Act). As mentioned, here, BLM substantially complied with the Wild Horse Act by establishing the appropriate management level ("AML") range and various short and long-term objectives through the Record of Decision and 2008 Ely District RMP, 1997 Tonopah RMP, and 1986 Humboldt National Forest Land & Resource Management Plan. *See* Fed. Defs.' Br. at 18-19. BLM also followed gather standards and responded to comments to address and implement the minimal feasible level for the gather. *Id*. at 19. This thorough analysis and determination demonstrates that Plaintiffs do not dispute the reasonableness—and necessity—of BLM's decision; they merely disagree with the 2022 Gather.

**B. The Wild Horse Act's implementing regulations do not require BLM to create an HMAP before conducting a gather of excess horses.**

Plaintiffs attempt to rewrite the Wild Horse Act's implementing regulations to require BLM to create HMAPs before conducting gathers. Pls.' Reply at 10-12. But this attempt falls flat for at least two reasons. First, the plain text of the regulations upon which Plaintiffs rely creates no such duty. Second, if adopted, Plaintiffs' flawed reading of the regulations would create a conflict within the regulatory text and with Congress' intent behind enacting the Wild Horse Act.

---

[2] Plaintiffs assert that the Court should not consider this Interior Board of Land Appeals ("IBLA") Decision because it was not issued by an Article III court. Pls.' Reply at 7-8. However, the decision is persuasive authority since it is directly on point in rejecting Plaintiffs' regulatory interpretation argument. *See Brown v. Haaland*, 604 F. Supp. 3d 1059, 1082 n.34 (D. Nev. 2022) (recognizing that although Interior Board of Indian Appeals decisions are not binding or precedential, their reasoning can be considered as persuasive authority especially when there is a gap in federal caselaw).

First, the regulatory text does not require BLM to create an HMAP prior to removing excess wild horses. Plaintiffs argue that 43 C.F.R. §§ 4710.3-1 and 4710.4 create a "mandatory, non-discretionary duty" for BLM to do so, but fail to identify an express requirement. Pls.' Reply at 5, 10-11. In fact, Plaintiffs concede that an unambiguous requirement does not exist anywhere in the regulatory text. *See* Pls.' Reply at 6 ("Section 4710.3-1 does not, in and of itself, expressly identify a timeframe by which HMAPs must be created."); *see also id*. at 11 (appearing to concede the same). And as relevant to Plaintiffs' argument, Section 4710.4 merely states that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and [HMAPs]." Thus, a plain reading of each regulation reveals there is no mandate for the agency to create an HMAP before conducting a gather.

Seeming to acknowledge this shortcoming, Plaintiffs argue that only in "reading both [43 C.F.R. §§ 4710.3-1 and 4710.4] together, it is clear" that the requirement exists. *Id*. at 6, 11. But this is not so either. Reading the regulations together, as Plaintiffs suggest, merely shows that, "[i]n delineating each [HMA], [BLM] shall consider … the constraints contained in § 4710.4." 43 C.F.R. § 4710.3-1. And as stated above, the constraints that Plaintiffs refer to are that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and [HMAPs]." 43 C.F.R. § 4710.4. Simply put, the regulations only require BLM to consider that management be at the minimum feasible level to obtain its identified and approved goals when delineating HMAs. There is no duty for BLM to create an HMAP before conducting a gather that can be gleaned from the plain meaning of the regulations. The Court should accordingly decline to adopt Plaintiffs' interpretation, which, "would effectively be to rearrange the wording of the statute[.]" *Ctr. for Cmty. Action & Env't Just.*, 764 F.3d at 1024; *accord Exportal Ltda. v. United States*, 902 F.2d 45, 50 (D.C. Cir. 1990) (the APA mandates courts apply the plain meaning doctrine when interpreting regulations).

Second, Plaintiffs' reading of the regulations not only ignores—but conflicts with—the other Wild Horse Act implementing regulations that address the removal of excess animals. Under the Wild Horse Act's implementing regulations, there are separate sections for management considerations and the removal of excess animals. *Compare* 43 C.F.R. § 4710 *et seq.* ("Management Considerations"), *with* 43 C.F.R. § 4720 *et seq.* ("Removal"). As for removal, Section 4720.1 reflects Congress' intent in enacting the Wild Horse Act and requires that "[u]pon examination of current information and a determination by [BLM] that an excess of wild horses … exists, [BLM] shall remove the excess animals immediately[.]" *See also* 16 U.S.C. § 1333(b)(2) (requiring the immediate removal of excess animals when the Secretary determines that an overpopulation exists based on "all information currently available to him"). It is thus clear that Congress and BLM intended that the removal of excess horses not be hindered by separate management considerations where the agency substantially complies with the statute, much less prohibited until BLM has the resources to develop an HMAP for a given area.

