# EXHIBIT 2

No: 3:22-cv-00034-MMD-CLB

1
2
3                              UNITED STATES DISTRICT COURT
4                                    DISTRICT OF NEVADA
5                                          * * *
6   LAURA LEIGH, *et al.*,                         Case No. 3:22-cv-00034-MMD-CLB
7                              Plaintiffs,                        ORDER
8         v.
9   JON RABY, *et al.*,
10                             Defendants.
11
12
13  **I.     SUMMARY**
14         Animal rights plaintiffs[1] have filed suit against the U.S. Bureau of Land
15  Management ("BLM"), U.S. Department of the Interior, and Nevada BLM Director Jon
16  Raby on the grounds that a recent roundup of wild horses in eastern Nevada violated
17  the Wild Free-Roaming Horses and Burros Act ("WHA") and the National Environmental
18  Policy Act of 1969 ("NEPA"). Before the Court are the parties' cross-motions for
19  summary judgment (ECF Nos. 64, 70 ("Motions")) and Plaintiffs' request for judicial
20  notice of several documents (ECF No. 65 ("Request")).[2] As explained in further detail
21  below, the Court finds that BLM must be compelled to prepare a herd management area
22  plan ("HMAP") and must reanalyze the foreseeable effects of the Gather Plan
23  alternatives on wildfire risks in the Pancake Complex and reach a conclusion as to their
24  significance. Accordingly, the Court will grant in part and deny in part both Motions and
25

26         [1]Plaintiffs are Laura Leigh, Wild Horse Education, Animal Wellness Action, CANA
    Foundation, and the Center for a Humane Economy.
27
         [2]The Court has reviewed the parties' responses and replies. (ECF Nos. 68, 69,
28  71, 73, 78, 79.) The Court also considered the parties' arguments on the Motions after
    directing supplemental briefing. (ECF No. 80.)

1    Plaintiffs' Request.

2    **II.    BACKGROUND**

3         The following facts are undisputed and primarily derived from the administrative

4    record ("AR").

5         The Pancake Complex is a 1.2 million-acre area in eastern Nevada comprised of

6    two herd management areas ("HMAs"), one herd area, and one wild horse territory.

7    (ECF Nos. 64 at 10; 70 at 4-5.) The two HMAs in the Pancake Complex are the

8    Pancake HMA and the Sand Springs West Wild Horse HMA. (ECF No. 70 at 4.) BLM

9    created the Pancake HMA in 2008 by combining two pre-existing HMAs, the Monte

10   Christo HMA and the Sand Springs East HMA. (Pancake Complex Wild Horse Gather

11   Final Environmental Assessment ("Final EA") at AR 3501.) The Sand Springs West

12   HMA was established in the late 1980s. (*Id.* at AR 3554.)

13        BLM set the appropriate management level[3] ("AML") for the Pancake Complex at

14   a range of 361 to 638 wild horses. (*Id.* at AR 3502.) This AML is the sum of the AMLs

15   for its component management areas, which were most recently set in the Ely District

16   Record of Decision ("ROD") and Resource Management Plan ("RMP"), the Tonopah

17   RMP, and the Humboldt National Forest Land and Resource Management Plan

18   ("Humboldt RMP"). (*Id.* at AR 3502, 3553-54.)

19        In 2020, BLM conducted flight surveys and estimated that the population of wild

20   horses in the Pancake Complex was at least 2,300 above the low AML. (*Id.* at AR

21   3503.) The agency therefore determined that removing excess horses was necessary to

22

23        [3]BLM defines the AML as "the number of wild horses that can be sustained within
24   a designated HMA which achieves and maintains a thriving natural ecological balance
     in keeping with the multiple-use management concept for the area." (Pancake Complex
     Preliminary Environmental Assessment ("Preliminary EA") at AR 1928.) *See also Dahl
     v. Clark*, 600 F. Supp. 585, 595 (D. Nev. 1984) ("[T]he test as to appropriate wild horse
25   population levels is whether such levels will achieve and maintain a thriving, ecological
26   balance on the public lands."). Wild horse and burro management should seek to
     balance wild horse and burro populations, wildlife, livestock, and vegetation, and to
27   "protect the range from the deterioration associated with overpopulation of wild horses
     and burros." (Preliminary EA at AR 1928 (quoting *Animal Prot. Inst. of Am.*, 109 IBLA
28   112, 115 (1989).)

achieve a thriving natural ecological balance and protect rangeland resources. (*Id.*)

BLM then conducted a preliminary environmental assessment ("EA") of its gather plan. (Preliminary EA at AR 1924-2079.) Thousands of comments on the Preliminary EA were submitted during its 30-day public comment period. (ECF No. 70 at 6; Public Comments on Pancake Complex Wild Horse Gather EA ("Public Comments") at AR 2080-3392.) These public comments notified BLM of concerns about population growth rates, wildfire risks, gelding, livestock grazing levels, and AMLs. (*Id.*) BLM responded to the comments, edited the gather plan, then released the Final EA. (ECF No. 70 at 6.)

The Final EA considered five alternatives: (1) the no-action alternative; (2) the proposed action or Alternative A, which included phased gathers, fertility control, sex ratio adjustments, and releasing geldings; (3) Alternative B, which was the same as Alternative A but without geldings; (4) Alternative C, which would only use gathers; and (5) Alternative D, which would focus only on the Jakes Wash HA. (Final EA at AR 3506-07.) BLM signed its finding of no significant impact ("FONSI") and issued a Decision Record on May 4, 2021, adopting Alternatives A and D. (FONSI for Pancake Complex Wild Horse Gather at AR 3694-96; Decision Record at AR 3491-95.)

During the initial gather in early 2022, approximately 2,030 horses were removed from the Pancake Complex. (ECF No. 64 at 10.)

Plaintiffs brought this suit in January 2022 (ECF No. 1) and filed an amended complaint three months later (ECF No. 31 ("Complaint")). Now that discovery is complete, the parties have both moved for summary judgment. (ECF Nos. 64, 70 ("Motions").) Plaintiffs also seek to supplement the AR. (ECF No. 65.)

### III.   MOTIONS FOR SUMMARY JUDGMENT

The Motions seek summary judgment on Plaintiffs' claims that BLM violated the WHA and NEPA.[4] (ECF Nos. 64, 70.) "Because neither NEPA nor the [WHA] contain[s]

---

[4] Plaintiffs make other arguments in their Motion that the Court does not address in detail here. First, Plaintiffs affirmatively argue they have standing to prosecute this case. (ECF No. 64 at 16-22.) Defendants do not dispute Plaintiffs' standing, and the

1  an internal standard of judicial review, the Administrative Procedure Act [("APA")]

2  governs this court's review of the BLM's actions." *In Def. of Animals, Dreamcatcher Wild*

3  *Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014);

4  *see also* 5 U.S.C. § 702. The APA requires courts to compel "unlawfully withheld or

5  unreasonably delayed" agency action and to set aside agency actions that are

6  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

7  U.S.C. § 706. The Court will first determine whether BLM must be compelled to prepare

8  HMAPs, then assess whether the gather plan or its EA were arbitrary, capricious, or

9  otherwise not in accordance with the law.