Reading the regulations as Plaintiffs suggest, however, would create an illogical result: BLM would be tasked with immediately removing excess horses on the basis of the current information available but would also have to first create an HMAP where none exists—even where the action otherwise substantially complies with the Wild Horse Act. The Court should reject these "absurd results" that follow Plaintiffs' misreading of the Wild Horse Act and regulations. *Romo v. Barr*, 933 F.3d 1191, 1198 (9th Cir. 2019); *accord Sec'y of Labor v. Twentymile Coal Co.*, 411 F.3d 256, 260-61 (D.C. Cir. 2005) ("To read the regulation's use of the term... [in this way] would lead to absurd results .... This [c]ourt will not adopt an interpretation of a statute or regulation when such an interpretation would render the particular law meaningless.") (citations omitted).

This straightforward reading of the regulations also dovetails with BLM's Wild Horses and Burros Management Handbook ("BLM Handbook"). *See* AR_1350-1429. In the BLM Handbook, BLM separates management into three chapters: (1) habitat management, (2)

population management, and (3) herd management area planning. For herd management area planning, the BLM Handbook explains that "HMAPs establish short- and long-term management and monitoring objectives for a specific [wild horse and burro] herd and its habitat[,] … identify the actions to be taken to accomplish herd and habitat management objectives[,] … [and] assists the authorized officer in tracking progress toward achieving [land use plan] goals." AR_1360. But the BLM Handbook states, "[w]hen the authorized officer has determined that excess [horses] exist, gathers to capture and remove the animals immediately or as soon as possible are required." AR_1372. The BLM Handbook then directs the reader to BLM Manual Section 4720 and 43 C.F.R. §§ 4720.1, 4740.1 and 2. *Id*. The BLM Handbook notably does not direct BLM to 43 C.F.R. §§ 4710.3-1 and 4710.4—the regulations that Plaintiffs rely on—as a constraint on conducting gathers. Thus, Plaintiffs' contention that BLM "impose[d] upon itself specific management procedures" requiring the creation of an HMAP prior to removing excess horses is belied by both the regulatory text and the BLM Handbook.[3] Pls.' Reply at 12; *see Friends of Animals v. BLM*, 232 F. Supp. 3d 53, 63 (D.D.C. 2017) (rejecting plaintiff's argument that BLM must create an environmental assessment ("EA") for each gather and noting BLM's guidance encourages the use of existing analyses in order to "avoid redundancy").

Despite this evidence, Plaintiffs nonetheless return to *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and *Service v. Dulles*, 354 U.S. 363 (1957), to again argue BLM's duty to remove excess horses is constrained by Sections 4710.3-1 and 4710.4. Pls.' Reply at 12. But, as explained, those cases are inapplicable here as the Secretary is not bound by regulation or statute to create an HMAP before conducting a gather. Fed. Defs.' Br. at 24. Unlike this matter where Plaintiffs concede their theory cannot be gleaned from the face of the regulation, Pls.'

---

[3] Plaintiffs contend that the "BLM Handbook cannot alter BLM's [duty to create an HMAP prior to conducting a gather], and no *Auer* deference should be given to it." Pls.' Reply at 15. Federal Defendants make neither argument. Like the regulatory scheme, the BLM Handbook simply reinforces that the regulations should be understood in accordance with their plain meaning.

Reply at 6, 11, in *Shaughnessy* the court emphasized that the regulations at issue delegated authority in "unequivocal terms[.]" 347 U.S. at 266. The regulation in *Dulles* is also unequivocal as to the duty at issue. *See* 354 U.S. at 383-85 (quoting the regulatory text). Here, Plaintiffs combine two regulations, omit words, and ignore the regulations' scheme and plain meaning to construct their argument. Plaintiffs' interpretation could not be farther from "unequivocal." Thus, *Shaughnessy* and *Dulles* bear no weight here.

In sum, the Court should reject Plaintiffs' illogical reading of BLM's regulations, which cannot be garnered from the plain meaning of the regulations and would create conflict within the regulatory scheme.