10  **A.  Compelling Action Under the WHA and Implementing Regulations**

11  Plaintiffs allege that BLM has unlawfully withheld, or alternatively unreasonably

12  delayed, preparing HMAPs for the Pancake Complex. *See* 5 U.S.C. § 706(1). Under the

13  APA, courts may compel withheld or delayed agency action only if that action is both

14  discrete and legally required. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62-64

15  (2004). Preparing an HMAP is indisputably a discrete action. *See Vietnam Veterans of*

16  *Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1079 (9th Cir. 2016) (noting that an action

17  can still be discrete when the agency retains discretion over the way its duty may be

18  carried out); *cf. Norton*, 542 U.S. at 64 (describing the discreteness requirement as

19  precluding a "broad programmatic attack"). At issue here are the circumstances under

20  which developing an HMAP is also mandatory. The Court's analysis accordingly turns

21  on whether the deadline for preparing an HMAP is firm or discretionary—that is,

22

23  _____

24  Court finds that Plaintiffs have met the Article III threshold requirements. It is undisputed
   that BLM gathered horses from the Pancake Complex, which caused the injury and
25  deaths of wild horses. Plaintiffs, who are wild horse enthusiasts and animal rights
   groups, were harmed or have members whose aesthetic interests and interests in the
26  wellbeing of horses were harmed as a result. Plaintiffs' requested relief could remedy
   those harms moving forward.

27  Defendants also do not dispute Plaintiffs' assertion that they have exhausted
   their administrative remedies. (ECF No. 64 at 22.) Accordingly, the Court's analysis will
28  focus on whether Defendants violated the WHA and NEPA.

whether the HMAP is being unlawfully withheld or unreasonably delayed, respectively. *See Biodiversity Legal Found. v. Badgely*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002).

The Court will employ traditional tools of construction to determine whether the WHA and its implementing regulations are "genuinely ambiguous" as to the deadline for preparing an HMAP. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). If there is genuine ambiguity, then *Auer* deference might apply to BLM's interpretation; however, if "uncertainty does not exist . . . [t]he regulation then just means what it means." *Id.*

### 1.    Unlawfully Withheld HMAP

Plaintiffs argue that the interplay between two BLM regulations sets a firm deadline for preparing HMAPs: BLM must have an approved HMAP *before* performing management activities on an HMA. (ECF No. 64 at 31.) *See also* 43 C.F.R. §§ 4710.3-1, 4710.4. Otherwise, they argue, the mandate to manage wild horses and burros "at the minimum level necessary to attain the objectives identified in approved land use plans and [HMAPs]" would be rendered superfluous. 43 C.F.R. § 4710.4.

Viewed in isolation, the regulation requiring BLM to prepare HMAPs is silent as to the deadline for doing so. *See id.* at § 4710.3-1. Regulatory language, however, "cannot be construed in a vacuum." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also Kisor*, 139 S.Ct. at 2415 (holding that to "exhaust all the traditional tools of construction" courts must "carefully consider the text, structure, history, and purpose of a regulation" (cleaned up)). "It is a fundamental canon of [] construction" that regulations "must be read in their context" and with a view to their place in the overall regulatory scheme. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotation marks and citation omitted); *accord King v. Burwell*, 576 U.S. 473, 492 (2015).[5] Courts must interpret a statute's implementing regulations "as a symmetrical

---

[5]Though these cases discuss statutory interpretation, the Supreme Court indicated in *Kisor v. Wilkie* that the same rules of interpretation apply to regulations. *See* 139 S.Ct. at 2414-15.

and coherent regulatory scheme and fit, if possible, all parts into a[] harmonious whole." *Brown & Williamson*, 529 U.S. at 133 (quotation marks and citation omitted).

The requirement to prepare HMAPs should thus be read in the context of other implementing regulations of the WHA, as well as the WHA's controlling statutory language. The WHA requires that the Secretary of the Interior manage wild horses in a manner that will "achieve and maintain a thriving natural ecological balance" on public land. 16 U.S.C. § 1333(a). If the Secretary determines an area is overpopulated, she must fulfill her duty to maintain ecological balance by "*immediately* remov[ing] excess animals from the range." *Id.* at § 1333(b)(2) (emphasis added). Though Plaintiffs assert that the directive to manage wild horses at "the minimal feasible level" is operative here, *id.* at § 1333(a), "Congress could not have intended that the 'minimal' management requirement would force the BLM to ignore these other statutory mandates," *In Def. of Animals*, 751 F.3d at 1066. Reading the regulations as Plaintiffs request would force BLM to put gathers on hold for months, years, or perhaps even decades until an HMAP is approved, instead of conducting immediate removals. As the WHA implementing regulations must comport with the WHA itself, they have "only one reasonable construction." *Kisor*, 139 S. Ct. at 2415. BLM may conduct management activities on HMAs which do not yet have an approved HMAP.

As Plaintiffs have not identified any firm deadlines for developing an HMAP, the Pancake Complex HMAPs have not been unlawfully withheld.

**2. Unreasonable Delay in Preparing an HMAP**

In the absence of a firm deadline for preparing HMAPs, the Court will assess whether BLM has unreasonably delayed creating an HMAP for the Pancake Complex HMAs. The Court finds that BLM has unreasonably delayed its performance of this mandatory duty and must be compelled to prepare an HMAP.

**a. Notice Pleading Standard**

As a threshold matter, Defendants object that Plaintiffs' unreasonable delay claim was not adequately raised in the Complaint. (ECF Nos. 70 at 19; 73 at 13-14.) The

1  Federal Rules of Civil Procedure require only that a complaint include "a short and plain

2  statement of the claim showing that the pleader is entitled to relief." FED. R. CIVIL PROC.

3  8(a)(2). Though plaintiffs must state a demand for the relief they seek, that demand

4  "may include relief in the alternative." *Id.* at (a)(3). "This simplified notice pleading

5  standard relies on liberal discovery rules and summary judgment motions to define

6  disputed facts and issues," rather than requiring plaintiffs to define all their claims

7  perfectly before further proceedings are conducted. *Swierkiewicz v. Sorema N. A.*, 534

8  U.S. 506, 512 (2002).

9       The Complaint satisfies these notice pleading requirements because Defendants

10  have received fair notice of Plaintiffs' claims and the grounds upon which they rest. *See*

11  *id.* at 514; *Updike v. Multnomah Cnty.*, 870 F.3d 939, 952 (9th Cir. 2017). The second

12  cause of action begins with a focus on BLM's duty to prepare HMAPs before gathering

13  horses. (ECF No. 31 at 22.) It then more broadly states,

14       Defendants have unlawfully withheld *or unreasonably delayed* their mandatory
duty to prepare an HMAP for the Pancake Complex of Herd Management Areas
15  or for the individual herd management areas that make up the Complex . . .
Defendants' failure to adopt a Herd Management Area Plan for the Pancake
16  Complex of Herd Management Areas has injured Plaintiffs in the manner
described in this Complaint.

17  (*Id.* (emphasis added).) Plaintiffs may set out multiple statements of a claim in a single

18  count, and "the pleading is sufficient if any one of them is sufficient." FED. R. CIVIL PROC.

19  8(d). Thus, Plaintiffs' general request that the Court compel BLM to prepare an HMAP is

20  not defeated by their more specific request that the Court compel BLM to prepare an

21  HMAP before engaging in management actions. Nor is this claim defeated by Plaintiffs'

22  failure to expressly request preparation of an HMAP as a form of relief, as Plaintiffs

23  included a blanket request that the Court grant "additional and further relief to which

24  plaintiffs may be entitled." (ECF No. 31 at 26.) The liberal notice pleading standard has

25  been met. The Court will proceed with reviewing the claim on its merits.