**C. Plaintiffs' interpretation of BLM's regulations contradicts the Wild Horse Act and congressional intent.**

Plaintiffs also suggest that applying the plain meaning of the regulations "requires the Court to engage in a strained interpretation" and "ignores the legislative history" of the regulations. Pls.' Reply at 11. Both arguments fail. Giving each word effect within the regulations is not a strained interpretation—it is required. Moreover, Plaintiffs' interpretation of the regulatory text would cause an impermissible conflict with congressional intent. Thus, it is Plaintiffs who minimize the Wild Horse Act's legislative history, which underscores Congress' intent that BLM remove excess horses immediately based on the information it has available so long as it substantially complies with the statute.

First, Plaintiffs' claim that somehow giving the word "approved" effect in Section 4710.4 engages in a strained interpretation and ignores the legislative history of the regulations is unfounded. Pls.' Reply at 11. Contrary to Plaintiffs' contention, giving effect to the plain meaning of words in a statute is not a strained interpretation; it is the required interpretation. *Exportal Ltda.*, 902 F.2d at 50. Indeed, "[i]t is a fundamental principle of statutory interpretation that [courts] must 'give effect, if possible, to every clause and word of a statute[.]'" *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018) (quoting *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883)). And so, reading the regulation to require BLM to consider objectives in *approved* land use plans and HMAPs—rather than

unapproved ones or ones not yet developed—does not render the Section "without effect" as Plaintiffs suggest. Pls.' Reply at 11. Doing so renders each word in the regulation with effect as required.[4]

Also, Plaintiffs' interpretation of the regulatory text impermissibly conflicts with the purpose of the Wild Horse Act. It is axiomatic that in order for regulations to be valid, they "must be consistent with the statute under which they are promulgated[.]" *Pac. Gas & Elec. Co. v. United States*, 664 F.2d 1133, 1136 (9th Cir. 1981) (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977)). Plaintiffs, however, do not discuss the text of the authorizing statute for Sections 4710.3-1 and 4710.4—the Wild Horse Act—or its legislative history in their reply. Plaintiffs merely cite 16 U.S.C. § 1333 for the requirement that BLM conduct all management activities at the minimal feasible level. Pls.' Reply at 6; *cf*. Fed. Defs.' Br. at 20-21. But Plaintiffs' fleeting reference to the Wild Horse Act ignores the wide discretion Congress granted to BLM in managing excess horses that is embedded in the text of the statute. For example, the statute lists information BLM may use to determine that a wild horse overpopulation exists and then states "in the absence of [such] information" BLM must proceed with removal on the basis of whatever information BLM has at the time of the decision. 16 U.S.C. § 1333(b)(2). Thus, the text shows that the purpose of the Wild Horse Act removal provision is to respond to wild horse overpopulations and that a lack of information immediately available should not prevent that from occurring. Like the conflict Plaintiffs' misreading would cause within the Wild Horse Act's regulations, *see supra* 5-7, their regulatory interpretation would also frustrate the purpose of the Wild Horse Act which makes clear that the agency must immediately remove excess horses once a determination is made. *See, e.g.*, *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 169 (D.D.C. 2022) (finding

---

[4] Plaintiffs' argument that Federal Defendants ignore that Section 4710.4 is entitled "Constraints on management" likewise fails. Pls.' Reply at 11. By giving each word effect in Section 4710.4, it is evident that any constraint is focused on management being at the "minimum level." This reading is consistent with the Wild Horse Act as well. *See* 16 U.S.C. § 1333(a) (requiring all management activities be at the minimal feasible level).

nothing in the legislative history to "suggest 'immediately' means anything other than what it says"); *Blake v. Babbitt*, 837 F. Supp. 458, 459 (D.D.C. 1993) (finding the Wild Horse Act requires truly immediate action upon an excess finding because of Congress' determination in the Wild Horse Act that "the endangered and rapidly deteriorating range cannot wait"). The Court should reject this misreading.