26            **b.**    **Legally Required**

27       Section 4710.3-1 of BLM's WHA implementing regulations provides that HMAs

28

"shall be established for the maintenance of wild horse and burro herds" and that BLM "shall prepare a [HMAP], which may cover one or more [HMAs]." 43 C.F.R. § 4710.3-1. These are mandatory duties with which BLM must comply. (ECF No. 70 at 14 (Defendants' admission that Section 4710.3-1 includes a "general mandate that BLM create HMAPs"); BLM Wild Free-Roaming Horses and Burros Management Policy Manual ("Manual") at AR 1433 (noting BLM district or field office managers must prepare "HMAPs for all HMAs in their offices").) *See also Animal Prot. Inst. of Am.*, 109 IBLA at 127 ("43 CFR 4710.3-1 requires preparation of an HMAP."); *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'"). Therefore, regardless of the discretion the agency was originally granted under the WHA, BLM "has chosen to constrain its own discretion via regulations that carry the force of law." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021); *accord Flores v. Bowen*, 790 F.2d 740, 742 (9th Cir. 1986). BLM must comply with Section 4710.3-1 and develop one or more HMAPs for the Pancake Complex HMAs. *See Flores*, 790 F.3d at 742; *Vietnam Veterans of Am.*, 811 F.3d at 1079; *Erie Boulevard Hydropower, LP v. Fed. Energy Regul. Comm'n*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("It is axiomatic that an agency is bound by its own regulations.").

### c.  Substantial Compliance with HMAP Mandate

Defendants concede that they have not prepared HMAPs for the Pancake or Sand Springs West HMAs (ECF Nos. 78 at 11; Final EA at AR 3553-54; ECF No. 80 (oral argument on the Motions)); however, they argue that BLM has substantially complied with its duty to develop an HMAP through its land use plans ("LUPs"), including the Humboldt, Tonopah, and Ely District RMPs.[6] This interpretation of Section 4710.3-1 is unreasonable, as LUPs and HMAPs are not equivalent documents. BLM must adhere to its own regulations and develop an HMAP for the Pancake Complex.

---

[6]RMPs are a type of LUP. (H-4700-1 Wild Horses and Burros Management Handbook ("Handbook") at AR 1356.)

1      Only two regulations discuss HMAPs: Section 4710.3-1 and Section 4710.4. *See*

2  43 C.F.R. §§ 4710.3-1, 4710.4. Neither lays out what comprises an HMAP, leaving that

3  largely up to the agency to decide. *See Kisor*, 139 S. Ct. at 2415. The regulations,

4  however, are clear on what HMAPs are *not*, as they explicitly distinguish HMAPs from

5  LUPs. *See id*. at 2415-16; 43 C.F.R. § 4710.4. BLM recognizes this distinction

6  throughout its guidance documents, and other courts have recognized that the

7  documents are not equivalent as well. (Manual at AR 1431, 1435; BLM Wild Horses and

8  Burros Management Handbook ("Handbook") at AR 1359-60, 1395.) *See, e.g.*, *Friends*

9  *of Animals v. BLM*, 548 F. Supp. 3d 39, 47 (D.D.C. 2021).

10      BLM counters that issuing RMPs which included all the substantive requirements

11  of HMAPs fulfilled its duty under Section 4710.3-1. Even if an RMP engaged in all the

12  herd-focused management planning of an HMAP, the differences between HMAPs and

13  RMPs go beyond their substance. Parties aggrieved by an HMAP have different

14  procedural rights and administrative review processes than parties who wish to protest

15  RMPs.[7] *Compare* 43 C.F.R. §§ 4.21, 4.410 (administrative review procedures for wild

16  horse and burro implementation decisions, including HMAPs), *with* 43 C.F.R. §§

17  1610.5-1, 1610.5-2 (protest procedures for RMPs); *High Desert Multiple-Use Coal., Inc.,*

18  *et al. Keith Collins*, 142 IBLA 285, 289 (1998). To the extent that BLM argues that any

19  wild horse management decisions would be implementation decisions subject to the

20  same administrative review procedures as an HMAP, the agency failed to recognize this

21  in its RMPs. (Ely District RMP at AR 880-81 (recognizing other actions as

22  implementation decisions).) Engaging in the decision-making of an HMAP without

23  actually preparing an HMAP could therefore deprive interested parties of the

24  administrative review processes to which they are entitled.

25      Moreover, BLM engages in environmental review under NEPA at each stage of

---

26

27      [7]The same is true for HMAPs and gather plans. (Handbook at AR 1394-95 (distinguishing the appeals timing and processes for HMAPs and gather decisions).) *Compare* 43 C.F.R. §§ 4.21, 4.410, *with id.* at § 4770.3(c) (gather and removal decision

28  appeals procedures).

its wild horse management planning process, from establishing broad LUPs to narrower HMAPs and specific gather plans. (Handbook at AR 1385-90, 1397-99.) *See also* 43 C.F.R. § 1601.0-6 (requiring NEPA review for RMPs). Skipping the HMAP stage evades that middle level of environmental review. Such additional review might well be redundant if an RMP includes the same information that an HMAP would cover; however, it is not the Court's role to question that policy choice. BLM has committed itself to engaging in a tiered, iterative process for managing wild horses on public lands. The agency must uphold that commitment, even if it appears formalistic.

BLM's reading of Section 4710.3-1 is therefore outside "the bounds of reasonable interpretation." *Kisor*, 138 S. Ct. at 2416 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013)). RMPs cannot fulfill the Section 4710.3-1 HMAP preparation mandate.

### d.   *TRAC* Factors

The issue then is whether BLM's delay in preparing HMAPs has been unreasonable. To answer that question, the Ninth Circuit uses the six-factor balancing test announced by the D.C. Circuit in *Telecommunications Research & Action Center v. FCC* ("*TRAC*"). *See Vaz v. Neal*, 33 F.4th 1131, 1137 (9th Cir. 2022) (quoting *TRAC*, 750 F.2d 70, 80 (D.C. Cir. 1984)).

The first factor considers "whether the time for agency action has been reasonable." *Id.* at 1138 (quoting *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139 (9th Cir. 2020) ("*In re NRDC*")). Though not determinative, it is "the most important factor." *Id.* (quotation marks omitted). "Repeatedly, courts in this and other circuits have concluded that a reasonable time for agency action is typically counted in weeks or months, not years." *Id.* (quoting *In re NRDC*, 956 F.3d at 1139) (quotation marks omitted).

By these standards, BLM has taken more than a reasonable amount of time to prepare HMAPs for the Pancake and Sand Springs West HMAs. The duty to prepare an HMAP arose as soon as BLM created the HMAs—or, if the HMAs predate Section

4710.3-1, that duty arose when BLM promulgated the regulation 38 years ago in 1986. (ECF No. 71 at 13.) *See also* Revision of Existing Regulations on Protection, Management, and Control of Wild Free-Roaming Horses and Burros, 51 Fed. Reg. 7410, 7416 (Mar. 3, 1986) (to be codified at 43 C.F.R. pt. 4710.3-1). BLM's decades-long delays in developing and approving HMAPs have therefore been "nothing short of egregious" and clearly violate the rule of reason. (Final EA at AR 3501, 3553-54 (noting that BLM created the Pancake HMA in 2008 and the Sand Springs West HMA in the late 1980s).) *In re NRDC*, 956 F.3d at 1142; *see also In re Pesticide Action Network N. Am.*, 798 F.3d 809, 814 (9th Cir. 2015) (eight-year delay with no concrete timeline to reach a final ruling was a "roadmap for further delay" that "stretched the 'rule of reason' beyond its limits"); *All. for Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025, 1039 (D. Mont. 2023) (20-year delay in grizzly bear management was "clearly" unreasonable). The first *TRAC* factor strongly favors Plaintiffs.