To be clear, Federal Defendants do not contend that Sections 4710.3-1 and 4710.4 have no effect or that BLM can simply choose which regulations to follow if it determines that an excess of animals exists on the range and removal is necessary.[5] *Cf.* Pls.' Reply at 11, 15. Consistent with the IBLA's holding in *Animal Protection Institute of America,* and as Federal Defendants have maintained since this case first began, "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the statute." 109 IBLA at 127; *see also* Defs.' Opp. to Request for Temp. Restraining Order and Prelim. Injunction, ECF No. 18 at 11-12. And as explained, to substantially comply, BLM could use a land use plan, an EA, an established AML, and a gather plan, or some combination, in issuing a gather decision. *Friends of Animals v. BLM*, No. CV 18-2029 (RDM), 2021 WL 2935900, at *20 (D.D.C. July 13, 2021). These options do not bypass constraints on management, as Plaintiffs argue. Pls.' Reply at 11-12. Rather, as outlined in the BLM Handbook and confirmed by statute, they give BLM "considerable flexibility" in choosing the types of plans relied on for gathers so that the agency can comply with its mandate to immediately remove excess animals. *Id.*; *see also In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1066 n.20 (9th Cir. 2014) (concluding the Wild Horse Act gives

---

[5] Likewise, it is not disputed that BLM is generally required to create an HMAP or that Sections 4710.3-1 and 4710.4 pertain to how the agency manages HMAs. *See, e.g.*, Mem. in Support of Fed. Defs.' Cross-Mot. for Summ. J. and Opp. to Pls.' Mot. for Summ. J. ("Fed. Defs.' Br."), ECF No. 70 at 17 n.4. These issues are not before the Court. The question that is before the Court is whether the Wild Horse Act or its regulations prohibit removal of excess horses prior to creation of an HMAP. *See* March 30, 2023, Order at 5, ECF No. 54 (clarifying the issue).

1   BLM discretion to take measures not delineated by statute because BLM must also comply

2   with the Wild Horse Act's command to remove excess horses immediately).

3          This reading of the regulations and understanding of Congress' intent to afford BLM

4   wide discretion in relying on information to support the gather and removal of excess horses

5   has been long recognized by courts. *See Cloud Found. v. BLM*, No. 3:11-CV-00459-HDM-

6   VPC, 2013 WL 1249814, at *5 (D. Nev. Mar. 26, 2013) (The statute "clearly conveys

7   Congress's view that BLM's findings of wild horse overpopulations should not be overturned

8   quickly on the ground that they are predicated on insufficient information." (quoting *Am.*

9   *Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1318 (D.C. Cir. 1982)); *see also Am. Horse Prot.*

10  *Ass'n*, 694 F.2d at 1317–18 (The 1978 amendments added language to specify "what

11  information the Secretary must possess—or, more accurately, the information the Secretary

12  need *not* possess—before removing wild horses deemed to be in excess.") (citing 16 U.S.C. §

13  1333(b)(2)). Plaintiffs seek to rebut these cases but "do not disagree with th[e] general

14  proposition" that Congress afforded BLM with discretionary authority in addressing and

15  removing excess horses. Pls.' Reply at 10. Rather, Plaintiffs attempt to undermine these

16  decisions by simply arguing they hold no weight because they do not "address Section 4710.4

17  or the regulatory history of BLM's regulations." *Id.* at 7-10. But this is inaccurate. Throughout

18  their briefing, Plaintiffs insist that a reading of Section 4710.3-1 necessarily implicates Section

19  4710.4. *See, e.g.*, *id.* at 6 ("[Section 4710.3-1] directs the reader to Section 4710.4."); *id.* at 11

20  (asserting "Defendants ignore this connection between Sections 4710.[3]-1 and 4710.4"). Thus,

21  when the IBLA concluded that Section 4710.3-1 "does not require preparation of an HMAP as

22  a prerequisite for a removal action" the IBLA necessarily considered whether Section 4710.4,

23  which the reader is directed to, requires the same. *Animal Prot. Inst. of Am.*, 109 IBLA at 127.

24  And because this reading is clear from the text of the regulations, Plaintiffs' contention that the

25  decisions do not address the tools of statutory construction is irrelevant.  For these reasons,

26  Plaintiffs' arguments against the applicability of *Friends of Animals v. Pendley*, 523 F. Supp.

27  3d 39, and *Friends of Animals v. BLM*, Case No: 16-CV-0199, 2017 WL 5247929, at *8 (D.

28

Wyo. Mar. 20, 2017), similarly fail as both cases interpret 43 C.F.R. § 4710.3-1 with its reference to Section 4710.4. *See* Pls.' Reply at 9.