The second factor is not applicable because Congress has not supplied a timeframe in which HMAPs should be prepared. *See In re NRDC*, 956 F.3d at 1140-41.

The third factor indicates that delay is less likely to be reasonable when the regulation at issue affects human health and welfare than when it is an economic regulation, and the fifth factor looks more broadly at the nature and extent of the interests that have been prejudiced by the agency's delay. *See Vaz*, 33 F.4th at 1137. The Court will analyze these factors together, as they often overlap. *See Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 509 (9th Cir. 1997). The consequences of BLM's failure to prepare an HMAP "fall neither into the economic realm nor specifically into the realm of human health and welfare." *Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 842 (D. Or. 2022), *appeal dismissed sub nom. Or. Nat. Desert Ass'n v. BLM*, No. 23-35101, 2023 WL 5012123 (9th Cir. June 5, 2023). The third factor is thus neutral.

But "the public can still have a significant interest in agency management that promotes such important values as wildlife, scenery, cultural resources, and recreational opportunities." *Id.* (quotation marks omitted). Congress enacted the WHA to

1    protect wild horses and burros—which are "an integral part of the natural system of the

2    public lands" and symbols of American history and culture—and the ecology of the

3    public lands they inhabit. 16 U.S.C. §§ 1331, 1333(a). Defendants contend that,

4    because the RMPs are functionally HMAPs, none of these interests were prejudiced by

5    BLM's delay in developing an HMAP. (ECF No. 80.) The Court will assume, without

6    deciding, that this is true[8] and that the fifth factor weighs in Defendants' favor.

7         The fourth factor looks to "whether compelling the agency to act would detract

8    from its higher or competing priorities." *Vaz*, 33 F.4th at 1138. Preparing the Pancake

9    Complex HMAP may take personnel and funding away from other BLM activities, like

10   gathering excess horses. (ECF No. 78 at 13-14.) The Court is sympathetic to the fact

11   that BLM, like most public agencies, has multiple resource-intensive mandates and

12   limited resources with which to fulfill them. *See Vaz*, 33 F.4th at 1138. But it would be

13   overly generous to say that BLM gets a free pass on the fourth factor because all of its

14   activities to some extent touch on the important values of wildlife, recreation, and the

15   multiple use of public lands. *See In re NRDC*, 956 F.3d at 1141. Preparing an HMAP

16   should have only limited impact on BLM's other priorities. The agency can conduct

17   gathers in the meantime, and the HMAP should require minimal work since BLM claims

18   to have already substantially prepared one. (ECF No. 80.) This factor favors Plaintiffs.

19        Finally, the sixth factor is irrelevant because there is no evidence that BLM has

20   behaved improperly. (ECF Nos. 64 at 32; 78 at 14.) *See also Vaz*, 33 F.4th at 1138 n.6.

21        Only the fifth factor has weighed in Defendants' favor, leaving little question that

22   BLM's delay in preparing HMAPs for the Pancake and Sand Springs West HMAs has

23   been unreasonable. BLM must develop and approve one or more HMAPs for the

24

25        [8]Before the gather, a massive overpopulation of wild horses was harming the
     ecology of the Pancake Complex, its rangeland resources, and the horses themselves.
26   (Final EA at AR 3503-04.) These are the types of issues that HMAPs are meant to
     address, leaving the Court not entirely convinced that no interests have been prejudiced
27   by the decades-long delays in preparing HMAPs. (Handbook at AR 1386, 1401.)
     Regardless, this factor is not dispositive, and the Court still finds that BLM's delay is
28   unreasonable, as explained below.

Pancake Complex HMAs within the next year.[9] *See* 43 C.F.R. § 4710.3-1 (noting that HMAPs may cover one or multiple HMAs). Plaintiffs' Motion is granted, and Defendants' Motion is denied, as to Plaintiffs' second cause of action.

### B.  Timing of Gather Plan Arbitrary and Capricious

Plaintiffs further argue that BLM's decision to adopt the gather plan and proceed with the gather was arbitrary and capricious, an abuse of discretion, and contrary to the law in light of BLM's mandatory duty to prepare an HMAP prior to conducting herd management activities. (ECF Nos. 31 at 23; 64 at 33-35.) *See also* 5 U.S.C. § 706(2)(A). The Court has already found that BLM may gather excess horses without first preparing and approving an HMAP. BLM's interpretation of its duties therefore does not conflict with binding law, nor does it lack a reasonable basis. Plaintiffs' Motion is denied, and Defendants' Motion is granted, as to Plaintiffs' third cause of action.

### C.  Timing of Gather Plan in Excess of BLM's Authority

BLM likewise did not act in excess of statutory jurisdiction, authority, or limitations by gathering horses before preparing an HMAP for the Pancake Complex. (ECF Nos. 31 at 24; 64 at 36.) *See also* 5 U.S.C. § 706(2)(C). Again, the gather was congruent with the WHA and its implementing regulations, and thus conducting a gather for an area which did not yet have an HMAP was within BLM's authority. Plaintiffs' Motion is denied, and Defendants' Motion is granted, as to Plaintiffs' fourth cause of action.

### D.  Compliance with NEPA and its Implementing Regulations

The Court will now turn to whether the Gather Plan EA complies with NEPA. Although NEPA lacks a substantive mandate, its "action-forcing" procedural requirements help carry out a "national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); *accord* 42 U.S.C. § 4331. One such means by which NEPA forces action is its

---

[9]The parties agreed at the March 19, 2024, hearing that one year was a reasonable period in which BLM could complete an HMAP for the Pancake Complex HMAs. (ECF No. 80.)

requirement that agencies take a "hard look" at the environmental consequences of their proposed actions. *See Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002). This 'hard look' includes conducting an environmental assessment ("EA") in certain circumstances to inform whether the agency prepares an environmental impact statement ("EIS") or instead issues a finding of no significant impact ("FONSI"). *See* 40 C.F.R. §§ 1501.5(c)(1), 1501.6(a).

Courts examine an EA "with two purposes in mind: to determine whether it has adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment, and whether its determination that no EIS is required is a reasonable conclusion." *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1215 (9th Cir. 2008)). Here, Plaintiffs challenge both whether BLM took the requisite "hard look" at its Gather Plan and whether BLM's decision not to conduct an EIS was reasonable. They specifically allege that BLM did not adequately consider the environmental impacts of the Gather Plan, appropriate alternative courses of action, its AML calculation formula, or the effects of incomplete information.

### 1.    Hard Look at Environmental Impacts

To satisfy NEPA's 'hard look' requirement, agencies preparing an EA must provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *350 Montana*, 50 F.4th at 1265 (quoting *Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1194). Compiling an "exhaustive examination of each and every tangential event that potentially could impact the local environment," however, would be an "impossible, and never-ending," task. *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1129 (9th Cir. 2012). As a result, EAs are designed "not to amass and disclose all possible details regarding a proposal but to . . . briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." *Id.* at 1128 (cleaned up); *accord* 40 C.F.R. § 1508.1(h) (defining EAs as

"concise" documents). The agency's analysis must include a "satisfactory explanation" for its action so that the Court may assess "whether the process employed by the agency to reach its decision took into consideration all the relevant factors." *Asarco, Inc. v. U.S. Env't Prot. Agency*, 616 F.2d 1153, 1159 (1980).