As for *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020), Plaintiffs argue that, because "the court was not asked to consider whether BLM complied with its implementing regulations," the decision does not have precedential value. Pls.' Reply at 7. This misses the mark. Like here, the plaintiff in *Silvey* argued that BLM's overpopulation determination and response violated the Wild Horse Act's implementing regulations governing management activities.[6] *See* Pls.' Mot. for Summ. J. and Mem. of P. & A., 3:18-cv-00043-LRH-CLB, ECF No. 21 at 20 (citing 43 C.F.R. § 4700.0-6(c)). The *Silvey* court explained that plaintiff's argument "fails in light of the widely accepted understanding that the [Wild Horse Act] 'conveys Congress's view that BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information.'" *Silvey*, 353 F. Supp. 3d at 1007 (quoting *Am. Horse Prot. Ass'n, Inc.*, 694 F.2d at 1318). Similarly, Plaintiffs' HMAP argument is premised upon the false assertion that, in absence of an HMAP, BLM's gather decision is based on insufficient information. *See* Pls.' Reply at 6, 8, 11, (arguing the constraints contained in 4710.4 are among the information BLM must consider); *id*. at 15-16 (arguing the minimum feasible level must be considered). And so, the court's reasoning in *Silvey* equally applies here: BLM's 2022 Gather should not be overturned quickly on the ground that it was predicated on insufficient information in the name of an HMAP that does not exist. *See supra* 2-3 (discussing information relied upon). The Court should thus reject Plaintiffs' "baseless" interpretation which conflicts with the "plain meaning of the statutory terms of the [Wild Horse Act.]"[7] *Silvey*, 353 F. Supp. 3d at 1009.

---

[6] The only difference is that, here, Plaintiffs challenge BLM's decision to gather horses before creating an HMAP whereas, in *Silvey*, plaintiff challenged BLM's decision to geld a portion of the wild horse population. *Silvey*, 353 F. Supp. 3d at 1007; Pls.' Reply at 15.

[7] Plaintiffs also repeat their assertion that Federal Defendants do not adequately respond to their reference to *National Cable Television Associaion, Inc*. Pls.' Reply at 10. But this

In short, Plaintiffs quibble with mistaken and meaningless distinctions between the instant matter and case law but do not dispute the broad discretion afforded to BLM under the Wild Horse Act in making determinations to remove excess horses. Pls.' Reply at 10. Nor do Plaintiffs dispute—or even address—that their reading of the regulations thwarts the Congressionally-dictated goals of the Wild Horse Act. *Cf.* Fed. Defs.' Br. at 20-21 (discussing such). Accordingly, the Court should reject Plaintiffs' theory which would cause "tension with the structure and purposes" of the Wild Horse Act. *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 401-02 (2008).

**D.  Plaintiffs' claim that BLM unlawfully withheld or unreasonably delayed the creation of an HMAP fails as a matter of law.**

Plaintiffs also argue that BLM unlawfully withheld or unreasonably delayed the creation of an HMAP under 5 U.S.C. § 706(1). Pls.' Reply at 12-13. Both arguments fail as a matter of law. First, Plaintiffs' contention that BLM unlawfully withheld creating an HMAP before conducting a gather fails because Plaintiffs have not—and cannot—show there is a specific legislative command to do so. *See supra* 3-11. As explained, it is fundamental that a court's power to "compel agency action" under the APA is limited to situations when an agency has ignored a specific legislative command. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (constraining judicial review under 5 U.S.C. § 706(1) to "discrete" actions that are "legally *required*"); *see also Brown*, 604 F. Supp. 3d at 1079 (to compel agency action under the APA, the agency must have "a clear, certain, and mandatory duty") (internal quotation marks and citation omitted). Plaintiffs concede that there is no clear, certain, and mandatory duty to create an HMAP before conducting a gather. *See* Pls.' Reply at 6 ("Section 4710.3-1 does not, in and of itself, expressly identify a timeframe by which HMAPs must be created."); *see also id.* at 11 (appearing to concede the same). Plaintiffs attempt to invent a duty by putting together two regulations—and ignoring regulatory text, scheme, and congressional

---

argument needs to only be briefly addressed. As discussed, the cases Federal Defendants rely on address whether BLM can conduct a gather without an HMAP, which is precisely the issue in this case. *See supra* 9-11.

intent along the way—but that cannot establish a duty, the fulfillment of which was unlawfully withheld. *See In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) ("an agency cannot unreasonably delay that which it is not required to do").