Plaintiffs argue that the EA did not sufficiently assess the Gather Plan's impacts on the population growth rate of wild horse populations, herd social dynamics, or wildfire risks in the Pancake Complex. The Court will conduct "a searching and careful inquiry into the facts" in reviewing these claims. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

### a.   Impacts to Population Growth Rate

Commenters raised concerns that removals may increase wild horse herd population growth rates by lowering population levels below food-limited carrying capacity and consequently decreasing competition for forage. (Public Comments on EA at AR 2118, 2151-52.) Plaintiffs now allege that BLM did not respond to these comments and thus failed to take a 'hard look' at how a gather may keep population growth rates high, despite the Gather Plan's stated purpose to "reduce the wild horse population growth rates to achieve and maintain established AML ranges."[10] (Final EA at AR 3504.)

Both the Preliminary and Final EAs include significant discussion of the issue, which the Court will summarize here. (Preliminary EA at AR 1962-65; Final EA at AR 3506-37.) Wild horses are a non-self-regulating species, meaning without human intervention their population will steadily increase beyond the range's carrying capacity. (Final EA at AR 3529.) Allowing the range to naturally limit populations would therefore

---

[10]As part of this claim, Plaintiffs allege that BLM did not examine recommendations from a 2013 study published by the National Academy of Sciences ("NAS"). (ECF No. 64 at 40.) The Final EA cites the study several times, including when examining the impacts of a no-action alternative on wild horse population growth. (Final EA at AR 3521, 3529 ("The NAS report (NRC 2013) concluded that the primary way that equid populations self-limit is through increased competition for forage at higher densities.").) BLM also examined the substance of the NAS recommendation at issue. The Court thus finds this argument unpersuasive.

not only be inhumane but would also violate the WHA's mandates to immediately remove excess horses, protect the range from the deterioration associated with overpopulation, and preserve and maintain a thriving natural ecological balance. (*Id.* at AR 3521, 3529.) *See also* 16 U.S.C. §§ 1333(a), 1333(b)(2). Moreover, BLM ran population models which estimated that the no-action alternative would actually lead to higher average annual growth rates over a ten-year period than Alternatives A, B, or C—all of which included a gather.[11] (Final EA at AR 3596-605.) BLM thus gave a hard look to impacts on population growth rates, concluded a gather would not raise growth rates, and properly eliminated the no-action alternative from further consideration. (*Id.* at AR 3520-21.) *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (holding that, to be afforded deference, an agency must support its conclusions with studies that the agency deems reliable).

Plaintiffs' argument also ignores the totality of BLM's purpose in reducing population growth rates, which was to achieve and maintain established AMLs. (Final EA at AR 3504.) As the herd population in the Pancake Complex was about seven times greater than its low AML, BLM concluded that removing a significant portion of the wild horses on the Pancake Complex was necessary to reach AMLs and restore a thriving natural ecological balance. (FONSI at AR 3694; Decision Record at 3493.) BLM recognized that removing horses from the range, without more, would cause "reduced competition for scarce resources within the HMA," and thus removals alone "would not address population control on the range by reducing population growth." (Final EA at AR 3537.) Alternatives which combined gathers with means of curbing the herd's fertility were therefore also assessed. These alternatives were the best at controlling population growth rates and maintaining AMLs, so BLM adopted an approach that used both gathers and fertility controls. (*Id.* at AR 3594-605; Decision Record at AR 3492.)

The EA adequately considered how gathers might keep herd population growth

---

[11]This conclusion refences the estimated median ten-year growth rates.

1  rates high and even implemented additional corrective measures to ensure that the

2  Plan's population control purposes were met. (*Id.* at AR 3504.) BLM gave the Gather

3  Plan's impact on population growth a sufficiently hard look and adopted an alternative in

4  line with the evidence before the agency. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*

5  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs' Motion is denied, and

6  Defendants' Motion is granted, as to whether BLM adequately considered the impacts

7  to population growth rates.

8                    **b.      Impacts to Horses and Herds from Returning Geldings**

9          In support of their challenge to BLM's analysis of how re-introducing hundreds of

10  geldings into the Pancake Complex might impact horses or herds, Plaintiffs reference

11  the lack of complete information on these effects, as well as expert opinions that

12  contradict the studies upon which BLM relied. (ECF No. 64 at 44-45.)

13         Incomplete information about the effects of gelding does not itself render the EA

14  arbitrary and capricious, so long as BLM considered and addressed the relevant

15  unknown factors, explained why additional information was not available, and did not

16  otherwise engage in a clear error of judgment. *See Am. Wild Horse Campaign v.*

17  *Bernhardt*, 963 F.3d 1001, 1012 (9th Cir. 2020); *Marsh v. Or. Nat. Res. Council*, 490

18  U.S. 360, 378 (1989). BLM did just that in the Gather Plan EA. (Final EA at AR 3531,

19  3626-31.) The agency looked at existing studies on geldings and their interactions with

20  other horses, recognizing that it was unclear exactly how a wild horse's behavior would

21  change post-gelding or how releasing geldings would affect the behavior of other wild

22  horses. (*Id.* at AR 3627-29.) Based on this literature, BLM concluded that the proposed

23  level of gelding in the Pancake Complex would not significantly change herd social

24  structures or demographics. (*Id.* at AR 3630.) Such analysis is sufficient, even with gaps

25  in scientific knowledge. *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1016-17

26  (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020); *Bernhardt*, 963 F.3d at 1012-13.

27         BLM also adequately responded to comments which raised concerns about the

28  studies BLM cited. (Final EA at AR 3663-65, 3670-73, 3675-76.) One commenter

referenced two experts who stated that gelding a wild stallion would materially change his behavior. (*Id.* at AR 3675-76.) BLM directly addressed these expert opinions, "ultimately determining them to be 'speculative' because neither of them had actually conducted a study on the issue." *Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 3d 971, 985 (D. Nev. 2018), *aff'd sub nom. Bernhardt*, 963 F.3d 1001. The agency likewise noted that other concerns were unfounded. (Final EA at AR 3664-65, 3671-72.) Determinations like these are the types of "scientific judgments and technical analyses within the agency's expertise" that require the Court to be "at its most deferential." *N. Plains Res. Council*, 668 F.3d at 1075; *accord Marsh*, 490 U.S. at 378; *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 782-3 (9th Cir. 2019).

BLM has fairly considered the available evidence and the issues before it with regard to gelding. *See Zinke*, 353 F. Supp. 3d at 985-86. Plaintiffs' Motion is denied, and Defendants' Motion is granted, as to whether BLM adequately considered the effects of gelding stallions.

### c.    Increased Wildfire Risks

Plaintiffs next maintain that BLM did not sufficiently respond to concerns about increased wildfire risk post-gather. (ECF No. 64 at 40-41.)