Perhaps acknowledging this shortfall, Plaintiffs appear to abandon their Mandamus and Venue Act claim and instead focus on arguing that BLM unreasonably delayed the creation of an HMAP. Pls.' Reply at 13. But this argument fares no better than Plaintiffs' Mandamus and Venue Act and unlawfully withheld action claims for two reasons. Plaintiffs cannot now, after two years of litigation, rewrite their claim in their reply brief. In addition, Plaintiffs' claim fails as a matter of law.

First, Plaintiffs assert the discrete action that was unreasonably delayed is "the mandate [for BLM] to create an HMAP." Pls.' Reply at 13; *see also Telecomms. Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 79-80 (D.C. Cir. 1984). But that is not so. Plaintiffs' unreasonable delay claim hinges upon whether BLM has a duty to create an HMAP *prior* to conducting a gather. *See* Pls.' Am. Compl. ¶¶ 120-21; Fed. Defs.' Br. at 27 n.9. That is the discrete action to be analyzed; not whether BLM was only required to create an HMAP.[8] Plaintiffs cannot now pursue a different claim in their reply brief because their initial unreasonable delay claim is unavailing. *Silvey*, 353 F. Supp. 3d at 1008 (rejecting a similar attempt by plaintiff to do so). Because Plaintiffs cannot change their unreasonable delay claim now—and Plaintiffs cannot show BLM is legally required to create an HMAP before conducting a gather—Plaintiffs' citations to cases discussing unreasonable delays are inapplicable here. Pls' Reply at 13-14. And as explained, Plaintiffs' reference to the

---

[8] Plaintiffs' requested relief demonstrates this to be so. If Plaintiffs' claim were truly focused on compelling BLM to develop an HMAP, that would be the only agency action that the Court could compel. *See Viet. Veterans of Am. v. CIA*, 811 F.3d 1068, 1075-76 (9th Cir. 2016) (citing *Norton*, 542 U.S. at 63-64). However, Plaintiffs here seek invalidation of the 2021 Gather Decision for an alleged noncompliance with the Wild Horse Act's implementing regulations. In other words, Plaintiffs truly bring an APA 706(2) challenge that the 2021 Gather Decision is "otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

Fifteenmile HMAP is not only irrelevant but inappropriate. *See* Fed. Defs.' Br. at 30 n.11; *see also* Fed. Defs.' Resp. to Pls.' Mot. for Judicial Notice (ECF No. 65), ECF No. 68.

Plaintiffs attempt to overcome this flaw in their unreasonable delay argument by suggesting that, while the unlawfully withheld prong requires the Court to analyze whether an HMAP must have been created prior to removing excess horses from the range, "analysis under the unreasonably delayed prong does not." Pls.' Reply at 14. According to Plaintiffs, this is because "the unreasonably delayed prong is only addressed where no specific deadline exists." *Id*. Plaintiffs' argument does not withstand scrutiny. Plaintiffs cannot now remove a necessary condition of their claim—that the creation of an HMAP is required *prior* to removing excess horses—in an attempt to save their argument. *See, e.g.*, *Gonzalez v. Cuccinelli*, 985 F.3d 357, 366 (4th Cir. 2021) (rejecting plaintiffs' unreasonable delay claim alleging the defendants had a duty to issue a determination *upon a party's request* and explaining "where an agency is *not required* to do something, we cannot compel the agency to act—let alone to act faster.") (citing *Norton*, 542 U.S. at 63 n.1).

In sum, Plaintiffs cannot now change their claims to keep their unreasonable delay argument alive. And because Plaintiffs have failed to show there is a duty to create an HMAP before conducting a gather, there can be no unreasonable delay as a matter of law.[9] *Alaska v. Haaland*, No. 3:21-CV-0158-HRH, 2022 WL 772968, at *9 (D. Alaska Mar. 14, 2022) (finding because BLM has no duty to publish public land orders under its regulations, there is no basis for allegation that there has been an unreasonable delay). The Court should thus reject Plaintiffs' 5 U.S.C. § 706(1) claims.