To start, the record indicates that the impacts from altered wildfire risk are not "tangential event[s]" which the agency can ignore. *Tri-Valley CAREs*, 671 F.3d at 1129; *accord Salmon River Concerned Citizens v. Robertson*, 798 F. Supp. 1434, 1442 (E.D. Cal. 1992), *aff'd*, 32 F.3d 1346 (9th Cir. 1994) (holding environmental reviews need not discuss all speculative impacts). Throughout the EA, BLM references how wildfires, and the lack thereof, have affected riparian areas, wetlands, surface water quality, soils, watersheds, and rangeland habitat health in the Pancake Complex. (Final EA at AR 3540, 3552, 3607, 3610-11.) Impacts to wildfire risk were also reasonably foreseeable and had a reasonably close causal connection to the gather, as BLM noted in the EA. (*Id.* at 3614 (discussing how considered alternatives would affect the spread of invasive plants, which could change the fire regime).) *See also* 40 C.F.R. §§ 1508.1(g), (aa).

BLM could have still properly determined that the Gather Plan's effects on wildfire risks were minimal, but the record does not allow the Court to find that the agency took a hard look at wildfire risks. If the effects of the proposed action on wildfire risks were insignificant, the EA needed to say that and explain why it reached that conclusion. *See* 40 C.F.R. § 1502.2 (noting that a FONSI should include enough discussion of insignificant issues to show why further study is not needed); *350 Montana*, 50 F.4th at 1266 (holding that an agency's failure to cite scientific evidence or identify science-based criteria used to support its decision was fatal to its determination a project's impacts would be minor); *Tri-Valley CAREs*, 671 F.3d at 1124 ("[A]n agency must support its conclusions with studies that the agency deems reliable."). Here, BLM responded to concerns about how reductions in wild horse grazing might alter fire risks by stating that grazing was just one of many factors that influence wildfire risk and thus "it is an oversimplification and inaccurate to state that grazing—*in and of itself*—will reduce wildfire risk." (*Id.* at AR 3671 (emphasis added).) The Court will defer to these expert opinions. *See N. Plains Res. Council*, 668 F.3d at 1075. But grazing was not the only wildfire risk factor that the gather would affect. BLM itself recognized in the Final EA that, under every considered alternative, wild horses would spread an invasive weed called cheatgrass, which could alter the fire regime by increasing wildfire risks.[12] (*Id.* at AR 3526-27, 3614, 3671.) No effort was made to evaluate how greatly the spread of invasive plants would alter risks or how the combined effects of changes in wild horse grazing and the spread of cheatgrass would shift risk levels. The reader is instead left to guess how these factors will interact. *See 350 Montana*, 50 F.4th at 1266.

Consideration of how all affected wildfire risk factors might alter the Pancake Complex fire regime was essential to ensuring that BLM made an informed decision on whether it should prepare an EIS. *See Found. for N. Am. Wild Sheep v. U.S. Dep't of*

---

[12]The no-action alternative would lead to the greatest spread in invasive plants and therefore, impliedly, the greatest increase in fire risk, though BLM did not explicitly reach this conclusion. (*Id.* at AR 3614.)

*Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982). BLM therefore did not provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *350 Montana*, 50 F.4th at 1265 (quoting *Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1194). As such, Defendants acted in an arbitrary and capricious manner and failed to take the required 'hard look' at the foreseeable direct and indirect effects on fire risk from the proposed gather alternatives. Therefore, vacatur of the EA, ROD, and FONSI is necessary. BLM must reanalyze the foreseeable effects of the Gather Plan alternatives on wildfire risks in the Pancake Complex and reach a conclusion as to their significance. Plaintiffs' Motion is granted, and Defendants' Motion is denied, as to BLM's consideration of effects on wildfire risk.

Once the agency has addressed the identified problems, BLM may decide to make different choices. *See Oregon Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1124 (9th Cir. 2010). "NEPA is not a paper exercise, and new analyses may point in new directions." *Id.* But the Court is not necessarily directing BLM to reach a different outcome. *See Norton*, 542 U.S. at 65. The issue identified today is only with the processes by which BLM reached its final result, not the final result itself.

### 2.    Consideration of Range of Alternatives

In addition to thoroughly assessing the Gather Plan's environmental impacts, BLM must have also considered a reasonable range of alternatives. Agencies developing an EA for a proposal involving unresolved conflicts over how to use available resources must consider "appropriate" alternatives to the proposed action, including a 'no action' alternative. 42 U.S.C. §§ 4332(2)(C)(iii), (H); *see also* 40 C.F.R. § 1501.5(c)(2).[13] Of course, not every possible alternative is appropriate or reasonable.

---

[13]Congress has amended NEPA since BLM prepared the EA in 2021. *See* Fiscal Responsibility Act of 2023, Pub. L. 118-5, 137 Stat. 38. These amendments did not meaningfully change the aforementioned substantive requirements of NEPA Section 102 but merely renumbered them. *See id.* at § 321 (redesignating Section 102 subparagraphs (D) through (I) as (G) through (L)). The Court cites Section 102 as it is currently codified and notes that, because updates to the NEPA regulations following

1  Agencies need not consider alternatives that do not advance the purpose of a project or

2  are otherwise infeasible or impractical. *See Native Ecosystems Council v. U.S. Forest*

3  *Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005); *Env't Def. Ctr. v. Bureau of Ocean Energy*

4  *Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022); 40 C.F.R. § 1508.1(z).[14] Nor must agencies

5  engage in duplicative work by considering alternatives that are "substantially similar" to

6  other alternatives. *Native Ecosystems Council*, 428 F.3d at 1249. However, the

7  "existence of a viable but unexamined alternative renders the environmental review

8  conducted under NEPA inadequate." *Env't Def. Ctr.*, 36 F.4th at 877 (quotation marks

9  omitted).

10  This examination need not be extensive. Agencies' "obligation to consider

11  alternatives under an EA is a lesser one than under an EIS," and they may reject an

12  alternative without detailed discussion if they considered the alternative and provided

13  "an appropriate explanation as to why [it] was eliminated." *Native Ecosystems*, 428 F.3d

14  at 1246. The Court will now determine whether BLM insufficiently considered three

15  alternatives that would have increased the number of wild horses remaining on the

16  Pancake Complex.

17  ### a.    Reductions in Livestock Grazing

18  According to Plaintiffs, BLM improperly eliminated from further consideration a

19  suggestion to reduce livestock grazing so that Pancake Complex could support more

20  wild horses. (ECF No. 64 at 41-42.) But BLM provided an "appropriate explanation as to

21  why it rejected the livestock reduction alternative: it simply could not reduce livestock

22  grazing allotments through the gather process." *Cloud Found. v. BLM*, 802 F. Supp. 2d

23

24  the 2023 NEPA amendments have not yet been finalized, 40 C.F.R. § 1501.5(c)(2)'s
reference to Section 102(2)(E) now refers to Section 102(2)(H).

25  [14]Though this provision of the NEPA implementing regulations has recently been
26  amended, it still defined "reasonable alternatives" as a "range of alternatives that . . .
meet the purpose and need for the proposed action" when the EAs were prepared. *See*
27  Update to the Regulations Implementing the Procedural Provisions of the National
Environmental Policy Act, 85 Fed. Reg.  43304-01, 43376 (July 16, 2020) (to be codified
28  at 40 C.F.R. pt. 1508(z)).

1192, 1206 (D. Nev. 2011); *accord Silvey*, 353 F. Supp. 3d at 1016. As the agency noted in its response to this suggestion, livestock allotments may only be changed through the official amendment of an RMP, which requires public involvement, preparation of an EA or EIS, interagency coordination, and other analysis. (Final EA at AR 3520.) *See Cloud Found.*, 802 F. Supp. 2d at 1206-07 (citing 43 C.F.R. § 1610.5-5). Lowering livestock grazing allotments was therefore outside the scope of the Final EA. (Final EA at AR 3519.)