**E. The Court should reject Plaintiffs' remaining Wild Horse Act arguments.**

Finally, Plaintiffs pull together several last-ditch arguments related to the Wild Horse Act that are quickly dismantled. First, Plaintiffs argue, for a third time, that BLM cannot

---

[9] Moreover, even if the Court were to consider the *TRAC* factors, for the reasons previously explained, Plaintiffs' arguments would still fail. *See* Fed. Defs.' Br. at 26-28. Notably, Plaintiffs do not respond to the reasoning provided in Federal Defendants' opening brief and we do not further address these points.

achieve the minimal feasible level without an HMAP. Pls.' Reply at 15-16; Pls.' Notice of Mot. for Summ. J. and Mem. of P. & A. in Support Thereof, ECF No. 64 at 34; Pls.' Ex Parte Request for Temp. Restraining Order and Prelim. Inj., ECF No. 4 at 17. But this is simply inaccurate. As mentioned previously, the approved management plans for the herd areas in the Pancake Complex contain many short and long-term objectives for maintaining the wild horse population at the minimal feasible level. *See* Fed. Defs.' Br. at 30, 32. Additionally, the Wild Horse and Burro Comprehensive Animal Welfare Program, which BLM relied upon in conducting the 2022 Gather, contains guidance on how agency personnel should manage HMAs and employ minimal management tools. *Id*. at 20. Thus, Plaintiffs' myopic focus on just the gather-EA and not these other documents that provide a range of objectives for the Pancake Complex is insincere and incorrect.

Plaintiffs also argue that they were denied the opportunity to publicly participate because BLM did not create an HMAP before the 2022 Gather. Pls.' Reply at 16. But this argument is belied by the record.[10] As stated, BLM held a 30-day comment period and considered comments from about 3,600 individuals or organizations. AR_3654. Many of the comments submitted were from Plaintiffs. *See, e.g.*, AR_3658-61. Moreover, there was public involvement and the opportunity to comment on different objectives for the various other decisions governing management of the Pancake Complex. *See, e.g.*, AR_873 (Ely District RMP); AR_575 (Tonopah RMP); AR_417 (Newark Allotment Final Multiple Use Decision within the Ely District); AR_419 (the Six Mile Allotment within the Ely District). It is thus inaccurate for Plaintiffs to claim that they were denied an opportunity to publicly participate or to suggest that an HMAP is the only opportunity for them to do so. It is thus clear that Plaintiffs merely disagree with BLM's decision to conduct the 2022 Gather, a position that would not have been altered by an additional opportunity to comment.

---

[10] As mentioned, in addition to Plaintiffs' claim being factually inaccurate, neither the Wild Horse Act nor the APA require BLM to explicitly respond to all opinions submitted during the public-comment period. Fed. Defs.' Br. at 31.

At bottom, Plaintiffs reiterate the same arguments that they have pushed for the last two years to challenge BLM's 2022 Gather. Despite this, Plaintiffs fail to meet their burden of showing that BLM has a duty under the Wild Horse Act or its implementing regulations to create an HMAP before conducting the gather. Because of this, Plaintiffs fail to show that BLM unlawfully withheld or unreasonably delayed doing so. Plaintiffs' auxiliary arguments fare no better and are also quickly dismantled. Accordingly, the Court should deny Plaintiffs' Wild Horse Act claims.

## II.    BLM is entitled to summary judgment on Plaintiffs' NEPA claims.

Plaintiffs continue to fail to establish that the challenged gather decisions were arbitrary and capricious. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Plaintiffs' NEPA arguments center on alleged deficiencies in the scientific analysis of each of the challenged EAs. However, the record reflects that BLM took the required "'hard look' at the environmental consequences" of its proposed actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) ("The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences[.]"). Plaintiffs merely disagree "as to the choice of the action to be taken." *Id*. (internal quotation marks and citation omitted); *see also Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Bartell Ranch LLC v. McCullough*, 2023 U.S. Dist. LEXIS 19280, at *52 (D. Nev. Feb. 6, 2023) (scientific or technical disagreement alone is not a basis to overturn agency action, particularly in light of deference). Plaintiffs' initial brief provided no basis to determine that BLM's analysis showed a "clear error of judgment." *Marsh*, 490 U.S. at 378 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Their reply does not provide any further basis for their claim. Accordingly, the Court should grant summary judgment for BLM on Plaintiffs' NEPA claims.