Moreover, reducing livestock grazing to increase wild horse AMLs was not a reasonable alternative because it would have undermined the Gather Plan's stated purpose to "prevent undue or unnecessary degradation of . . . and to restore a thriving natural ecological balance and multiple-use relationship on public lands." (*Id.* at AR 3504.) *See also Native Ecosystems Council*, 428 F.3d at 1247. Due to the unique negative impacts wild horses had upon native vegetation and riparian buffers in the Pancake Complex, BLM concluded that "simply re-allocating livestock Animal Unit Months (AUMs) to increase the wild horse AMLs would not achieve a thriving natural ecological balance." (Final EA at AR 3520.) "It is not our role to question that informed scientific judgment." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 991 (9th Cir. 2022). BLM had no obligation to consider this alternative that conflicted with the purpose of the Final EA. *See Native Ecosystems Council*, 428 F.3d at 1247-48.

The livestock reduction alternative was properly considered and eliminated.

### b.    Rewilding

Plaintiffs also claim that BLM ignored a commenter's suggestions to consider "rewilding," which they define as returning the land to its natural state by reducing livestock grazing and "other conflicting monopolizers" like mining or off-highway vehicle use. (ECF No. 64 at 42; Public Comments at AR 3028.) However, BLM need not undertake a separate analysis of why it eliminated this alternative because it would have "substantially similar consequences" to reducing livestock grazing. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004); *accord Native*

*Ecosystems Council*, 428 F.3d at 1249. Reallocating other uses of the Pancake Complex to support more wild horses would still undermine the thriving ecological balance of the area, as the additional horses are an ecological concern regardless of what land use they replace. (Final EA at AR 3520.) There was no need for BLM to engage in a redundant analysis of why it would not further consider decreasing other uses of the Pancake Complex to increase the horse population. *See Native Ecosystems Council*, 428 F.3d at 1248-49. The rewilding alternative was properly ignored.

### c.    Raising AMLs

Plaintiffs finally assert that BLM did not adequately support its decision not to raise the AML range for the Pancake Complex. (ECF No. 64 at 42-43.) Their primary concerns are that BLM did not rely upon sufficient monitoring data and acted before an evaluation of the Sand Springs West HMA rangelands could be completed. (*Id.*)

To start, BLM had no statutory or self-imposed requirements to assess the AML. The WHA does not require BLM to determine new AMLs based on current conditions each time the agency decides to restore an already-established AML. *See In Def. of Animals*, 751 F.3d at 1064 n.13. Nor must BLM show that an AML range remains valid before relying upon it. *See Friends of Animals v. BLM*, 2018 WL 1612836, at *18 (D. Or. Apr. 2, 2018). Existing management plans likewise do not commit BLM to recalculating the AML in any particular timeframe. (Monte Cristo HMAP at AR 18-20; Humboldt National Forest RMP at AR 54-55; Tonopah RMP and ROD at AR 532-724; Ely RMP and ROD at AR 871-1349.) *See also Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1125 (D. Mont. 2016).

BLM also properly considered and rejected suggestions to increase the AML for the Pancake Complex. (Final EA at AR 3519.) The agency found that monitoring and other historical data did not indicate that AMLs should be increased but instead "confirm[ed] the need to remove excess wild horses." (Final EA at AR 3519; Handbook at AR 1367 (recommending BLM evaluate AMLs when "resource monitoring and population inventory data indicates the AML may no longer be appropriate").) Plaintiffs

1   have presented no evidence to the contrary, beyond unsupported assertions that the

2   AMLs seem too low. (Public Comments at AR 2089-91 (stating that the square miles of

3   habitat per horse are low)[15]; *id.* at AR 2126 (noting that horses receive limited AUMs

4   compared to livestock).) As Plaintiffs have "failed to provide any support to show how a

5   reevaluation and adjustment in AMLs would reduce . . . or in any way promote the

6   health of existing wild horse populations," BLM reasonably eliminated this alternative

7   from analysis as contrary to the principles of the WHA. *Silvey*, 353 F. Supp. 3d at 1015.

8       The unfinished rangeland health evaluation does not alter that conclusion. In

9   determining whether a gather is necessary, BLM "must act immediately, even if more

10   relevant information could become available at a later date." *Am. Wild Horse Campaign*

11   *v. Bernhardt*, 442 F. Supp. 3d 127, 155 (D.D.C. 2020), *aff'd sub nom. W. Watersheds*

12   *Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021); *accord* 16 U.S.C. § 1333(b)(2).

13   Therefore, BLM did not need to wait to conduct a gather until it had completed the

14   rangeland evaluation.

15       BLM has fulfilled its duty to prepare appropriate alternatives for the EA and gave

16   those alternatives due consideration, even though they were outside the purpose and

17   need of the Gather Plan.

18       **3.    Arbitrary and Capricious Means of Calculating Total AMLs**

19       Plaintiffs also suggest that it was arbitrary and capricious for BLM to calculate the

20   AML for the entire Pancake Complex by adding up the AMLs of its component

21   management areas, instead of calculating a cumulative AML. (ECF No. 64 at 42-43.)

---

22       [15]This commenter also noted that studies have shown many AMLs are well below
ecological carrying capacity. (Public Comments at AR 2091.) But, as BLM explained,
23   the ecological carrying capacity is not equivalent to a thriving natural ecological balance.
(Final EA at 3520-21 (finding that controlling wild horse populations by natural means
24   would result in the "catastrophic mortality of wild horses," "reduce herbaceous
vegetative cover, damage springs[,] and increase erosion, and could result in
25   irreversible damage to the range"); Handbook at AR 1395 ("AML decisions determine
the maximum number of WH&B to be managed in the HMA that results in a TNEB and
26   avoids a deterioration of the range.").) *See also Cent. Or. Wild Horse Coal. v. Vilsak*,
No. 2:21-CV-01443-HL, 2023 WL 4456855, at *7 (D. Or. May 12, 2023), *report and*
27   *recommendation adopted sub nom. Cent. Or. Wild Horse Coal. v. Vilsack*, No. 2:21-CV-
1443-HL, 2023 WL 7545514 (D. Or. Nov. 14, 2023).

28

1  While several commenters requested that BLM raise AMLs, no commenters questioned

2  the methodology of using an aggregate AML. (Public Comments at AR 2081, 2089-91,

3  2109, 2126.) Thus, BLM was not notified of this concern during the public comment

4  process with sufficient particularity for the agency to give the issue "meaningful

5  consideration." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 489 (9th Cir. 2023)

6  (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004)).

7  No exceptional circumstances exist here that might excuse the belated raising of

8  this issue. *See Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1033 (9th Cir.

9  2018). Plaintiffs had the full information needed to make these concerns known during

10  the public comment period. (Preliminary EA at AR 1927-29.) *Cf. id.* at 1034 (holding that

11  an exceptional circumstance existed where an agency's failure to disclose information

12  prevented the plaintiff from raising a concern during the comment period). There is also

13  no evidence that BLM had independent knowledge of this issue. *Cf. 'Ilio'ulaokalani Coal.*

14  *v. Rumsfeld*, 464 F.3d 1083, 1092-93 (9th Cir. 2006).