The purpose of an EA is "not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to '[b]riefly provide sufficient

evidence and analysis for determining whether to prepare an environmental impact statement [("EIS")] or a finding of no significant impact [("FONSI")].'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (citations omitted). Consistent with the purpose and need to gather and remove excess wild horses from the Pancake Complex and to reduce the horse population's growth rates to achieve and maintain established AML ranges, *see* AR_3504, the EA evaluated a no-action alternative and four action alternatives. AR_3506-07. Before issuing the EA and FONSI, BLM analyzed nearly 30 environmental, economic, and social factors for the proposed action and its alternatives. AR_3522-58. BLM received and responded to 3,600 comments across 92 issue areas. *See* AR_3654-93. As support for the EA and their responses to comments, BLM relied on hundreds of scientific articles. *See* AR_3559-74.

Against the background of this effort, Plaintiffs' citation to only two issues—without discussion of their import to the EA or the resulting FONSI—rings particularly hollow.[11] Rather than point to any failure "to address certain crucial factors, consideration of which [is] essential to a truly informed decision whether or not to prepare an EIS[,]" *In Def. of Animals*, 751 F.3d at 1072 (internal quotation marks and citation omitted), Plaintiffs' reply asks this Court to "fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies," *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996) (internal quotation marks and citation omitted). *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998).

Further, the EA substantively responds to both issues areas raised by Plaintiffs in their reply. Plaintiffs argue that BLM disregarded whether "regularly removing horses from public lands [] can actually cause high horse population growth rates." *See* Pls.' Reply at 17. This is not so. BLM compared a no-action alternative—where no gather would occur—and the Proposed Action. The results found that, when compared with a no-action alternative, the Proposed Action and Alternative B would result in lower growth rates over a ten-year period,

---

[11] In replying to BLM's opposition, Plaintiffs appear to have conceded that their other arguments are futile, as the reply does not address BLM's response to issues other than the two discussed below.

*see* Appendix VI, AR_3592-605, establishing a rational basis for their conclusion. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 668 (9th Cir. 2009). Further, the study mentioned by Plaintiffs was considered as part of the EA. *See* AR_3561, AR_3571. Even if BLM had not considered this study, Ninth Circuit precedent makes clear that "an agency need not respond to every single scientific study" particularly where the agency has otherwise established a basis for its decision. *See Ecology Ctr.*, 574 F.3d at 668; *see also In Def. of Animals*, 751 F.3d at 1072-73 (finding no requirement that the agency "address in detail the substance conveyed in every single comment made on an EA to prove that the agency 'considered' the relevant factors").

The same applies to Plaintiffs' contention regarding wildfires. As BLM's opposition discussed, *see* Fed Defs' Br. at 37-38, BLM both responded to the comment on wildfires, *see* AR_3671 ("[T]here are many different factors that affect wildfire risk and it is an oversimplification and inaccurate to state that grazing—in and of itself—will reduce wildfire risk, since this is just one component relevant to wildfire risk."), and considered the effect of high populations of wild horses on rangelands, including the spread of invasive plant species, which could increase wildfire risk, *see id.*; AR_3549 (explaining that the no-action alternative could lead to an expansion of noxious and invasive species). However, even if it had not addressed wildfire, for the reasons discussed above, this single comment—raised without citation to scientific information or adequate support for its contention—would not dispose of an otherwise robust EA. Rather than expose a flaw using scientific analysis, Plaintiffs' argument here shows that they disagree with BLM's conclusion. But "disagreement does not render…[the] review and comment process improper." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 473 (9th Cir. 2010).

For these reasons, the Court should grant summary judgment in favor of BLM on Plaintiffs' NEPA claims.

## CONCLUSION

Accordingly, Federal Defendants request that the Court grant their cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Respectfully submitted this 15th day of December, 2023.

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
S. JAY GOVINDAN, Section Chief
BRIDGET K. MCNEIL, Assistant Section Chief

*/s/  Christian Carrara*
CHRISTIAN CARRARA, Trial Attorney
(NJ Bar No. 317732020)
Wildlife & Marine Resources Section

*/s/  Samantha Peltz*
SAMANTHA PELTZ, Trial Attorney
(IL Bar No. 6336536)
Natural Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 598-9736 (Carrara)
Fax: 202-305-0275
Christian.carrara@usdoj.gov

*Of Counsel:*
Janell M. Bogue
U.S. Dep't of the Interior
Office of the Solicitor
Pacific Southwest Region

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Nevada using the Court's CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system, which includes counsel of record for all parties in the case.

> */s/ Christian Carrara*
> CHRISTIAN CARRARA
> Attorney for Defendants