15  As BLM did not receive a prior opportunity to consider whether aggregating

16  AMLs was appropriate and no exceptional circumstances are present, this claim has

17  been waived. *See Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1063-65 (9th

18  Cir. 2023).

19  **4.    Decision Not to Prepare an EIS**

20  Plaintiffs finally argue that the unknown effects of gelding and the unsupported

21  Pancake Complex AML require an EIS. (ECF No. 64 at 43, 45.) The Court disagrees.

22  **a.    Uncertainty Regarding Gelding**

23  NEPA requires federal agencies to prepare an EIS for "major Federal actions

24  significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). This

25  mandate extends to situations where an EA left "substantial questions" as to whether

26  the proposed action will have a significant effect. *See Bernhardt*, 963 F.3d at 1007.

27  Although NEPA does not require an EIS "anytime there is some uncertainty," substantial

28  questions exist if the effects of the project are "highly uncertain." *Ctr. for Cmty. Action &*

*Env't Just. v. Fed. Aviation Admin.*, 61 F.4th 633, 649 (9th Cir. 2023) (quoting *Bernhart*, 963 F.3d at 1008).

BLM's proposal to geld and release male horses to the range does not meet the 'highly uncertain effects' threshold. Gelding horses is an established practice with well understood consequences. (Final EA at AR 3531.) *See also Bernhardt*, 963 F.3d at 1008. The Final EA thoroughly reviewed the known impacts of gelding on domestic horses and other species, then used these studies to find that gelding would have minimal effects on the wild horses in the Pancake Complex. (Final EA at AR 3626-31.) This was a "reasonable prediction[] on the basis of prior data" which left "only that quotient of uncertainty which is always present when making predictions about the natural world." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009); *accord Bernhart*, 963 F.3d at 1008-09.

The inclusion of gelding did not raise substantial questions regarding whether the Gather Plan would significantly affect the environment.

### b.    Unsupported AMLs

The Court has already discussed each component of this claim but will briefly reiterate those findings here. The EA properly identified the basis for BLM's decision not to recalculate AMLs for the Pancake Complex. (Final EA at AR 3503, 3519.) Monitoring data did not show any need to do so. (*Id.*; Ely RMP at AR 1106.) Nor was the calculated total AML for the Complex arbitrary. BLM simply added up the controlling, previously evaluated AMLs of its component parts to obtain the total numbers—a methodology which Plaintiffs failed to challenge before filing their Motion. *See Earth Island Inst.*, 87 F.4th at 1063-65 (finding claim waived under similar circumstances). Incomplete rangeland studies also did not render the AMLs invalid, as the WHA mandates that BLM "immediately" remove excess horses even if all relevant information on a gather is not yet available. 16 U.S.C. § 1333(b)(2). Plaintiffs fail to identify a basis upon which the Final EA or FONSI were inadequate with regard to the Pancake Complex AML.

Apart from its inadequate assessment of impacts on wildfire risks, BLM took the

appropriate hard look at the environmental impacts of and considered reasonable alternatives to its plan to achieve established AMLs in the Pancake Complex. The Court denies Plaintiffs' Motion and grants Defendants' Motion as to all NEPA claims except the claim regarding wildfire risk assessment.

## IV.   REQUEST FOR JUDICIAL NOTICE

Plaintiffs have requested that the Court take judicial notice of six additional documents to supplement the AR: (1) the Fifteenmile HMAP from Wyoming; (2) notes for 43 C.F.R. Part 4700; (3) a 1986 Federal Register notice for the final rulemaking of 43 C.F.R. Part 4700; (4) a 1991 Federal Register notice of an interim final rulemaking for 43 C.F.R. Part 4700; (5) 43 C.F.R. Part 4700; and (6) a 1984 Federal Register notice of proposed rulemaking for 43 C.F.R. Part 4700. (ECF No. 65.) Defendants oppose only judicial notice of the Fifteenmile HMAP. (ECF No. 68 at 2 & n.1.)

### A.  Fifteenmile HMAP

"Judicial review of agency actions should generally be confined to the original record upon which the actions were based." *Rybachek v. U.S. Env't Prot. Agency*, 904 F.2d 1276, 1296 n.25 (9th Cir. 1990). "The reviewing court may consider information supplemental to the record only exceptionally: for instance, if the information is necessary as background to explain the basis of the agency's action and the factors the agency considered." *Id.* (quotation marks omitted).

Plaintiffs argue that the Fifteenmile HMAP provides necessary background information on the differences between HMAPs and other planning documents. (ECF No. 65 at 3-4.) The Court disagrees. BLM did not rely on any information in the Fifteenmile HMAP, the HMAP does not address any issues not already present in the record, and it would not provide any explanation as to the basis of BLM's failure to prepare an HMAP for the Pancake Complex. *See Rybachek*, 904 F.2d at 1296 n.25. Whether RMPs can act as substitute HMAPs for the purposes of Section 4710.3-1 is a legal question upon which other HMAPs have no bearing. There is accordingly no need for the Court to reference the Fifteenmile HMAP, and Plaintiffs' Request is denied as to

this document.

### B.  Other Documents

Defendants submitted a notice of their non-opposition to judicial notice of the documents from the Code of Federal Regulations or Federal Register. (ECF No. 68 at 2 n.1.) Defendants have therefore consented to the Court granting Plaintiffs' Request as to these filings. *See R.S. Coppola Tr. - Oct. 19, 1995 v. Nat'l Default Servs.*, No. 3:21-CV-00281-MMD-CSD, 2022 WL 2753512, at *1 (D. Nev. July 13, 2022), *aff'd sub nom. Coppola v. Nat'l Default Servs.*, No. 22-16212, 2023 WL 6566493 (9th Cir. Oct. 10, 2023). Alternatively, the Court grants the Request as to these documents because they are properly subject to judicial review as part of "the original record upon which the actions were based." *Rybachek*, 904 F.2d at 1296 n.25.

## V.    CONCLUSION

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion because they do not affect the outcome of the Motions.

It is therefore ordered that Plaintiffs' motion for summary judgment (ECF No. 64) and Defendants' motion for summary judgment (ECF No. 70) are granted in part and denied in part as discussed herein.

The Court grants Plaintiff's Motion and denies Defendants' Motion as to the claim under the Wild Free-Roaming Horses and Burros Act that BLM unreasonably delayed preparing an HMAP but otherwise denied. Under 5 U.S.C. § 706(1), the Court remands to compel Defendants to prepare and approve HMAP(s) covering the Pancake Complex HMAs within one year of the date of this order.

The Court grants Plaintiff's Motion and denies Defendants' Motion as to the National Environmental Policy Act claim involving BLM's consideration of wildfire risks in the Final EA. The Court vacates and remands the Environmental Assessment, Record of Decision, and Finding of No Significant Impact for the agency to reanalyze the

foreseeable effects of the Gather Plan alternatives on wildfire risks in the Pancake Complex and reach a conclusion as to their significance. The Court otherwise denies Plaintiff's Motion and grants Defendants' Motions as to the remaining claims.

It is further ordered that Plaintiffs' request for judicial notice (ECF No. 65) is denied as to the Fifteenmile HMAP (ECF No. 65-2) but granted as to the other exhibits (ECF Nos. 65-3–65-7).

It is further ordered that the Clerk of Court enter judgment in accordance with this order and close this case.

DATED THIS 28th Day of March 2024.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE